**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| **TRANSLUCENT COMMUNICATIONS** | ) | |
| | ) | |
| **Translucent,** | ) | |
| | ) | |
| **v.** | ) | **Civil No. 8:08-CV-03235-WGC** |
| | ) | |
| **AMERICAS PREMIERE CORP, ET AL.** | ) | |
| | ) | |
| **Defendants** | ) | |

## TRANSLUCENT'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Translucent Communications, LLC ("Translucent"), by and through undersigned counsel, and pursuant to Rule 56 of the Federal Rules of Civil Procedure, respectfully moves this Court for an Order granting summary judgment in favor of Translucent regarding liability and damages on all counts. Translucent is also entitled to an adverse inference due to Defendants' failure to produce a document critically important to this litigation.  The grounds for this motion, fully set forth in the attached Memorandum of Points and Authorities, are that there are no genuine disputes as to any material facts.  Therefore, Translucent is entitled to judgment as a matter of law.

Dated: October 9, 2009

Respectfully submitted,

HOLLAND & KNIGHT LLP

\_\_\_\_/s/_____
Thomas W. Brooke (17503)
Drew E. Shenkman (28886)
2099 Pennsylvania Ave., N.W. Suite 100
Washington, D.C. 20006
thomas.brooke@hklaw.com
drew.shenkman@hklaw.com
Telephone: (202) 955-3000
Facsimile:  (202) 955-5564
*Counsel for Plaintiff Translucent Communications*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
SOUTHERN DIVISION**

| | | |
|---|---|---|
| **TRANSLUCENT COMMUNICATIONS** | ) | |
| | ) | |
| **Translucent,** | ) | |
| | ) | |
| **v.** | ) | **Civil No. 8:08-CV-03235-WGC** |
| | ) | |
| **AMERICAS PREMIERE CORP, ET AL.** | ) | |
| | ) | |
| **Defendants** | ) | |

**MEMORANDUM OF LAW IN SUPPORT OF
TRANSLUCENT'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff Translucent Communications, LLC, ("Translucent"), pursuant to Rules 37 and 56 of the Federal Rules of Civil Procedure, hereby moves for summary judgment against Defendants America's Premiere Corp., National Angus Corp. (collectively doing business as "APC Wireless") and its President and CEO Paul Greene, both personally and professionally (collectively "Defendants"), on all counts because the record shows that there are no material issues of fact. Therefore, Translucent is entitled to judgment as a latter of law. Translucent is also entitled to an adverse inference due to Defendants' failure to produce a document critically important to this litigation. The grounds for this Motion are as follows:

**TABLE OF CONTENTS**

STATEMENT OF UNDISPUTED FACTS .......... 3

ARGUMENT .......... 13

I. Translucent is Entitled to a Spoliation Inference Due to Defendants' Failure to Preserve Relevant Documents and Reasonable Attorneys' Fees. .......... 13

II. Defendants Fraudulently Induced Translucent Into Inaction Causing Translucent to be Held Liable for a Debt of $1,267,964.26. .......... 17

III. Translucent Reasonably Relied on Defendant's Clear and Definite Promise to Cover All Losses Suffered by Translucent Due to Translucent Being Held Liable for a Debt of $1,267,964.26. .......... 23

IV.  Defendants Must Indemnify Translucent for All Past and Future Losses as a Direct          25
    Result of Defendants' Actions Relating to the Debt of $1,267,964.26.
V. Defendants Converted Translucent's Internet-Domain for its Own Use and Deprived            29
    Translucent of it.
VI. Defendants Improperly Used Translucent's Mark in Violation of 15 U.S.C. § 1125.           31

        A. It is Undisputed that the TRANSLUCENT COMMUNICATIONS Mark              33
            Belongs to Translucent.
        B. Defendants Used Translucent's Mark In Connection with the Marketing and Sale    34
            of Goods and Services in Commerce.
        C. Defendants Use Translucent's Mark in a Manner Likely to Confuse Consumers      35
            in Violation of 15 U.S.C. 1125(a)(1).
        D. Defendant's Use of Translucent's Mark on Translucentcommunications.com         37
            Violates the Anti-Cybersquatting Consumer Protection Act.
        E. Translucent is Entitled to Defendants' Profits and Maximum Statutory Damages   40
            Because of the Willful Nature of Defendants' Conduct.
        F. Translucent is Entitled to Reasonable Attorney Fees and Costs Because of the   41
            Willful Nature of Defendants' Conduct
VII. Defendants' Use of Translucent's Mark Violates Maryland Unfair Competition Law.          42

CONCLUSION                                                                                    44

## TABLE OF AUTHORITIES

**CASES**

                                                                                      **Page(s)**
*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986)..........................................................................................18
*Asher v. United Airlines*,
    70 F. Supp. 2d 614 (D. Md. 1999) ....................................................................17
*Chan v. Triple 8 Palace, Inc.*,
    2005 WL 1925579 (S.D.N.Y. 2005)..................................................................21
*Citigroup, Inc. v. Shui*,
    611 F.Supp.2d 507 (E.D. Va. 2009) .................................................................46
*Darcars Motors of Silver Springs, Inc. v. Borzym*,
    841 A.2d 828 (Md. 2004) ...........................................................................34, 35
*Electronics Store, Inc. v. Cellco Partnership*,
    732 A.2d 980 (Md. Ct. Spec. App. 1999).....................................................46, 47
*Goldstein v. Miles*,
    859 A.2d 313 (Md. Ct. Spec. App. 2004)....................................................22, 26
*Goodman v. Praxair Servs.*,
    632 F.Supp.2d 494 (D. Md. July 7, 2009) ........................................................20
*Harrods Ltd. v. Sixty Internet Domain Names*,
    302 F.3d 214 (4th Cir. 2002) ...................................................................43, 44
*Hoffman v. Stamper*,
    867 A.2d 276 (Md. 2005) ......................................................................22, 23, 26

*Inmi-Etti v. Aluisi,*
    492 A.2d 917 (Ct. Spec. App. 1985)........................................................34
*Jennings v. United States,*
    374 F.2d 983 (4th Cir.1967) .................................................................31
*Keys v. Chrysler Credit Corp.,*
    494 A.2d 200 (Md. 1985) .....................................................................34
*Lamparello v. Falwell,*
    420 F3d 309 (4th Cir. 2005) ................................................................40
*Malek v. Leavitt,*
    437 F. Supp. 2d 517 (D. Md. 2006)......................................................18
*McKenzie v. Comcast Cable Commc'ns., Inc.,*
    393 F.Supp.2d 362 (D.Md. 2005)..........................................................28
*Nails v. S & R, Inc.*
    639 A.2d 660 (Md.1994) ......................................................................26
*New York State Society of Certified Public Accountants v. Eric Louis Associates, Inc.,*
    79 F.Supp.2d 331 (S.D.N.Y.1999) ..................................................40, 42
*NuPulse, Inc. v. Schlueter Co.,*
    853 F.2d 545 (7th Cir.1988) ................................................................46
*OBH, Inc. v. Spotlight Magazine, Inc.,*
    86 F.Supp.2d 176 (W.D.N.Y. 2000) .....................................................36
*Pavel Enters., Inc. v. A.S. Johnson Co.,*
    674 A.2d 521 (Md. 1996) .....................................................................28
*People for the Ethical Treatment of Animals v. Doughney*
    ("*PETA*"), 263 F.3d 359 (4th Cir. 2001).................36, 37, 39, 40, 42, 45
*Planned Parenthood Federation of America, Inc. v. Bucci,*
    1997 WL 133313 (S.D.N.Y. 1997)........................................................36
*Pyramid Condominium Ass'n v. Morgan,*
    606 F.Supp. 592 (D.Md. 1985) ............................................................30
*Sea Watch Stores v. Council of Unit Owners of Sea Watch Condominium,*
    691 A.2d 750 (Md. Ct. Spec. App. 1997)..............................................38
*Swinson v. Lords Landing Village Condominium,*
    758 A. 2d 1008 (Md. 2000) .............................................................22, 23
*Tesch v. United States,*
    546 F.Supp. 526 (E.D.Pa.1982) ...........................................................31
*Virtual Works, Inc. v. Volkswagen of America, Inc.,*
    238 F.3d 264 (4th Cir. 2001*)* ..............................................................41

## STATUTES

15 U.S.C. §1117 *et seq*...............................................36-37, 41-42, 44-46
15 U.S.C. §1125 *et seq*.................................7, 36-37, 39, 41-42, 44-45

## OTHER AUTHORITIES

Restatement (Second) of Contracts §90(1) (1979) .....................................28
Prosser & Keeton on Torts § 51, at 341-42 (5th ed. 1984)....................31, 33

## INTRODUCTION AND BACKGROUND

This is a case about simple fairness—where one company, Defendants APC Wireless, and its President and CEO, Paul Greene both personally and professionally—knowingly took advantage of Translucent Communications, wrongfully binding it to a debt of over $1.2 million and causing Translucent to be sued on that debt by a third-party, and thereafter usurping Translucent's website and trademark in a purely retaliatory manner. Fairness requires that Defendants, who admit all responsibility for the debt, and have admitted to using Translucent's mark, must be held to account for their wrongful, deliberate actions.

This case rests on a simple set of undisputed facts. Defendants APC Wireless and its President and CEO, Paul Greene, concocted a scheme to receive a cash-advance on false invoices in the name of Translucent, and against Translucent's will, in order to obtain a loan of over $1.2 million dollars from a non-party factoring company called AmeriFactors Financial Group ("AmeriFactors"). It is undisputed that on or about April 11, 2008 Defendants America's Premiere Corp. and National Angus Corp., (doing business as "APC Wireless") and its President, Paul Greene, entered into a contract with AmeriFactors[1] that, by Defendant Greene's own admission, improperly bound Translucent to a staggering debt of $1,267,964.26 for goods never actually ordered, shipped, or received:

> Q: Did [Translucent's President Brett Schmulian] have the phones?
> A: He did not have the phones.
> Q: Why did you say "it was a hundred percent our fault."?
> A: Because, as I said from the beginning, I don't believe this is his debt. This is my debt. And, just is what it is.
> Q: And why did you say, "We will take full blame."?
> A: Because it's our debt.
> Greene Dep. 216:6-15.

---

[1] This Court need not consider the particularized details surrounding the validity  and existence of any contract, and instead should take judicial notice of the fact that AmeriFactors is suing Translucent on the same debt in Florida state court.

The evidence overwhelmingly demonstrates that Defendants then fraudulently induced Translucent into inaction with repeated assurances, and a clear and definite promise from APC Wireless and Paul Greene, stating unequivocally that Defendants—not Translucent—would be responsible for the debt owed to AmeriFactors as well as any resulting harm to Translucent. This fraudulent transaction and subsequent inducement and reliance began on April 11, 2008, and continued into early June of 2008. As a direct result of Defendants' actions, AmeriFactors brought suit against Translucent in Florida state court to recover the $1,267,964.26 debt, at extreme cost and detriment to Translucent.[2] As a further result of Defendants' actions, Translucent's business has been significantly harmed in the form of a lost investor and its inability to receive bank financing due to the Florida lawsuit.

To add further fuel to the fire, in October 2008, as Translucent's competitor in the cellular telephone industry and to further damage Translucent, Defendants deliberately took possession of Translucent's website domain name, translucentcommunications.com, and redirected all internet traffic and business derived by the website from Translucent's website to Defendants' website.  Defendants thereby converted the website, which Translucent values to be $50,000,  for its own benefit and use by redirecting all internet traffic and business, and caused Translucent unknowable harm as a result of its unfair business practices.

Further, Defendants offered goods and services through its own website operating on Translucent's domain name in an attempt to deceive the public, and cause confusion and mistake as to the origin of the goods and services marketed on the website, and in a textbook case of unfair competition utilized Translucent's mark and trade name for Defendants' own benefit and to

---

[2] On September 16, 2008, AmeriFactors initiated a lawsuit against Translucent seeking payment in the amount of $1,267,964.26 plus interest and costs (correct?), for Account Stated, Open Account, Goods Sold, Breach of Contract, and Promissory Estoppel, captioned as *Amerifactors Financial Group, Inc. v. Translucent Communications, LLC,* Case No. 08-54842 CA 03 filed in the 11th Circuit Court in Miami-Dade County, Florida .

Translucent's detriment.  15 U.S.C. §1125 *et seq*.  Moreover, Defendants' taking of the website and redirection of all of Translucent's internet traffic and business constitutes a direct violation of the Anti-Cybersquatting Consumer Protection Act.  *Id*.  As a result of Defendants' offenses upon Translucent's trade name, domain name, and redirection of internet traffic, Translucent has suffered both knowable and unknowable damages that must compensated through an accounting of Defendants' profits, statutory damages in the amount of $100,000 for infringing Translucent's domain, as well as reasonable attorney's fees costs in prosecuting this action.

The facts, fairness, and simple logic dictate that (1) Defendants must be held responsible for the debt which underlies this lawsuit and all resulting harm suffered by Translucent based upon its reliance on the fraudulent inducement and guarantee made by Defendants, and (2) Defendants must be held responsible for all resulting harm suffered by Translucent due to Defendants' taking of Translucent's website domain name and trade name.  Summary judgment should be entered in Translucent's favor on all Counts as a matter of law.

## STATEMENT OF UNDISPUTED FACTS

The following material facts are undisputed and are supported by the allegations in the Verified Complaint, discovery responses, sworn affidavits, deposition transcripts and documents related to this action[3]:

---

[3] The following depositions and affidavits are attached as Exhibits A-H and abbreviated as follows:
Exhibit A:  Deposition Excerpts of Defendant Paul Greene ("Greene Dep.")
Exhibit B:  Deposition Excerpts of Brett Schmulian ("Schmulian Dep.")
Exhibit C:  Affidavit of Daniel Toledo ("Toledo Aff.")
Exhibit D:  Deposition Excerpts of Samuel Bahreini ("Bahreini Dep.")
Exhibit E: Affidavit of Marc Green ("Marc Green Aff.")
Exhibit F:  Affidavit of Birte Hohne ("Hohne Aff.")
Exhibit G:  Affidavit of Krupesh Patel ("Patel Aff.")
Exhibit H:  Deposition Excerpts of Blazer Catzen ("Catzen Dep.")

### Defendants' Actions Regarding the AmeriFactors Debt

1.      Translucent is being held liable for a debt of $1,267,964.26 pursuant to invoices issued by Defendants and assigned to AmeriFactors.  *See* Translucent's First Amended Verified Complaint attached hereto (without exhibits) as **Exhibit 1**; AmeriFactors' Complaint, *AmeriFactors Financial Group, Inc. v. Translucent Communications, LLC,* Case No. 08-54842 CA 03 (11th Circuit Court, Miami-Dade County, Florida), attached hereto as **Exhibit 2**.  These invoices, dated April 8, 2008 (Invoice No. 3006092), and April 14, 2008 (Invoice No. 3006094) ("the Invoices") relate to the alleged sale of wireless telephones and communications equipment.  The Invoices were first received by Translucent on April 11, 2008 at 2:04 PM from APC Wireless' Vice President Samuel Bahreini, and are attached hereto as **Exhibit 3**; *see also* Exh. 1 ¶ 22 ; Toledo Aff. ¶5; Schmulian Dep. 172:4-173:6.

2.      In April, 2008, Defendants commenced a multi-million dollar purchase of a company called Movida from a Delaware Bankruptcy Court auction.  Defendants were looking to raise capital to fund the purchase from a number of sources, including selling Defendant Greene's shares in Translucent and factoring invoices.[4]  Greene Dep. 93:9-94:7.

---

[4] Q:   All right.  How did you figure you were going to pay for this Movida purchase?
A    Um, we had -- it was very similar.  We had to assume all the liabilities and we have been paying it off ever since.
* * *
Q.   All right.  Did you have to raise cash to do this?
A    Yes, we did.
Q.   All right.  How did you raise the cash?
A    We factored some invoices.  We sold some equipment.  We sold Translucent.  We did anything we could to raise cash.
Q.   All right.  How did you factor -- how, what kind of invoices did you factor?
A    I factored air time and hardware invoices.
Q.   Who did you factor with?
A    I don't recall.  Several companies.
Q.   AmeriFactors?
A    To AmeriFactors, correct.
Greene Dep. 93:9 to 94:7.

3.      On April 11, 2008, Defendant Paul Greene, President of APC Wireless, requested that Brett Schmulian, President of Translucent, execute an assignment letter (hereafter the "Assignment Letter") reflecting APC Wireless' intention to assign the Invoices to AmeriFactors for collection. Schmulian Dep. 146:22-147:13, 148:8-151:24, 153:19-154:21, 161:3-167:8, 227:21-229:18, 227:21-229:18; Toledo Aff. ¶¶6-11.   Mr. Schmulian refused to execute the Assignment Letter.  Schmulian Dep. 171:9-172:4.

4.      Defendant Greene similarly requested by email that Daniel Toledo, Vice President of Translucent, call him to discuss the Invoices.   A true and correct copy of this email is attached hereto as **Exhibit 4**. *See also* Toledo Aff. ¶¶6-8. Defendant Greene requested that Mr. Toledo sign the Assignment Letter on Translucent's behalf, and  Mr. Toledo responded to Defendant Greene that he would not sign without Mr. Schmulian's authorization. Toledo Aff. at ¶11.   At no time did Mr. Toledo sign the Assignment Letter.  *See id*;. Bahreini Dep. 113:21-114:8; Exh. 1 at ¶ 30.

5.      After Mr. Schmulian refused to sign the Assignment Letter for the Invoices, Defendant Greene sent an email with the subject line "Per your request" to Mr. Schmulian stating:

> Brett,
>
> Any loses (sic) incurred arising from any loss to Translucent/Brett Schmulian will be covered by APCWireless in reference to AmeriFactors invoices for factoring. I am will put up APCWireless as collateral. The invoices you are signing are the complete responsibly of APC not Translucent. All payments incurred from AmeriFactors will be paid in full by APCWireless.
>
> Paul Greene

A true and correct copy of this email is attached hereto as **Exhibit 5**; Toledo Aff. ¶11; Greene Dep. 134:19-137:6 Exh. 1 at ¶ 25.

6.      On the afternoon of April 11, 2008, Mr. Schmulian, Mr. Toledo, and Defendant Greene participated in a conference call during which Mr. Schmulian and Mr. Toledo again refused to sign the Assignment Letter. See Schmulian Dep.149:2-150:18, 296:5-297:19; Toledo Aff. at ¶ 9-10; Exh. 1 at ¶ 26.

7.      The Invoices did not reflect an actual sale of goods from APC Wireless to Translucent. Neither Translucent, nor anyone at its direction or on its behalf, ordered the goods listed on the Invoices; and neither did Defendants ship or cause to be shipped any of the goods listed on the Invoices, nor did Translucent receive them. Bahreini Dep. 46:7-17, 86:9-20, 113:21-114:8, 142:16-144:13; Greene Dep. 162:13-163:5, 172:4-5, 215:5-216:7, 217:16-218:13, 220:19-221:8, 240:16-21; Schmulian Dep. 190:5-20, 210:13-211:8; Toledo Aff ¶6.

8.      At 7:21 PM, on April 11 Samuel Bahreini, Vice President of APC Wireless, forwarded a purported record of an email with a subject line "Nextel Phones Invoices," to Dennis Bays at AmeriFactors, and copied, among others Defendant Greene and Mr. Bahreini.  A true and correct copy of this email and its attachment is attached hereto as **Exhibit 6**.

9.      The "Nextel Phones Invoices" email purported to forward a four-page fax from Translucent which had the effect of binding Translucent to a debt of $1,267,964.26.  The four-page attachment sent by Mr. Bahreini consisted of a signed Assignment Letter purporting to contain the signature of Brett Schmulian, and the Invoices. The first page was a Translucent fax cover sheet, featuring Mr. Schmulian's name in a smaller and different font, the second page was the Assignment Letter, and third and fourth pages were the Invoices. Importantly, unlike the pages which were allegedly faxed by Translucent, the forged Translucent cover sheet does not bear any time-date stamp from *any* fax machine, let alone that of Translucent.  *See id.*  Toledo Aff. ¶ 12-17; Schmulian Dep. 210:20-212:10.

10.     Mr. Toledo never sent the purported "Nextel Phones Invoices" email to Mr. Bahreini or Defendants. Toledo Aff. ¶17.[5] Defendants never produced such a document pursuant to a explicit discovery request, and an expert hired by Defendants (who was subsequently disqualified) testified that he too was unable to locate the email.  *See* Letter from Blazer Catzen attached as **Exhibit 7**; Catzen Dep. 37:5-8.   Moreover, there is no record of the original "Nextel Phones Invoices" email in any documents or data recently provided by Defendants to Translucent.  Patel Aff. at ¶¶ 3-8.

11.     Mr. Schmulian did not sign the Assignment Letter.   Schmulian Dep. 66:7-10, 68:6-23, 210:20-212:10. Exh. 1 at ¶37. Mr. Schmulian was not in the State of Florida that day, and had no access to fax or scanning equipment.  *See* Defendants' Answers to Translucent's First Requests for Admission at Response to Request No. 9, attached hereto as **Exhibit 8**.  Schmulian Dep. 66:7-10, 68:6-23, 173:2-20; Toledo Aff. ¶12; Greene Dep. 104:20-106:20; Bahreini Dep. 66:7-23, 113:21-114:8. At no time did Mr. Toledo sign his own name, or Mr. Schmulian's name, to the Assignment Letter.[6] *See* Toledo Aff. at ¶¶ 10-11.

12.     Translucent's telephone and fax records indicate that no fax was sent from Translucent to AmeriFactors at any time on April 11, 2008.[7]  A true and correct copy of Translucent's telephone and fax records from April 11, 2008, which were subpoenaed from its

---

[5] Mr. Toledo preserved all documents relevant to this litigation, and no such document exists in Translucent's records.  Moreover, pursuant to Translucent's request, and after given multiple opportunities by the Court, APC Wireless was unable to produce a copy of the purported original, forwarded email with the subject line "Nextel Phones Invoices."   *See* Toledo Aff. at ¶17; Court Order of August 10, 2009 (Dkt. No. 48); Correspondence re: defense having a significant problem in efforts to comply with court's order of August 10, 2009 (Dkt. No 51).

[6] Mr. Toledo had authority to sign his own name on behalf of Translucent, and was not required to seek approval from Mr. Schmulian to bind Translucent.  *See* Toledo Aff., at ¶ 3.  Mr. Toledo would not have had to forge Mr. Schmulian's name to bind Translucent – he could have signed his own name.  *Id.*

[7] The date, time and sender stamp generated by the fax machine on pages two to four of the fax displays as sender the fax number 786-845-8097, and 16:39 as the time the fax was allegedly sent. The records do not show that any communication, neither via phone nor fax, occurred from this number at that time. In addition, AmeriFactors fax number, listed as 407-566-1250 on the fax cover sheet and on the date-time stamp on the allegedly sent fax, does not appear anywhere in the phone records on April 11, neither as "Calling Number," nor as "Called Number."

telephone carrier, AT&T, are attached hereto as **Exhibit 9**. *See also* Toledo Aff. at ¶12-14 Exh. 1 at ¶¶ 28-38.

13.     On April 14, 2008, AmeriFactors advanced $600,000 to APC Wireless representing AmeriFactors' purchase of the Invoices from APC Wireless.   A true and correct copy of the funding statement from AmeriFactors to APC Wireless regarding the Translucent debt dated April 14, 2008 is attached hereto as **Exhibit 10.** Bahreini Dep. 137:7-138:1, 213:5-23.

14.     On or about April 15, 2008, Translucent received a letter from AmeriFactors stating that it had purchased the Invoices from APC Wireless and therefore acquired all of APC Wireless' rights in the Invoices.   AmeriFactors demanded that Translucent pay the full amount listed on the Invoices. On April 16, 2008, Mr. Schmulian emailed Defendant Greene and Mr. Bahreini the April 15, 2008 letter.   A true and correct copy of this email and its attachments are attached hereto as **Exhibit 11**. *See also* Bahreini Dep. 93:8-94:18.

15.     On numerous occasions, Translucent asked Defendants Greene and APC Wireless when they would pay the AmeriFactors debt back.

- On April 29, 2008, Mr. Schmulian emailed Mr. Bahreini, requesting that he "please let me know when you are planning on paying this off, they are sending me docs – three times."

- On May 12, 2008, Mr. Schmulian emailed Mr. Bahreini in reference to the AmeriFactors debt and asked "When is this due?"

- On May 13, 2008, Mr. Schmulian emailed Mr. Bahreini and copied Defendant Greene, saying that he "spoke with Paul regarding our conversation this morning, AmeriFactors called to ask about payment, Paul referred me back to you.  When is this payment due?"

- On May 23, 2008, Mr. Schmulian again emailed Mr. Bahreini and Defendant Greene asking when Defendants would pay the debt to AmeriFactors: "I just received a call from AmeriFactors. They have called every day, but I haven't taken the calls. They are saying that the [Invoices] are late. . . They wanted to know when payment will be done in full. Please advise when this will be paid in full as it is currently past due."

- On May 28, 2008, Translucent and Mr. Schmulian received six calls from AmeriFactors about the Invoices.  Mr. Schmulian did not respond and, two days later, emailed Defendant Greene with "high importance" stating: "these guys are calling me non stop, stating that the invoices are seriously past due.  They claim that you gave us 30 days and its closing in on 50.  Please let me know when you are going to pay it off or how to handle it. They claim they are going to report this too (sic) the agencies and take action. Please let me know what to do."

A true and correct copy of these foregoing communications are attached hereto as Composite **Exhibit 12**. Schmulian Dep. 243:19-244:19.

16.     On June 2, 2008, at 2:18 PM, Defendant Greene emailed Mr. Schmulian a copy of the first page of an agreement Defendants made with AmeriFactors and instructed Mr. Schmulian to "Call to discuss."  The same day, at 3:43 PM AmeriFactors sent Mr. Schmulian an email stating that the debt was past due, and that AmeriFactors would take legal action to collect same debt. Mr. Schmulian then forwarded this email to the attention of Defendant Greene and Mr. Bahreini, and asked that they "please advise."  Mr. Bahreini responded with the same document Defendant Greene sent the previous day, and Mr. Schmulian then replied "yes I have this, but according to the invoice its only 30 days . . . the seem to be sticking to it." A true and correct copy of the June 2, 2008 correspondence is attached hereto as **Exhibit 13**. Bahreini Dep. 109:11-111:14.

17.     The next day, on June 3, 2008, Mr. Schmulian sent an email to Defendant Greene again forwarding the previous day's email from AmeriFactors, stating that Translucent never received any of the goods listed in the April 8, 2008 Invoice and the April 14, 2008 Invoice; that the Invoices were not issued by Translucent; and that he, Mr. Schmulian, never signed the Assignment Letter. A true and correct copy of this email is attached hereto as **Exhibit 14**.

18.     Defendant Greene responded in a series of emails on June 3rd and 4th to Translucent's demand, continuing to pretend as if there was a legitimate sale of goods and that

Translucent should simply return them to Defendants to get rid of the AmeriFactors debt.   On

June 3, 2008 Defendant Greene stated :

> The only way for us to credit the account is for you to send back the goods.   We will issue a full refund and take full responsibility.   You are not liable if you send the goods back. It then becomes our debt. I told AmeriFactors that we extended you 120 days based on their paperwork. it is 100% our fault and we will take the full blame. this is an easy solution, I can have [my attorney] David Sellman send you the release prior to shipping. Ship it immediately though….Don't do anything that can't be undone, just send the phones back!

Early the next morning on June 4, 2008 at 2:04 AM, Defendant Greene further stated:

> I won't be available until tomorrow night, any way to hold off your issue until then? Don't let these guys scare you. If you return the goods and we accept them the liability is on us. And I will sign a document attesting to that.

Finally, on the evening of June 4, 2008, Defendant Greene made one final plea for Translucent to

"return the phones."

> I agree that we should not do anything that is considered illegal. TLC is setting a good example and I feel all my companies should follow in TLC's footsteps. Since we are doing everything now completely by the book. . . . It is not in our best interest to do anything that would harm our company. . . . I have Someone prepared to loan me the $600k at a ungodly interest rate as well as 5% of Movida to "pay off the debt" to the factor. This is my backup, It would kill me to give anything away after all of the hard work I have done.   As I mentioned before. because I untentionally (sic) mislead you on the payment terms and due to the harassing nature of the phone calls you are receiving I will credit you the complete invoice as soon as the phones land in my warehouse.

True and correct copies of the relevant emails are attached hereto as **Exhibit 15**.

19.     Defendant Greene admitted in his deposition that the goods referenced in the

Invoices were never shipped to Translucent, and thus there were never any phones for

Translucent to ship back to APC Wireless. *See* Greene Dep. at 217:16-218:13.[8]

---

[8] As further evidence that Defendants never shipped the goods, on June 2, 2009, Defendant Greene oddly offered to Translucent to ship the goods listed on the Invoices despite this pending litigation.  A true and correct copy of this letter is attached hereto as **Exhibit 16.**

20.     Defendants admit complete responsibility for the debt owed to AmeriFactors.[9]
Greene Dep. 134:15-137:4, 172:4-5, 205:16-207:19, 211:7-213:4, 216, 230:16-233:5, 269:6-11.

21.     In an effort to satisfy the outstanding debt owed to AmeriFactors by APC
Wireless and Defendant Greene, AmeriFactors, Defendants APC Wireless and Paul Greene,
(individually), entered into an agreement in which Defendants Greene and APC Wireless agreed
to pay AmeriFactors the debt which AmeriFactors now seeks from Translucent in this action. *See*
**Exhibit 17**; *see also* Greene Dep. at 230:3-233:5.   Translucent is not a party to the Settlement
Agreement. *See id*.   Defendants are currently making payments to AmeriFactors to settle the
outstanding debt on the invoices in Translucent's name. Greene Dep. 230:3-233:5; Exh.8.   Even
so, AmeriFactors continues to hold Translucent liable for the debt and the lawsuit against
Translucent in Florida continues.

22.     Translucent has suffered a number of compensable losses as a direct result of
Defendants actions:

- Translucent is being sued in Florida by AmeriFactors for the full amount of the
  $1,267,964.26 debt created by the Invoices, and as a result has been forced to retain
  advice of counsel to defend itself in that case at extreme expense. Schmulian Dep.
  214:9-12.

- Translucent lost a $450,000 investor, Marc Green (no-relation to Defendant Greene),
  who was unwilling to commence his agreed-upon purchase of 38% of Translucent
  shares due to the litigation hanging over Translucent.  *See* Affidavit of Marc Green,
  attached hereto as Exhibit E; Schmulian Dep. 253:17-255-17.

---

[9] Q. Did [Translucent's President Brett Schmulian] have the phones? A: He did not have the phones.
Q. Why did you say "it was a hundred percent our fault."? A: Because, as I said from the beginning, I don't believe
this is his debt. This is my debt. And, just is what it is.
Q. And why did you say, "We will take full blame."? A: Because it's our debt. Greene Dep. 216:6-15.

- Translucent has been unable to obtain bank-financing because of the litigation hanging over Translucent. Schmulian Dep. 252:20-253:1.

**Defendants' Improper Use of Domain Name and Translucent's Mark**

23.     Translucent Communications is the trade name used by Plaintiff Translucent Communications, LLC to offer goods and services related to the cellular telephone industry.  *See* Exh. 8 at Response to Request 15. Schmulian Dep. 191:18-192:7.

24.     Defendants do not have any right to use the names and marks Translucent and Translucent Communications for use in the sale of telephones, mobile devices and related equipment. *See* Exh. 8 at Response to Request 16.

25.     Prior to October 6, 2008, Translucent Communications operated a website at the domain translucentcommunications.com on which it actively marketed its goods and services. Schmulian Dep. 233-13-239:7; Greene Dep. 234:8-236:3; Bahreini Dep. 123:9-124:7, Toledo Aff. ¶18.

26.     On or about October 6, 2008, Defendants changed or caused to be changed the registration Translucent's domain name such that the website automatically redirected all internet traffic to Defendants' website apcwireless.com. *See* Exhibit 18 attached hereto. Greene Dep. 235:10-236:1, Toledo AFF ¶18. Schmulian Dep. 236:10-238:17.

27.     On or about October 6, 2008, Defendants provided or caused to be provided materially false contact information to the domain registrar, listing Paul Greene as Registrant of the Translucent Communications website, and disabling Translucent from accessing its website and making any changes to it.  *See* Exhibit 18.

28.     On October 7, 2008, Mr. Schmulian contacted the domain Registrar, Register.com, and requested that the translucentcommunications.com domain be returned to

Translucent.   Register.com ultimately determined that it could not return the domain to Translucent without a court order. *See id.*

29.     The domain translucentcommunications.com continues to divert all internet traffic to apcwireless.com.   *See* Affidavit of Birte Hohne ("Hohne Aff.") attached hereto as Exhibit F.

30.     As a result of the taking of the domain by Defendants, Translucent was forced to create a new webpage at a new domain at Translucent's expense, and has lost an unknowable amount of business due to the redirection of all incoming internet traffic to the translucentcommunications.com domain.  Schmulian Dep. 240:15-17.

## ARGUMENT

Under Federal Rule of Civil Procedure 56(c), a court is to grant summary judgment when "no genuine dispute of material fact exists and the moving party is entitled to judgment as a matter of law." *Asher v. United Airlines*, 70 F. Supp. 2d 614, 616 (D. Md. 1999) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986)). The non-moving party's opposition must consist of more than mere unsupported allegations or denials and must be supported by affidavits or other competent evidence setting forth specific facts showing that there is a genuine issue for trial. FED. R. CIV. P. 56(e); *Celotex Corp,* 477 U.S. at 324. The nonmovant needs more than "a mere scintilla of evidence" in support of its position to defeat the motion.  *Malek v. Leavitt,* 437 F. Supp. 2d 517, 523 (D. Md. 2006)(quoting *Detrick v. Panalpina, Inc.*, 108 F.3d 529,  536 (4th Cir. 1997)).  If the non-movant's evidence is "merely colorable" or "not significantly probative," summary judgment may be granted. *Anderson*, 477 U.S. at 249-50.

## I.   Translucent is Entitled to a Spoliation Inference Due to Defendants' Failure to Preserve Relevant Documents and Reasonable Attorneys' Fees.

Translucent is entitled to a spoliation inference as to the non-existence of the original "Nextel Phones Invoices" email purporting to contain a fax that AmeriFactors relied upon to bind

13

Translucent to the Invoices.  The original, un-forwarded "Nextel Phones Invoices" email from Daniel Toledo to Sam Bahreini has never been located.  The absence of this original email is probative because Defendants sent this purported email on to AmeriFactors with the subject line "fax," binding Translucent to pay the value of the Invoices to AmeriFactors.  Translucent has no record of ever sending it and Defendants have never located it.  Moreover, throughout the course of this litigation, Defendants have sent Translucent on a number of fools errands to obtain other relevant requested documents, including specifically the "Nextel Phones Invoices" email.

First, Translucent asked for the original email via discovery request, yet Defendants produced nothing more than 50 printed pages of irrelevant or unintelligible Gmail emails.  *See* Translucent's Motion to Compel (Dkt. No. 29) and Order of August 10, 2009 (Dkt. No. 48).[10] Next, after failing to produce requested documents, Defendants alerted Translucent to a heretofore unexplained and conveniently-timed data-breach and document spoliation. Greene Dep. 246:22-250:6.[11]  Then in response, Defendants hired a now-disqualified expert witness, Mr.

---

[10] The August 10 Order of this Court reads in pertinent part:

> Plaintiff's Supplemental Memorandum in Support of its Motion to Compel Production of Documents and Things (Document No. 29) is **GRANTED**. Defendants are ordered to produce all documents responsive to Translucent's Request for Production, including electronically stored information in the form requested by Translucent with accompanying metadata.  Additionally, Defendants must provide a privilege log and supplement their Response to adequately explain the disposition of documents that were formerly in their possession, custody, or control, but which have been lost or destroyed. Defendants must produce the above documents and things within *twenty (20) days* of this Order.  (Dkt. No. 48).

[11] Q.   So tell me, when you knew there was a lawsuit, did you realize you had a duty to preserve data?
A    Um, yeah.
Q.   Okay.  Did you preserve data?
A    I mean, we didn't do anything differently.
* * *
Q.   What's Mr. Katzen doing?
A    He went back and he is attempting to recreate Sam Bahreini's hard-drive.  And Sam Bahreini, when he was fired he came in and tried to wipe his hard-drive.  He had made a copy and taken it home and then he went in and attempted to wipe out the hard-drive.
Q.   What about the server, has anybody tampered with the server?
A    He deleted all his files, and anything, all our company files.  He deleted all our financials.  He went in and deleted everything.
Q.   He being Sam?
A    Sam Bahreini, yes.

Blazer Catzen, to search for the email, who was ultimately also unable to locate it.  Catzen Dep. at 36:21-37:8; *see also* Exh. 7.  This Court then granted Translucent's Motion to Compel, ordering Defendants to produce all requested electronically stored information and metadata. *See* Dkt. No. 48.  In response to this Court's Order, Defendants engaged in an electronic "data dump" of largely irrelevant electronically stored information, with the notable exception of data from Defendant Paul Greene.  Translucent's attorneys searched the data (a great deal of which was produced on corrupted CD's) and once again found nothing.  *See* Affidavit of Krupesh Patel attached as Exh. G.  In sum, on the eve of summary judgment, Defendants failed to produce the "Nextel Phones Invoices" email in original form, have not disclosed a single shred of evidence from Defendant Paul Greene himself other than a few incomplete Gmail messages, and have disclosed no paper documents from APC Wireless whatsoever.  *See* Dkt. No. 51 and 52.

Insofar as Defendants continue to be unable to locate a critical piece of evidence, the original "Nextel Phones Invoices" email, a spoliation inference in favor of Translucent is clearly

---

Q.   Okay.
A    We know this because we know the IP address in his house and, you know, when Rami was still there he was able to trace it, as are the FBI.
Q.   And so how did the FBI get involved?
    MR. MIXTER:  Let -- I think we've gone far enough on that subject.  I don't think you really – I mean, I understand your spoliation inquiry.  That's the whole point here --
    MR. BROOKE:  Right.
    MR. MIXTER:  -- but that goes to what efforts they made to ask about to preserve and the like and I don't think it goes to an FBI investigation of what is alleged to have happened vis-a-vis certain data.
    BY MR. BROOKE:
    Q.   Well, I would like to ask, what led you to go to the FBI?
    MR. MIXTER:  I'm going to instruct him not to answer.  And the reason I'm doing that is because I don't want it to come full circle.
    MR. BROOKE:  Al right.
    MR. MIXTER:  You understand what I'm saying?
BY MR. BROOKE:
Q.   At what point did you realize there had been tampering or destruction?
A    The day he left.
Q.   Immediately?
A    Later that night.  I mean, what had happened is I had gone in and after about an hour I was on his computer.  It was acting kind of weird so I went in and I unplugged his computer and just left it.  But at that point it was too late.  Then he attacked our servers.  He's a pretty, you know, technical savvy guy, a lot more so than me.
Q.   All right.  So tell me what happened.  When did you dismiss him?
A    Sometime in February.

warranted at this time.   As Magistrate Judge Grimm recently held, "the failure to preserve electronic or other records, once the duty to do so has been triggered, raises the issue of spoliation of evidence and its consequences." *Goodman v. Praxair Servs.,* 632 F.Supp.2d 494, 505 (D. Md. July 7, 2009), citing *Thompson v. U.S. Department of Housing & Urban Development,* 219 F.R.D. 93, 100 (D. Md. 2003).   A court's authority to levy sanctions on a spoliator derives from (1) the "court's inherent power to control the judicial process and litigation, a power that is necessary to redress conduct 'which abuses the judicial process" and (2) Rule 37 if the spoliator violates a specific court order. *Id.* at 505-506.   Where spoliation occurs, a court may impose a variety of sanctions, ranging from dismissal or judgment by default, preclusion of evidence, imposition of an adverse inference, or assessment of attorney's fees and costs.   *Goodman*, 632 F.Supp.2d at 506 (granting adverse inference).

Here, an adverse inference is clearly warranted, as Defendants have repeatedly been unable to locate the "Nextel Phones Invoices" email, and therefore unable to prove that it was ever sent by Translucent and received by Defendants.   Defendants admit that they knew of their duty to preserve all electronic evidence and failed to do so.   Greene Dep. 246:22-250:6.   Further, Defendants were unable to comply with this Court's August 10, 2009 Order to produce all requested evidence, and thus have violated it. (Dkt. No. 51, 52). As a result, this Court should infer that because the "Nextel Phones Invoices" email was not produced, it is reasonable to assume that it never existed in the first place, and is a fabrication of Defendants.

Translucent requests this Court to order Defendants to pay Translucent's costs and attorneys fees related to the portions of their previously filed Motion to Compel, related proceedings, and efforts to search through Defendants' recent "data dump" pursuant to this Court's inherent authority and Rule 37(c)(1)(A).   *See id* at 524. *See also Broccoli v. Echostar*

*Commc'ns Corp.,* 229 F.R.D. 506, 509-10, 513 & n.7 (D.Md.2005)(ordering defendant to pay attorneys' fees including those for "client, third party and intra-office meetings with attorneys" and "time charged for drafting and editing the motion"); *Zubulake v. UBS Warburg, LLC*, 220 F.R.D. 212, 222 (S.D.N.Y.2003)(ordering defendant to "bear [plaintiff's] costs for re-deposing certain witnesses for the limited purpose of inquiring into issues raised by the destruction of evidence"); *Chan v. Triple 8 Palace, Inc.,* 2005 WL 1925579, at *4 (S.D.N.Y. 2005)("The most appropriate sanction is ... an adverse inference against the defendants.... The plaintiffs are also entitled to an award of the costs, including attorneys' fees, that they incurred in connection with this motion."); *Leon v. IDX Sys. Corp.,* 2004 WL 5571412, at *5 (W.D.Wash. 2004) (requiring spoliator to pay reasonable expenses it "incurred investigating and litigating the issue of the spoliation"). Translucent expended a great deal of time and money in a fruitless attempt to recover documents from Defendants. To the very end, Defendants appeared to cooperate just enough to get by, yet simply failed in their duty to preserve documents and continually attempted to shift the costs of discovery upon Translucent. At the end of discovery, Defendants simply must be accountable for such transgressions upon Translucent and this Court.

**II. Defendants Fraudulently Induced Translucent Into Inaction Causing Translucent to be Held Liable for a Debt of $1,267,964.26.**

Defendants made repeated false representations of material fact to Translucent stating that Defendants APC Wireless and Paul Greene would take responsibility for, and pay, the amount owned under the Assignment Letter. A misrepresentation is found where (1) the defendant made a false representation to the plaintiff, (2) the falsity of the representation was either known to the defendant or the representation was made with reckless indifference to its truth, (3) the misrepresentation was made for the purpose of defrauding the plaintiff (4) the plaintiff relied on the misrepresentation and had the right to rely on it, and (5) the plaintiff

suffered compensable injury as a result of the misrepresentation. *Hoffman v. Stamper*, 867 A.2d 276, 292 (Md. 2005). *See also Goldstein v. Miles*, 859 A.2d 313, 331-32 (Md. Ct. Spec. App. 2004); *Swinson v. Lords Landing Village Condominium*, 758 A. 2d 1008 (Md. 2000) (setting forth elements for fraud and for negligent misrepresentation).

First, Defendants made repeated false representations to Translucent that they would take responsibility for, and pay, the AmeriFactors debt, yet have failed to take affirmative steps to do so. These representations include:

- "The invoices you are signing are the complete responsibly of APC not Translucent." *See* Exh. 5.

- "All payments incurred from AmeriFactors will be paid in full by APCWireless." *See id.*

- "Any losses incurred arising from any loss to Translucent/Brett Schmulian will be covered by APCWireless in reference to AmeriFactors invoices for factoring. I am will (sic) put up APCWireless as collateral." *See id.*

- "The only way for us to credit the account is for you to send back the goods. We will issue a full refund and take full responsibility. You are not liable if you send the goods back. It then becomes our debt. I told AmeriFactors that we extended you 120 days based on their paperwork. it is 100% our fault and we will take the full blame." *See* Exh. 15.

Second, Defendants' false representations were made knowingly, or in the very least, with reckless indifference to the truth. Defendants have admitted under oath that the debt belongs to them, not to Translucent. Greene Dep.216:8-19. Defendants' admission, combined with its inaction in not paying AmeriFactors the full amount due on the Invoices, demonstrates that the false statements that they would take responsibility for and pay off the debt were made knowingly. Moreover, Defendants' statements were clearly false in saying that Translucent would be absolved of the debt if it sent the goods back. Defendants admit that no goods were

ever shipped in the first place.[12]  Finally, Defendants admit that they have made payments to AmeriFactors as part of an independent agreement that did not release Translucent from the AmeriFactors debt.  *See* Exh. 8.

Reckless indifference as to truth arises when a defendant "makes the representation even though aware that he does not know whether it is true or false—where he knows that he lacks knowledge as to its truth or falsity—and nonetheless makes the representation without regard to that lack of knowledge."  *See Hoffman*, 867 A.2d at 300 (citing *Ellerin v. Fairfax Savings*, 652 A.2d 1117, 1125 (Md. 1995)).   At the time Defendants stated that "the invoices [were] the complete responsibly of APC not Translucent," it is obvious that Defendants made such representation without knowledge of whether it was true or false.  Today, Translucent continues to be held liable for the complete amount of the invoices by AmeriFactors, as evidenced by AmeriFactors' lawsuit against Translucent in Florida.  Defendants did not have the authority or ability to make such representations to Translucent, and AmeriFactors continues its lawsuit against Translucent despite receiving direct payments from Defendants.   Defendants demonstrated "reckless indifference" to the truth by failing to follow through on their representations, and making flatly false assertions that it would take responsibility for the AmeriFactors debt.

Third, the misrepresentations were made for the purpose of defrauding Translucent so that Translucent would not alert AmeriFactors as to the invalidity of the AmeriFactors debt.

---

[12] A.   Basically, Paul is telling Brett to send the goods back and, you know, don't do anything that can't be undone, just send the phones back, . . . it's 100 percent our fault and we will take the full blame, this is an easy solution, I can have [my attorney] David Sellman send you a release prior to shipping, but ship it immediately, though.
Q:   Why is he telling him to ship back these phones?
A:   I have no idea.
Q:   Were there any phones to ship back?
A:   No.
Q:   No phones were ever shipped; correct?
A:   No phones were shipped to Brett or from Brett at Translucent.
Bahreini Dep. 115:2 to 115:17.

Defendant Greene acknowledged at his deposition that the statements were made explicitly for

the purposes of defrauding Translucent into inaction:

> Q:   Do you know why you said that you put up APC as collateral?
> A:   Probably to calm him down.
> Q:   Why was he upset?
> A:   He wasn't upset.  He was just nervous.
> Q:   Why was he nervous?
> A:   Don't know.  He's a nervous person.
> Greene Dep. 136:7-16.
>
> Q:   Now, why do you think this was a problem?
> A:   Well, obviously Brett's upset.  He hadn't sold the phones.  I hadn't paid -- even
> though the invoices are not 1.2 million, I had not paid back AmeriFactors.  We
> assumed from our receivables that we would be able to pay them back but we didn't
> know when we purchased the companies that we wouldn't be able to collect any
> money for three weeks but still be responsible for all the billing, which is exactly
> what happened.
> Greene Dep.  212:19-213:12
>
> Q:   Why did you tell him to send the phones back?
> A:   This I believe is an e-mail that me and Brett orchestrated to try to get him to
> return the phones so that the debt would become ours and not his.
> Q:   Did he have the phones?
> A:   He did not have the phones.
> Q:   Why did you say "it was a hundred percent our fault."?
> A:   Because, as I said from the beginning, I don't believe this is his debt.  This is
> my debt.  And, just is what it is.
> Q:   And why did you say, "We will take full blame."?
> A:   Because it's our debt.
>
> Greene Dep. 216:1-15.

Mr. Bahreini, who was then APC Wireless' Vice President, agreed that Defendants made such

false assertions for the purpose of defrauding Translucent into inaction:

> Q:   So why did Paul want to show [a breakdown of the percentage fees that
> AmeriFactors would collect if invoices were certain days past due], to Brett?
> A    To show he had 120 days to take care of this, not just 30.
> Q:   Did Paul expect Brett to take care of it?
> A    No, Paul expected Paul to take care of it.
> Q:   So why did he send this to Brett?
> A    To calm Brett down.
>           *          *          *

> A    Basically, AmeriFactors was attempting to collect invoices within net 30 terms.
> Paul was trying to make Brett think that he had up to 120 days in order to keep
> Brett silent from raising any flags and give Paul 120 days to figure out a way to pay
> off the debt with AmeriFactors. . . .
> Bahreini Dep. 109:11-111:14.

Fourth, Translucent reasonably relied upon Defendants' repeated assurances that they would take responsibility for, and pay, the AmeriFactors debt.   Mr. Schmulian confronted Defendant Greene shortly after he realized that Defendants' actions had improperly bound Translucent to the AmeriFactors debt. In response, Defendant Greene again stated that Defendants would "take care of" the AmeriFactors debt.

> Q:    What -- what did you talk to Mr. Greene about?  What did you say to him?
> What did he say to you?
> A:    I asked him what was this.  I told him I never agreed to do this.  I, in fact,
> adamantly said I would not do this, nor would anyone in my company**.  I told him to
> take care of it immediately.  He said not to worry, he will take care of this.  He
> needed a couple of days to pay whatever this was.**  And that was the basis of our
> discussion.
> Q:    Did you ever discuss anything about what purports to be your signature on this
> document, that is, whether you signed it or somebody else signed it, and, if so, who it
> was?  Any discussion about that?
> A:    No.  I said to him this isn't -- we didn't do this.  We never signed the document.
> We never received any goods.  We never agreed to this transaction.  We never agreed
> to do this.   Adamantly said not to do this.  So did Daniel Toledo.  So why was it
> done?
> Schmulian Dep. 210:10-211:8.

In determining whether the reliance was reasonable, the background and experience of the party that relied on the representation is relevant. *Goldstein*, 859 A.2d at 333 (citing *Parker v. Columbia Bank*, 604 A.2d 521 (Md. Ct. Spec. App. 1992).   Indeed, Maryland has long recognized that "misrepresentation need not have been the only motivation for the plaintiff's actions; it is sufficient that the misrepresentation substantially induced the plaintiff to act." *Nails v. S & R, Inc*. 639 A.2d 660, 669 (Md.1994)(citing *McAleer v. Horsey,* 35 Md. 439, at 453 (Md. 1872)("the plaintiff mainly and substantially relied upon the fraudulent representation, he will

have his action for damages, though he was in part influenced by other causes."). Here, the parties had a prior business relationship such that Defendant Greene was a *founding partner* in Translucent. *See* Exhibit 19 attached hereto. Prior to this litigation Defendant Greene and Mr. Schmulian cultivated a business relationship of trust and confidence. Moreover, Translucent repeatedly asked for and received assurances that Defendants, and not Translucent, would be responsible for paying the AmeriFactors debt, and Translucent placed its trust and confidence in these assurances.

Finally, Translucent has met its burden that it "suffered compensable injury resulting from the misrepresentation."  *See Hoffman*, 867 A.2d at 300 (citing *VF Corp. v. Wrexham Aviation,* 715 A.2d 188, 193 (Md. 1998)); *see also Environmental Trust v. Gaynor,* 803 A.2d 512, 516 (Md. 2002). These damages included the loss of Marc Green as a $450,000 investor due to the Florida lawsuit, the resultant legal fees from being sued by AmeriFactors in Florida state court, and Translucent's inability to obtain bank financing due to the lawsuit:

> Q:    The entire lawsuit.  What are your damages?
> A:    I believe over $1 million.
> Q:    All right.  Can you break it down into categories?
> A:    Loss of investor.  Inability to increase the line of credit at the bank due to a pending lawsuit.  Inability to generate profits based on investor not investing in the company, which is future earnings.  The removal of any loans from private equity that have been withdrawn due to the lack of or inability of removal of this lawsuit or lawsuits. Again, the -- the loss of business from inability to increase lines of credit at the bank from this lawsuit.
>             *          *          *
> A:    Okay.  Our inability to generate additional profits based on our inability to -- to -- to generate the profits from the investor or the line of credit from the bank.  That's off the top of my head.
> Schmulian Dep. 252:10-253:15.

While fraud must be proven by the standard of clear and convincing evidence, related to damages, what must be proven by that standard is that *some* compensable injury arose from the deceit, not however, the *measure* of the damages required to compensate for that injury.  *Id.*

Since Translucent has demonstrated a compensable injury due to Defendants' fraudulent statements, it has met its burden.[13]   Therefore, this Court should award Translucent compensatory damages, and to punish Defendants for their deliberate and willful misrepresentations, award punitive damages as this Court deems just.

### III. Translucent Reasonably Relied on Defendant's Clear and Definite Promise to Cover All Losses Suffered by Translucent Due to Translucent Being Held Liable for a Debt of $1,267,964.26.

Concurrent with the fraudulent misrepresentation, Defendants made a clear and definite promise to Translucent that "any losses incurred arising from any loss to Translucent/Brett Schmulian will be covered by APCWireless in reference to AmeriFactors invoices for factoring. I am will (sic) put up APCWireless as collateral." *See* Exh 5.   Defendants' promise to cover losses incurred by Translucent in reference to the AmeriFactors Invoices was intended to induce Translucent into silence and not notify AmeriFactors of what was clearly a fraudulent transaction.

The standard for detrimental reliance requires evidence of a promise, reasonable and foreseeable reliance on the promise, and injury sustained as a result of reliance on the promise. *Pavel Enters., Inc. v. A.S. Johnson Co*., 674 A.2d 521, 532 (Md. 1996).  Maryland courts follow the four-part test articulated in the Restatement (Second) of Contracts §90(1) (1979), which requires:

(1) a clear and definite promise;

(2) where the promisor has a reasonable expectation that the offer will induce action or forbearance on the part of the promisee;

(3) which does induce actual and reasonable action or forbearance by the promisee; and

---

[13] Upon the granting of this Motion, Translucent will tender its legal bills incurred in the Florida lawsuit to Defendants, or otherwise as the Court so directs.

(4) causes a detriment which can only be avoided by the enforcement of the promise.

*Id.* at 532; *see also Union Trust Co. of Md. v. Charter Medical Corp.,* 663 F.Supp. 175, 178 n. 4 (D.Md.1986) *aff'd w/o opinion,* 823 F.2d 548 (4th Cir.1987).

Defendants promised to pay for all losses suffered by Translucent in reference to the AmeriFactors Invoices, as well as the amounts listed on the Invoices themselves.  A "clear and definite promise" is described as "one that reasonably defines the contours of the action." *McKenzie v. Comcast Cable Commc'ns., Inc.,* 393 F.Supp.2d 362, 372-73 (D.Md. 2005).  The April 11, 2008 email from Paul Greene to Translucent's President, Brett Schmulian, clearly defines that contours of the promise:

> Brett,
> **Any losses incurred arising from any loss to Translucent/Brett Schmulian will be covered by APCWireless in reference to AmeriFactors invoices for factoring.** I am will put up APCWireless as collateral. The invoices you are signing are the complete responsibly of APC not Translucent. All payments incurred from AmeriFactors will be paid in full by APCWireless.
> Paul Greene

*See* Exhibit 5.

Second, Defendants reasonably expected that the promise would induce Translucent into inaction.  Defendants' reassurances to Translucent during the subsequent weeks after making the promise demonstrated that Defendants expected Translucent to remain quiet to allow Defendants more time to pay off their debt to AmeriFactors. Bahreini Dep. 109:11-111:14.   Indeed, Defendant Greene admitted that the purpose of the promise was to convince Translucent not to speak up and alert AmeriFactors to the fraudulent nature of the transaction in order to give Defendants additional time to pay the money owed to AmeriFactors on the Invoices:

> Q:    Do you know why you said that you put up APC as collateral?
> A:    Probably to calm him down.
> Q:.   Why was he upset?
> A     He wasn't upset.  He was just nervous.

Greene Dep. 136:7-16; *see also*  Bahreini Dep. 109:11-111:14.

Third, Defendants' promises actually induced Translucent into inaction.  For example, upon receiving notice of AmeriFactors' purchase of the Invoices on April 15, 2008, Translucent immediately forwarded the correspondence to Defendants and inquired as to when Defendants planned on paying off the Invoices. *See* Exhs.11 and 12. Translucent ignored phone calls and messages from AmeriFactors based upon the representations.    Schmulian Dep. 282:6-283:4.

Finally, Defendants' promise and Translucent's reliance upon it has caused Translucent great detriment, which may only be remedied through enforcement of the promise.  Translucent has suffered the extreme injustice and expense of being held liable by AmeriFactors for the full amount of the Invoices, as well as the cost, expenses, and attorneys' fees from fighting a frivolous litigation in Florida state court in reference to the same AmeriFactors Invoices.  Greene Dep. 216:16-19, Schmulian Dep. 49:20-24.   Therefore, in the interests of justice, this Court should enforce Defendants' promise and compensate Translucent for the losses it has incurred as a direct result of Defendants' actions, including its attorneys fees and costs related to defending the Florida litigation.

## IV.  Defendants Must Indemnify Translucent for All Past and Future Losses as a Direct Result of Defendants' Actions Relating to the Debt of $1,267,964.26.

Maryland law recognizes a right to indemnity, independent of a contract, where the character of one tortfeasor's conduct is significantly different from that of another who is also liable for the same damages. *Pyramid Condominium Ass'n v. Morgan,* 606 F.Supp. 592, 595-96 (D.Md. 1985)(citing *Blockston v. United States,* 278 F.Supp. 576, 585 (D.Md. 1968); *Gardenvillage Realty v. Russo,* 366 A.2d 101 (Md. Ct. Spec. App. 1976). For the purposes of this Count only, the Court should assume that Translucent could be a "negligent party" insofar as the

25

allegations of liability for the AmeriFactors debt in the Florida lawsuit. A party may be entitled to receive indemnification where his own conduct, although negligent, is considered to be passive or secondary. In *Blockston,* the district court determined that:

> The area in which a party held liable for negligence may pass that liability on to another negligent party is closely circumscribed. It encompasses a group of special situations and relationships where it has seemed reasonable to impose an ultimate responsibility on a party seeming to have played the active role in the negligence situation in favor of one who is made answerable to the injured party, but whose part in the event is passive or arises from the effect of public policy, contract, or status.

*Blockston,* 278 F.Supp. at 585 (quoting *Guarnieri v. Kewanee-Ross Corp.,* 263 F.2d 413 (2d Cir.1959)).

A right to indemnity may arise where one party is vicariously liable for the conduct of another person but did not participate in any way in the actions giving rise to the tort. *See* Prosser and Keeton, Law of Torts § 51, at 341-42 (5th ed. 1984). Also, the Fourth Circuit noted in *Jennings v. United States,* 374 F.2d 983, 987 n. 7 (4th Cir.1967) that:

> A right to indemnity is commonly recognized where, although both parties are negligent, the negligence of the indemnitee is not considered as serious as that of the indemnitor; for example, where the indemnitee's negligence is based upon a failure to inspect and thereby discover a defect in an article manufactured by the indemnitor.

*Id.* (citing 3 Moore, *Federal Practice* ¶ 14.11 (2d ed. 1964). Thus, it is abundantly clear that a party may seek indemnification from another when its liability is passive or secondary, which liability is rooted in the concept of imputed or constructive fault. *Tesch v. United States,* 546 F.Supp. 526, 529 (E.D.Pa.1982).  Here, fault has been imputed to Translucent by AmeriFactors.

First, Defendant Greene admitted under oath that APC Wireless never sold or delivered any cell phone equipment to Translucent:

Q:      All right.  And what did you say? Slowly enough so the reporter can get it.

A:      "I won't be available until tomorrow night.  Any way to hold off your issue
        until then?  Don't let these guys scare you.  If you return the goods and we
        accept them  the liability is on us.  And I will sign a document attesting to
        that."
Q:      So, again, did he have the goods?
A:      No, he did not.
Q:      Why did you tell him to return them?
A:      Because that would put the liability on us because if he did not have the
        goods, then on paper it would put liability back on us.
Q:      Did you ever tell AmeriFactors that you had the goods?
A:      I don't recall the conversation.  I had very limited conversation with them.
        Sam  handled them.  I don't recall any of them.
Q:      Did you ever tell, did you ever instruct Sam to tell AmeriFactors that you
        had the goods?
A:      No, I did not.  Not that –

Greene Dep. 217:16-218:13.   Mr. Bahreini also confirmed that APC Wireless never sold or

shipped any telephones to Translucent:

Q:      So you also mentioned that he factored -- that Mr. Greene factored invoices in
        relation to a sale to Translucent; is that right?
A:      Yes.
Q:      And was there a sale to Translucent?
A:      Never.
Q:      How did this come about?
A:      How did what come about?
Q:      How did the transaction with Translucent come about?
A:      There was no transaction.
Bahreini Dep. 46:7-17.

A:      Basically, Paul is telling Brett to send the goods back and, you know, don't
        do anything that can't be undone, just send the phones back, we're finally
        seeing some relief on the Movida side, it's 100 percent our fault and we
        will take the full blame, this is an easy solution, I can have [my attorney]
        David Sellman send you a release prior to shipping, but ship it
        immediately, though.
Q:      Why is he telling him to ship back these phones?
A:      I have no idea.
Q:      Were there any phones to ship back?
A:      No.
Q:      No phones were ever shipped; correct?
A:      No phones were shipped to Brett or from Brett at Translucent.
Bahreini Dep. 115:2-17.

Second, Translucent never agreed to pay any balance arising from the sale of the Invoices to AmeriFactors, including the $1,267,964.26 outstanding debt alleged in AmeriFactors' Complaint. Schmulian Dep. 66:7-10, 68:6-23, 210:20-212:10; Toledo Aff. at ¶¶ 10-11; Exh. 1 at ¶37. To the contrary, Mr. Greene admitted that he and APC Wireless were responsible for the debt allegedly owed to AmeriFactors. Mr. Greene stated the following at his deposition:

> Q:   Why did you say "it was a hundred percent our fault?"
> A:   Because, as I said from the beginning, I don't believe this is his debt. This is my debt. And just is what it is.
> Q:   And why did you say, "We will take full blame?"
> A:   Because it's our debt.
> Q:   Why is APC getting, I mean -- excuse me. Why is Translucent getting sued in Florida, not you.
> A:   Uh, maybe because I don't have an office in Florida. I don't know. Not me suing them.

Greene Dep. 216:8-19.

> Q:   Now why are you paying AmeriFactors?
> A:   Because I owe them money.
> Q:   Why do you owe them money?
> A:   Because --
>      Mr. Mixter: Same objection.
> Q:   And you can continue to answer.
> A:   Because we got the money and we owe them money.

Greene Dep. 230:16-231:231.

> Q:   Okay. You were very clear that as between APC and AmeriFactors its your belief that the debt that -- I'm going to call it debt -- that we have been discussing here today is owed AmeriFactors by APC, correct?
> A:   Correct.

Greene Dep. 269:6-11. APC Wireless' liability for the outstanding debt allegedly owed to AmeriFactors by Translucent is further evidenced by Mr. Greene and APC Wireless' continued payment of settlement funds to AmeriFactors. *See* Exhs. 8 and 17; Greene Dep. 230:3-233:5.

Translucent has been unjustly sued in Florida state court by AmeriFactors for the full amount listed on the Invoices. In that action, AmeriFactors alleges in essence that Translucent is

vicariously liable for the conduct of Defendants regarding the debt listed on the Invoices.  The ultimate responsibility rests on Defendants for playing "the *active* role in the negligence" instead of upon Translucent, which has been nothing more than a *passive victim* regarding the AmeriFactors debt.  *Blockston,* 278 F.Supp. at 585. *See also* Prosser and Keeton, Law of Torts § 51, at 341-42 (5th ed. 1984).

Here, <u>Defendants</u> entered into a factoring agreement with AmeriFactors on false Invoices. <u>Defendants</u> received a $600,000 cash advance on the Invoices. <u>Defendants</u> repeatedly promised Translucent that they would take responsibility for paying the Invoices. <u>Defendants</u> admit that it is their debt and not that of Translucent's. And <u>Defendants</u> have been actively paying back AmeriFactors the balance of money-owed during the course of this very litigation. Quite simply, Defendants' actions are patently unjust, and therefore, this Court should find that because of Defendants' actions as the active negligent party, Defendants should be held to indemnify Translucent as the passive negligent party for the full amount of $1,267,924.26, plus Translucent's legal fees and costs Translucent has incurred in the ongoing litigation in Florida.

## V. Defendants Converted Translucent's Internet-Domain for its Own Use and Deprived Translucent of it.

Defendants are liable for conversion under Maryland law based on its taking and wrongful possession of Translucent's domain name, translucentcommunications.com, including depriving Translucent access to its emails sent to the domain. Exh. 1 at ¶¶ 51-57. Conversion is an intentional tort consisting of a physical act and a certain state of mind. *Darcars Motors of Silver Springs, Inc. v. Borzym*, 841 A.2d 828, 835 (Md. 2004). The physical act may be "any distinct act of ownership or dominion exerted by one person over the personal property of another in denial of his right or inconsistent with it." <u>Id</u>. at 261 (quotation omitted). *See also Inmi-Etti v. Aluisi*, 492 A.2d 917, 920 (Ct. Spec. App. 1985). "[T]he gist of a conversion is not

the acquisition of the property by the wrongdoer, but the wrongful deprivation of a person of property to the possession of which he is entitled." *Borzym*, 841 A.2d at 836 (quotation omitted).

The intent element of the tort of conversion requires simply that the defendant have "an intent to exercise a dominion or control over the goods which is in fact inconsistent with the plaintiff's rights." *Keys v. Chrysler Credit Corp.,* 494 A.2d 200, 208 (Md. 1985). Indeed, "[t]he defendant may have the requisite intent even though he or she acted in good faith and lacked any consciousness of wrongdoing, as long as there was an intent to exert control over the property." *Borzym*, 841 A.2d at 836. Thus even "[a] purchaser of stolen goods . . . who sells them in the utmost good faith becomes a converter, since the [] acts are an interference with the control of the property." *Keys*, 494 A.2d at 208. "A mistake of law or fact is no defense." *Id.*

Here there is no dispute that Defendants took control of Translucent's domain, translucentcommunications.com, which had been in use by Translucent since 2005. *See* Exh. 18. On October 6, 2008, Defendants possessed the domain against Translucent's rights, redirected internet users to the website of APC Wireless, and deprived Translucent of access to its emails from the domain.[14] *See* Exh. 18. *See Borzym*, 841 A.2d at 835. Moreover, even if Defendant

---

[14] A    [O]ver a period of a couple of days we started not receiving any e-mails. We were able to send out e-mails and then that stopped. Customers were calling to complain that the Website which was translucentcommunications.com was going to another company called APC Wireless. And what was going on. Was everything okay. A lot of the different complaints that came in. To what extent had this taken place in terms of e-mails not being delivered or – or not correctly being delivered, or not being sent, I don't know. I know it happened over a period of a couple of days. In a business that we have, which relies very heavily on e-mails, specifically for stock offers, selling of inventory, of course specifically because we sell heavily to Latin America and e-mail is usually a very efficient way to do business, it -- it – it interrupted our business tremendously. And that's from what we've found out from the clients. Damage control took place a few days later. When people were going to translucentcommunications.com they were being directed to APC Wireless. So if I was a potential client going to Translucent Communications and went to APC Wireless, look up the number there and call APC Wireless and not Translucent. So Translucent Communications was a Website that belonged to Translucent Communications for the purpose of doing business as Translucent Communications. All the e-mails that were being sent back and forth were intended for either the partners or employees of Translucent Communications, and we weren't receiving those e-mails because Paul Greene, or someone at his office had taken the registration of Translucent Communications over and pointed that towards APCWireless.com, along with all of our e-mails and domain and URL. So from that standpoint it interrupted our business flow for -- you know, immediately for a couple of days, if not a week. And moving forward, customers that we hadn't spoken to or hadn't, you know, dealt with in awhile may have fallen off the face of the earth because they couldn't reach us in terms of an e-mail or to go to our Website.

Greene perceived in good faith that he was owed money for part of the website's *aesthetic content* as a former Translucent founding partner, it does not follow that either he or APC Wireless had the right to deprive Translucent from the use of the *domain name* as a result.[15] Notwithstanding, Translucent has paid for the aesthetic content on the website.  *See* Exhibit 20 attached hereto. Therefore, Defendants are liable to Translucent for conversion of the domain translucentcommunitions.com, and should be ordered to compensate Translucent $50,000 for damages caused, as well as ordered to transfer the domain back to Translucent's control.

On October 7, 2008, Mr. Schmulian contacted the domain Registrar, Register.com, and requested that the translucentcommunications.com domain be returned to Translucent. Register.com advised that it could not return the domain to Translucent without a court order. As a result of the taking of the domain by Defendants, Translucent was forced to create a new webpage at a new domain at Translucent's expense, and has lost an unknowable amount of business due to the redirection of all incoming internet traffic to the translucentcommunications.com domain.

## VI. Defendants Improperly Used Translucent's Mark in Violation of 15 U.S.C. § 1125.

In conjunction with Defendants' taking over of Translucent's domain name, translucentcommunications.com, Defendants also caused the domain to point to Defendants' active website apcwireless.com.  The resulting effect of Defendants' actions is that whenever an

---

Schmulian Dep. 236:10-238:17.
[15]  Q.   Why did you make a change on October 7?
A    Because Brett had not paid his half of the Web site.  So, I pointed the Web site to my Web site hoping he would pay his half of the Web site, which he laughed at, never did.  He was using my material on his Web site.
Q.   How is it your material, the content?
A    The content, we paid for it, we built it. It was our exact Web site.  All he did was change the contacts and the name on the Web site.  It was an exact copy of our Web site.
Q.   Why didn't you just close down the Translucent Communications Web site?
A    At the time I don't remember.  I think Rami Mansour did it.  He had it pointed somewhere.  I don't know.  It wasn't -- I don't remember.
Greene Dep. 235:10-236:1; *see also  id*  at 74:16-75:7.

internet user points the internet browser to translucentcommunications.com, the user is redirected to the content of APC Wireless' active website, though the domain remains static at translucentcommunications.com. *See* Hohne Aff. ¶¶3-5.  These acts constitute clear Trademark infringement in violation of 15 U.S.C. §1125(a), as well as a violation of the Anti-Cybersquatting Consumer Protection Act, 15 U.S.C §1125(d).

Actions comparable to that of Defendants's use of the Translucent domain have been held to be infringement.  *See People for the Ethical Treatment of Animals v. Doughney* ("*PETA*"), 263 F.3d 359, 364 (4th Cir. 2001)(defendant's use of peta.org infringed the animal rights group's mark); *OBH, Inc. v. Spotlight Magazine, Inc.*, 86 F.Supp.2d 176, 183 (W.D.N.Y. 2000)(even though defendant's website thebuffalonews.com parodied plaintiff's mark "The Buffalo News" it was still liable for infringement because it was "likely to prevent or hinder internet users from accessing plaintiffs' services on plaintiffs' own web site"); *Planned Parenthood Federation of America, Inc. v. Bucci*, 1997 WL 133313 (S.D.N.Y. 1997)(defendant's registration of the domain plannedparenthood.com and website antithetical to plaintiff's views infringed plaintiff's mark).

First, any plaintiff alleging trademark infringement must first prove that (1) it possesses a mark; (2) that the defendant used the mark; (3) that the defendant's use of the mark occurred "in commerce"; (4) that the defendant used the mark "in connection with the sale, offering for sale, distribution, or advertising" of goods or services.  *See* PETA, 263 F.3d at 364; 15 U.S.C. §§ 1114, 1125(a). The application of all four elements to Defendants' actions are wholly undisputed and in Translucent's favor.

### A. It is Undisputed that the TRANSLUCENT COMMUNICATIONS Mark Belongs to Translucent.

Defendants admit in their Responses to Translucent's First Request for Admission that TRANSLUCENT and TRANSLUCENT COMMUNICATIONS are the trade names for Translucent Communications, LLC:

> **Request for Admission No. 15**: Admit that Plaintiff is the owner of the names and marks TRANSLUCENT and TRANSLUCENT COMMUNICATIONS for use in the sale of telephones, mobile devices and related equipment.

> **Response**: Admitted.

Defendants further admitted that they have no right in Translucent's name and marks:

> **Request for Admission No. 16**: Admit that Defendants have no rights to use of the names and marks TRANSLUCENT and TRANSLUCENT COMMUNICATIONS for use in the sale of telephones, mobile devices and related equipment.

> **Response**: Admitted.

TRANSLUCENT COMMUNICATIONS is a mark entitled to protection under the common law due to continued use and promotion by Translucent. Trademark law requires that the mark be "distinctive at the time of registration of the domain name" 15 U.S.C. § 1125 (d)(1)(A)(ii)(I). Regarding the enforceability of common-law marks, Maryland courts agree that "the statute itself preserves the enforceability of common-law trade or service marks." *Sea Watch Stores v. Council of Unit Owners of Sea Watch Condominium,* 691 A.2d 750, 769 (Md. Ct. Spec. App. 1997). A trademark is protected under Maryland law as a name, symbol, word or combination of 2 or more of these that a person uses to identify the business or occupation of the person and to distinguish it from the business or occupation of another person," and need not be registered to be protected. *See id.* citing (Md. Code Business Regulation §401-1 *et seq*.

Translucent Communications adopted the mark TRANSLUCENT COMMUNICATIONS on or about December 13, 2003 and continually used it in interstate commerce to identify its goods and services and to distinguish such goods and services from those made and sold by others. The domain translucentcomunications.com was registered on January 10, 2005. *See* Exh. 18. Mr. Schmulian testified to the importance of Translucent's trade name:

> The trade -- the name Translucent Communications is a well known name in the -- in the industry for the company. People recognize us by our name. And our reputation and our business is -- is, you know, identified by our name, Translucent. So it's part and parcel of doing business. You know, customers and vendors recognize us by our name. And to -- to me that's what the name represents, an image. A -- you know, kind of an identification of who we are and what we do. Schmulian Dep. 191:18-192:7.

Therefore, due to Defendants' admission that Translucent is the exclusive owner of the Translucent mark, and its continual use in interstate commerce to identify Translucent's goods and services, the mark is entitled to protection.

**B. Defendants Used Translucent's Mark In Connection with the Marketing and Sale of Goods and Services in Commerce.**

Irrespective of how or why Defendants acquired control of Translucent's internet domain, it is an undisputed fact that Defendants continue to offer their own goods and services under Translucent's Mark on translucentcommunications.com. *See* Hohne Aff. at ¶¶3-5. Any internet user accessing translucentcommunications.com sees the active website of APC Wireless, which while the user clicks though the website, the browser continues to display the domain name translucentcommunications.com. *Id.* APC Wireless' website includes Defendants' contact information, a detailed company profile, the services and business "solutions" offered by Defendants, and active links to the websites of Movida and Liberty Wireless, two companies offering the sale of cellular telephone equipment and calling plans. *Id.* When clicked upon, each

linked website also appears under the Translucent domain.  *Id.*  Therefore, it is undisputed that Defendants have high-jacked Translucent's domain name and trademark for Defendants' benefit.

To use Translucent's Mark "in connection with" goods or services, Defendants need not even have actually sold or advertised goods or services on Translucent's domain. *See PETA*, 263 F.3d at 365. Rather, Defendants need only prevent users from obtaining or using Translucent's goods or services, or need only have connected the website to other's goods or services. *Id.* Thus, Defendants' use of Translucent's mark is "in connection with" the distribution of goods and services because it is "likely to prevent or hinder internet users from accessing plaintiff's services on plaintiff's own website." *Id.* (quoting *OBH*, 86 F.Supp.2d at 183).  Prospective users of Translucent's goods and services who mistakenly access Defendants' web site via translucentcommunications.com may fail to continue to search for Translucent's own home page, "due to anger, frustration, or the belief that plaintiff's home page does not exist." *Id.* at 365.  As the above elements are clearly met, all that remains is the final individual elements of unfair competition and passing off under the statute.  15 U.S.C. §1125(a); *PETA*, 263 F.3d 359, 364 (4th Cir. 2001).

### C. Defendants Use Translucent's Mark in a Manner Likely to Confuse Consumers in Violation of 15 U.S.C. 1125(a)(1).

The unauthorized use of a trademark infringes the trademark holder's rights if it is likely to confuse an "ordinary consumer" as to the source or sponsorship of the goods or services. *PETA,* 263 F.3d at 366 (citing *Anheuser-Busch, Inc. v. L & L Wings, Inc.,* 962 F.2d 316, 318 (4th Cir.1992)(citing 2 J. McCarthy, *Trademarks and Unfair Competition* § 23:28 (2d ed.1984)). To determine whether a likelihood of confusion exists, a court should not consider "how closely a fragment of a given use duplicates the trademark," but must instead consider "whether the use in its entirety creates a likelihood of confusion." *Id*. Defendants appropriated the Translucent Mark

in    full,    such    that    the    APC    Wireless    website    appears    on    the    domain translucentcommunications.com. This creates a presumption of likelihood of confusion among internet users as a matter of law. *New York State Society of Certified Public Accountants v. Eric Louis Associates, Inc.,* 79 F.Supp.2d 331, 340 (S.D.N.Y.1999)(applying in the internet context the rule that "if the evidence shows that the defendant intentionally copied the plaintiff's mark, likelihood of confusion will be presumed as a matter of law.")(citing *Mobil Oil Corp. v. Pegasus Petroleum Corp.,* 818 F.2d 254, 258 (2d Cir.1987)).

In addition, the Fourth Circuit has identified seven factors helpful in determining whether a likelihood of confusion exists as to the source, but "not all these factors are always relevant or equally   emphasized   in   each   case." *Lamparello v. Falwell,* 420 F3d 309, 313 (4th Cir. 2005)(citing *Pizzeria Uno Corp. v. Temple,* 747 F.2d 1522, 1527 (4th Cir. 1984) The factors are: (a) the strength or distinctiveness of the mark; (b) the similarity of the two marks; (c) the similarity of the goods/services the marks identify; (d) the similarity of the facilities the two parties use in their businesses; (e) the similarity of the advertising used by the two parties; (f) the defendant's intent; (g) actual confusion."). Of the factors relevant to Defendants' actions, each unequivocally tilts in favor of a finding of a likelihood of confusion.

Translucent's Mark is distinctive (and recognized by Defendants as a valid trademark), and    Defendants'    use    of    its    APC    Wireless    on    Translucent's    domain translucentcommunications.com is not merely similar, but identical to Translucent's Mark. Defendants and Translucent are competitors in the cellular telephone industry.  As demonstrated elsewhere in this Motion, Defendant's acts were intentional and done to deprive Translucent of its domain.  Finally, as Mr. Schmulian testified, actual consumers contacted him stating their confusion related to visiting translucentcommunications.com but instead seeing the active

website of APC Wireless. Schmulian Dep. 236:19-238:17.

### D. Defendant's Use of Translucent's Mark on Translucentcommunications.com Violates the Anti-Cybersquatting Consumer Protection Act.

The Anti-Cybersquatting Consumer Protection Act ("ACPA"), 15 U.S.C. §1125(d)(1)(A) prevents "cybersquatting," an expression that has come to mean the bad faith, abusive registration and use of the distinctive trademarks of others as internet domain names, with the intent to profit from the goodwill associated with those trademarks. *See Virtual Works, Inc. v. Volkswagen of America, Inc.,* 238 F.3d 264, 271 (4th Cir. 2001)(ACPA "was enacted to prevent the expropriation of protected marks in cyberspace and to abate the consumer confusion resulting therefrom"). ACPA provides in pertinent part:

> **Cyberpiracy prevention** (1) (A) A person shall be liable in a civil action by the owner of a mark, including a personal name which is protected as a mark under this section, if, without regard to the goods or services of the parties, that person—
> (i) has a bad faith intent to profit from that mark, including a personal name which is protected as a mark under this section; and
> (ii) registers, traffics in, or uses a domain name that—
> > (I) in the case of a mark that is distinctive at the time of registration of the domain name, is identical or confusingly similar to that mark;

15 U.S.C. § 1125(d)(1)(A). Defendants' actions related to the translucentcommunications.com domain constitute a violation of ACPA because (1) Defendants had a bad faith intent to profit from using the Translucent domain name, (2) the Translucent domain name is identical or confusingly similar to, or dilutive of, the Translucent Mark, and *See id.*

The facts set forth above prove the second element, such that Defendants high-jacked Translucent's name and mark for their own benefit. A simple comparison of the Translucent mark against translucentcommunications.com itself demonstrates that the domain name is identical, and therefore confusingly similar, to the mark. *See New York State Society of Certified Public Accountants*, 79 F.Supp.2d at 340; *PETA,* 263 F.3d at 365. As noted above, Defendants'

illegal use harms and confuses consumers because they may fail to search for plaintiff's own home page or acquire products or services they never intended to, thinking that Translucent and APC Wireless had become one and the same.  *Id.*  Defendant Greene admits that the Translucent domain was changed, Greene Dep. 71-73, and the Registration of the domain clearly states that the Registrant and Administrative Contact is:

> Translucent Communications
> Paul Greene
> 5268-R Nicholson Lane
> Kensington, MD 20895
> US
> Phone: 301-412-4412
> Email: Paul@APCWireless.com

*See* Exh.18.

As to the first element, under the ACPA, there are nine factors a court must consider in making a determination of whether the Defendant had a bad faith intent. 15 U.S.C. §1125(d)(1)(B).[16]   "The usual preponderance of the evidence standard applies to claims of bad

---

[16] (B) (i) In determining whether a person has a bad faith intent described under subparagraph (A), a court may consider factors such as, but not limited to—
(I) the trademark or other intellectual property rights of the person, if any, in the domain name;
(II) the extent to which the domain name consists of the legal name of the person or a name that is otherwise commonly used to identify that person;
(III) the person's prior use, if any, of the domain name in connection with the bona fide offering of any goods or services;
(IV) the person's bona fide noncommercial or fair use of the mark in a site accessible under the domain name;
(V) the person's intent to divert consumers from the mark owner's online location to a site accessible under the domain name that could harm the goodwill represented by the mark, either for commercial gain or with the intent to tarnish or disparage the mark, by creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the site;
(VI) the person's offer to transfer, sell, or otherwise assign the domain name to the mark owner or any third party for financial gain without having used, or having an intent to use, the domain name in the bona fide offering of any goods or services, or the person's prior conduct indicating a pattern of such conduct;
(VII) the person's provision of material and misleading false contact information when applying for the registration of the domain name, the person's intentional failure to maintain accurate contact information, or the person's prior conduct indicating a pattern of such conduct;
(VIII) the person's registration or acquisition of multiple domain names which the person knows are identical or confusingly similar to marks of others that are distinctive at the time of registration of such domain names, or dilutive of famous marks of others that are famous at the time of registration of such domain names, without regard to the goods or services of the parties; and

faith registration of domain names" under ACPA. *Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 227 (4th Cir. 2002).

Applying these factors, the weight of the evidence clearly demonstrates that Defendants had the requisite bad faith intent: (I) Defendants had no intellectual property right in translucentcommunications.com; (II) translucentcommunications.com is not Defendants' name or a name otherwise used to identify APC Wireless; (III) Defendants had no prior use of translucentcommunications.com in connection with the bona fide offering of any goods or services under the APC Wireless name; (IV) Defendants used the Translucent Mark in a commercial manner; (V) Defendants intended to confuse, mislead and divert internet users APC Wireless' web site, Translucent's competitor in the cellular telephone industry, and was therefore harmful to the goodwill represented by the Translucent Mark; (VI) Defendant Greene carried out his threat to Mr. Schmulian that if Translucent would not pay him for alleged money owed for the aesthetic content of the website, Defendants would shut down the website;[17] (VII) Defendants made patently false statements when registering the domain name by naming Paul Greene of APC Wireless as the Registrant for translucentcommunicatiosn.com and Defendants retained access to the passwords after Defendant Greene's separation from Translucent Communications; and (IX) the translucentcommunications.com domain name consists exclusively of Translucent's Mark.

---

(IX) the extent to which the mark incorporated in the person's domain name registration is or is not distinctive and famous within the meaning of subsection (c).

[17]   Q:   And you see the Web site that we're looking at [translucentcommunications.com] appears to be the APC Wireless Web site, is that correct?

A:   I do, yes.  Correct.

Q:   Do you know why this -- why that happens?

A:    Because Brett refused to pay his half of the cost to produce the Web site.  He told me to pay your half but we've got to take your Web site over.  He refused to pay so we moved the Web site.

 Greene Dep. 71:21-72:5.

Notably, the Fourth Circuit held that factor (V)—a Defendants' deliberate attempt to divert consumers and cause a likelihood of confusion—"is strong evidence of bad faith intent Factor (V) standing alone supports [a] finding of bad faith intent". *Harrods Ltd. v. Sixty Internet Domain Names,* 302 F.3d 214, 237 (4th Cir.2002).   Defendants in this case not only diverted Translucent's consumers, but mirrored their own site apcwireless.com to appear whenever translucentcommunications.com is accessed.  *See* Hohne Aff. at ¶¶ 3-5.

In addition to the damages requested below, ACPA allows this Court to "order the forfeiture or cancellation of the domain name or the transfer of the domain name to the owner of the mark."  15 U.S.C. §1125(d)(1)(C).   Therefore, Translucent requests that this Court order Defendants to immediately remove the APC Wireless website from the Translucent domain, relinquish the registration of the domain name translucentcommunications.com, and to transfer its registration of such domain name to Translucent.

### E.  Translucent is Entitled to Defendants' Profits and Maximum Statutory Damages Because of the Willful Nature of Defendants' Conduct.

A plaintiff may recover statutory damages that flow from the defendant's violation of the Anti-Cybersquatting Consumer Protection Act "in the amount of not less than $1,000 and not more than $100,000 per domain name, as the court considers just." 15 U.S.C §1117(d). Therefore, due to Defendants' numerous violations of Translucent's mark, it is just that $100,000 be the baseline of damages.   The statute further provides that there is a rebuttable presumption that the violation is "willful" for purposes of determining relief as long as the violator "knowingly provided or knowingly caused to be provided materially false contact information to a domain name registrar, domain name registry."  15 U.S.C. §1117(e).

Here, Defendants changed the registration of the domain in October 2008 to falsely reflect that the Registrant is Paul Greene, including his Maryland and APC Wireless contact

information.  *See* Exh. 18.  Thus, applying the rebuttable presumption, the Court should conclude that the defendant's conduct was willful for purposes of calculating damages.  Because of the Defendants' deliberate attempt to divert consumers and cause a likelihood of confusion, Translucent requests that this Court enter judgment of $100,000, the maximum statutory award, even without a determination that Defendants' conduct was willful.    15 U.S.C. §1117(d).

In addition, due to Defendants' violations of §1125(a), Translucent is entitled to recover its actual damages as well as all profits gained by Defendants through the use of the Translucent mark. 15 U.S.C. §1117(a).   Because Defendants' profits due to their use of the Translucent mark are unknowable, this Court should order Defendants to submit an accounting of all profits derived from the domain translucentcommunications.com and all websites linked thereto.

### F.  Translucent is Entitled to Reasonable Attorney Fees and Costs Because of the Willful Nature of Defendants' Conduct.

Translucent is presumed to be entitled to its costs, and should be entitled to recover reasonable attorneys' fees incurred in bringing this litigation. 15 U.S.C. §1117(a)(3).  The statute provides for an award of attorneys' fees to prevailing parties in exceptional trademark infringement actions. *PETA*, 263 F.3d 359, 370 (4th Cir. 2001) (quoting *Scotch Whisky Ass'n v. Majestic Distilling Co.,* 958 F.2d 594, 599 (4th Cir. 1991).[18] The Fourth Circuit defines exceptional cases as those in which the infringement was "malicious, fraudulent, willful or deliberate."  *Id.*  In view of Defendant's exceptionally clear, malicious, and willful infringement, this Court should award Translucent's attorneys' fees and costs.[19] 15 U.S.C. § 1117(a).

---

[18] In *PETA,* the Fourth Circuit recognized the right to attorneys' fees under the statute, but upheld the trial court's determination that though willful, the defendant's use did not warrant attorneys' fees because "he thought that he had a legitimate First Amendment right to express himself this way" and "to create a parody of the plaintiff's organization."  *PETA*, 263 F.3d at 370.

[19] Because Translucent now requests attorneys' fees pursuant to the statute, upon entry of judgment Translucent, will submit its Local Rule 109.2.b memorandum setting forth the attorneys' fees requested within 35 days of entry of judgment, or otherwise as this Court directs.

Attorney's fees have been routinely awarded in trademark cases under both ACPA and traditional trademark infringement.   In *Citigroup, Inc. v. Shui*, 611 F.Supp.2d 507 (E.D. Va. 2009), the court concluded that the defendant was liable under ACPA for its bad faith registration of marks similar to Citigroup's and it enjoined the defendant's use of the similar names and awarded Citigroup $100,000 in damages. *Id.* The court concluded that the defendant registered and used the disputed domain names in violation of the ACPA and that the use was "sufficiently willful, deliberate, and performed in bad faith to merit the maximum statutory award of $100,000 and an award of attorneys' fees." *Id. See also In NuPulse, Inc. v. Schlueter Co*., 853 F.2d 545, 547 (7th Cir.1988)(awarding attorneys' fees where defendant's conduct was "certainly intentional" and designed to reduce the plaintiff's sales).   Here too, Defendants' conduct was sufficiently willful to warrant an award of attorneys' fees because Defendants deliberately redirected all internet traffic and business derived by the website from Translucent's domain to Defendants' website.   Defendants' transfer of the website was undoubtedly performed in bad faith under ACPA, and done so in a purely retaliatory manner.

## VII.   Defendants' Use of Translucent's Mark Violates Maryland Unfair Competition Law.

In Maryland, the common law tort of unfair competition has been extended to "all cases of unfair competition in the field of business." *Electronics Store, Inc. v. Cellco Partnership*, 732 A.2d 980, 991 (Md. Ct. Spec. App. 1999)(citing *Baltimore Bedding Corp. v. Moses,* 34 A.2d 338 (Md. 1943)).   The rationale of the law is that "no one, especially a trader, is justified in damaging or jeopardizing another's business by fraud, deceit, trickery or unfair methods of any sort." *Id.* "What constitutes unfair competition in a given case is governed by its own particular facts and circumstances. Each case is a law unto itself, subject, only, to the general principle that all dealings must be done on the basis of common honesty and fairness, without taint of fraud or

deception." *Id.*  The Court of Appeals has held that: in the case of wrote:

> Like most doctrines of the common law, the law of unfair competition is an outgrowth of human experience. The rules relating to liability for harm caused by unfair trade practices developed from the established principles in the law of torts. These rules developed largely from the rule which imposes liability upon one who diverts customers from another to himself by fraudulent misrepresentation....

*Id.* (citing *Edmondson Village Theatre, Inc. v. Einbinder,* 116 A.2d 377 (Md. 1955)).  "The legal principles which are controlling here are simply the principles of old-fashioned honesty. One man may not reap where another has sown, nor gather where another has strewn.' " *Id.* at 992 (citing *GAI Audio of New York, Inc. v. Columbia Broadcasting Sys., Inc.,* 340 A.2d 736 (Md. Ct. Spec. App. 1975)(quoting *J.I. Case Plow Works v. J.I. Case Threshing Mach. Co.,* 155 N.W. 128, 134 (Wis. 1915)).  As explained, Defendants made changes to the registration of the domain name translucentcommunications.com, by not only disabling Translucent's website, but also pointing internet users to Defendants' active website apcwireless.com.  Defendants' use of Translucent's domain for the APC Wireless website is a directly fraudulent and deceitful use of Translucent's trade name.  Defendant APC Wireless is a competitor in the cellular telephone industry with Translucent.

While it is difficult for Translucent to know the extent of its damages from the redirection of internet users to the website its direct competitor, it has no doubt been damaged due to Defendants' "fraud, deceit, and trickery." *Id.*  Indeed, Translucent received numerous calls from confused consumers in the immediate aftermath of the website change.  Schmulian Dep. 236:19-238:17.  In addition, Translucent was forced to set up a new website on a new domain, and reeducate its entire customer base of the changed domain.  Moreover, it is impossible to know how many potential customers were simply lost, unable to locate Translucent's website, or assuming that APC Wireless and Translucent were now one and the same.  Notwithstanding that,

Translucent has suffered compensable injury, is entitled to an accounting related to profits derived from Defendants' use of Translucent's domain, and due to the willful nature of Defendants' conduct, Defendants should be punished with an award of punitive damages as deemed appropriate by this Court.

## CONCLUSION

Translucent respectfully requests that this Court grant its Motion for Summary Judgment because the undisputed facts in this case confirm that (1) Defendants fraudulently induced Translucent into inaction with repeated assurances, and a clear and definite guarantee and indemnification, and caused Translucent to be wrongfully sued for a debt that is not theirs, and (2) wrongfully converted Translucent's domain name and in the process violated Translucent's trademark an a patently unfair manner.  Moreover, the clear facts now before this Court confirm that Defendants have admitted to liability for the AmeriFactors debt, and have in fact made payments to AmeriFactors to repay the debt.  Neither the law nor justice can allow for the continued harassment of Translucent by APC Wireless and Defendant Paul Greene's improper acts, and as such summary judgment must be granted in favor of Translucent.

Dated: October 9, 2009

Respectfully submitted,

HOLLAND & KNIGHT LLP

/s/
Thomas W. Brooke (17503)
Drew E. Shenkman (28886)
2099 Pennsylvania Ave., N.W. Suite 100
Washington, D.C. 20006
thomas.brooke@hklaw.com
drew.shenkman@hklaw.com
Telephone: (202) 663-7271
Facsimile:  (202) 955-5564
*Counsel for Plaintiff Translucent Communications*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 9th day of October, 2009 a true and correct copy of the foregoing was served electronically on all parties of record.

/s/
Thomas W. Brooke