# EXHIBIT A

TO TRANSLUCENT'S
MOTION FOR SUMMARY JUDGMENT

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
SOUTHERN DIVISION

TRANSLUCENT COMMUNICATIONS
Plaintiff
vs.
AMERICAS PREMIERE CORP, a Maryland corporation, d/b/a "APC Wireless," NATIONAL ANGUS CORP., a Delaware Corporation, d/b/a "APC Wireless" and PAUL GREENE
Defendants
___________________________________/

Case No. 8:08-cv-03235-RWT

The videotaped deposition of PAUL GREENE was held on Monday, June 15, 2009, commencing at 10:38 a.m., at the Law Offices of Holland & Knight LLP, 3 Bethesda Metro Center, Suite 800, Bethesda, Maryland 20814, before Robert A. Shocket, Notary Public.

REPORTED BY: Robert A. Shocket

Q. And how did that work?
A What do you mean?
Q. Did you have to pay Mariose or what happened?
A No. I told you earlier we assumed the debt.
Q. So was there some sort of written agreement or --
A Yeah.
Q. Okay. So, how, did you go to Mariose and say we'll assume your debt?
A It actually wasn't with Mariose. It was with Sprint. We had to assume the Sprint bill.
Q. Okay. All right. So you did a deal with Sprint?
A Uh-huh.
Q. And was Cunningham involved in this?
A Yes.
Q. All right. How, what was his involvement?
A I told -- he was the broker.
Q. Okay. And so did you have to put up some money?
A I don't remember. Not much, if any. I don't remember.

Q. All right. In order to -- so have you taken care of this debt or how did you --
A It's been paid.
Q. Huh?
A It's been paid.
Q. How did you pay for it?
A We paid for it over a year to Sprint. The debt was with Sprint. We paid Sprint off over a year.
Q. All right. All right. And how did you raise the money do this?
A We didn't. We did it with the sales of the air time of Liberty.
Q. Okay. All right.
A We did it with the profit.
Q. All right. So, then flipping back to Movida, how did you learn there was an auction?
A Because Sprint -- I don't remember how I found out. I mean, I guess it's public information, I imagine.
Q. Was there a bankruptcy attorney involved?
A Yes.
Q. Who was that?
A Uh, Irv, um, called the shots. Irv, uh -- what's Irv's last name? Irv --

MR. BROOKE: He can't testify. Sorry. If you don't know, you don't know and that's fine.
THE WITNESS: I know. I'm just kidding.
MR. MIXTER: From Baltimore? From Baltimore?
THE WITNESS: Yeah.
MR. MIXTER: I may be able to help you. He used to be at Miles & Stockbridge. I can picture a mustache.
THE WITNESS: I know him well.
MR. BROOKE: We can come back to it.
MR. MIXTER: Okay.
MR. BROOKE: But again if you don't know --
MR. MIXTER: Yeah, don't guess.
MR. BROOKE: I'm sure Mr. Mixter told you, I don't know is a perfectly acceptable answer, as is "I don't remember."
MR. MIXTER: "I don't remember" is one of the best answers I've ever heard.
THE WITNESS: I don't remember right now.
MR. BROOKE: All right. That's fine. And only one of you can talk at once, but, all right.
BY MR. BROOKE:
Q. So there was a bankruptcy attorney involved

in Baltimore?
A Correct.
Q. And he was your attorney or the attorney for --
A My attorney.
Q. Okay. Do you recall who was the attorney on the other side?
A No, I don't.
Q. All right. How did you figure you were going to pay for this Movida purchase?
A Um, we had -- it was very similar. We had to assume all the liabilities and we have been paying it off ever since.
Q. All right. So, did you have to write a check to the Bankruptcy Court?
A We did send them money. I don't remember how much.
Q. All right. Did you have to raise cash to do this?
A Yes, we did.
Q. All right. How did you raise the cash?
A We factored some invoices. We sold some equipment. We sold Translucent. We did anything we could to raise cash.

Q. All right. How did you factor -- how, what kind of invoices did you factor?
A I factored air time and hardware invoices.
Q. Who did you factor with?
A I don't recall. Several companies.
Q. AmeriFactors?
A To AmeriFactors, correct.
Q. Any others?
A I don't remember.
Q. How about Triton?
A Triton, no. That's Triton.
Q. Huh?
A I was trying to remember the name of the company. Triton, no, we did not.
Q. Okay.
A But Triton is the company that Brett used to factor stuff from APC.
Q. Okay.
A And so he would -- well, we don't want to go get into that, do we?
MR. MIXTER: Just, just answer the question that's asked.
A No. Triton had nothing to do with this.
Q. And what was Triton; what did Triton do?

A Triton was a factoring company that had factored invoices between APC and Translucent.
Q. Had you ever heard of a factor before Triton?
A Of course.
Q. Okay. How did you first learn about the factor business?
A Oh, I don't recall. I mean, I don't recall. Isn't that a common --
Q. Is this something, factoring was a way of raising cash that you were familiar with?
A Yeah. Yeah.
Q. As you had entered into factoring relationships before this?
A Before Triton?
Q. No, before the time that you were trying to sell Movida.
A Yes. Yes.
Q. On both sides of the equation?
A Um, kind of, yeah.
Q. What do you mean "kind of"?
A Well, I owned APC and I owned 40 percent of Translucent so I guess in essence I was on both sides.
Q. All right. All right. Now, has your cash

flow been affected by your purchase of Liberty Wireless?
A No.
Q. So you weren't short on cash because of this?
A No.
Q. Were you short on cash for any other reason at the time?
A No. No.
Q. Did you have enough capital to make this purchase for Movida?
A Um, on paper, yeah. But, without getting too complicated, when you have a business deal things happen and all of a sudden we were upside down.
Q. What happened here?
A The business is run on cards so when a customer runs out of minutes they need to go and buy, purchase cards, purchase minutes. Because they were in bankruptcy, all the companies who were supposed to turn them back on so we could start receiving money immediately, did not.
Q. And they being Movida; you said they were in bankruptcy?
A Movida was in bankruptcy. So they had

promised us to turn the cards back on so that the air time that was being sold, we could redeem and get money for.
Q. Right.
A Didn't happen.
Q. How do you redeem?
A You walk into a Family Dollar and you pay $20. You get a card. You then get on your phone. You push the 11-digit phone in. It adds $20 to your phone.
Q. Okay. How do you make money off of this?
A We sell the cards to the stores.
Q. And what's the typical markup or percentage on those?
A Two, 3, 4, 5 percent. Depends on who it is.
Q. So, at the time Movida was selling cards and not getting paid, is that what was happening?
A Correct.
Q. If you bought, if a customer bought a card it wouldn't work or --
A No. It would work and we would have to -- we basically didn't want to turn any customers off because Sprint, we didn't want to kill the customers. If the customers couldn't use their phone, we would in

Page 102

A Because they're shipped, we just ship directly to stores. If it's a, you know, it's Wal-Mart, the cards are there, you know.
Q. And who ships the cards?
A They buy the pins directly from us or they use a card retailer, or, you know, it's a barter business where we sell to a company and then they'll sell to a company and they sell to a company. The cards come from everywhere. It's a, it's a, it's a, a self -- it's an industry in itself.
Q. All right. When you bought Movida did you get what you thought you were buying or was there a problem?
A We did not get as many subscribers as we thought we would but --
Q. Now, were all, was Movida customers all card-based or some of them subscribers?
A No, all card -- all prepaid.
Q. Interesting. Okay. Now, as a way to finance this, did you talk to Brett about selling him some phone equipment?
A Yes.
Q. Tell me how, what happened there.
A Brett approached Brightstar. We were going

Page 103

to sell him handsets that I know a portion of them were going to go to Brightstar and a portion of them were going to go to somewhere else. You know, at this point we were in the process of selling to him and he wasn't being as forthcoming as he was in the past. I was not really sure where they were going.
Q. Who is Brightstar again?
A A company out of Florida, a wholesale company, just a --
Q. Had they, so you say Brett approached Brightstar to --
A You know what? I don't know where he was selling them. I know he was selling them but at that point, you know, he was starting to go on his own. I'm not really sure where he was selling them.
Q. So he was selling telephone equipment?
A Yeah.
Q. All right.
A He was going to sell the telephone equipment I had in my warehouse.
Q. So he was buying from you; so you, so you approached him about this?
A I don't recall.
Q. All right. So you wanted to sell, had you

Page 104

sold equipment to Translucent before?
A Yes.
Q. Was this common or how often did you do that?
A I wouldn't say it's common but it happened.
Q. Well, like once a year or twice a year or --
A I don't recall.
Q. -- once a month?
A Not that often.
Q. How much did you usually sell them?
A I don't know. Couple thousand handsets. I'm not really sure.
Q. How much were a couple handsets worth?
A Three, four, 500,000. I think we did 800,000. It was all over the place.
Q. Okay. Did you tell Brett that you were trying to finance the Movida purchase?
A I don't recall.
Q. Now, you've looked at this complaint and you know a lot of this centered around one day, don't you; do you remember what day that was?
A The 11th.
Q. Of?

Page 105

A April.
Q. What year?
A 2008.
Q. All right. You remember -- what do you remember about that day?
A Um, I don't know, it was a year ago and everything was crazy and we were trying to keep everything together. I don't remember much of that whole month.
Q. What made it so crazy?
A That we had just, you know, purchased this company and there were a million problems and we couldn't get suppliers up and, you know just damage control for 20 hours a day. And there was all sorts of hidden bombs everywhere we didn't know about. And it was just a very hectic time.
Q. And by "this company" you mean --
A Movida.
Q. Where were you that day?
A Um, I believe in my office.
Q. Do you have a sharp recollection of that day?
A Not really.
Q. Do you remember what you were wearing, for

Page 106

instance, what --
A I'm not even sure I was wearing anything.
Q. Do you remember what the weather was like?
A No.
Q. All right. What time did you arrive at the office that day?
A No clue.
Q. Do you remember what time you left?
A No clue.
Q. Do you know where Brett was that day?
A Uh, not really sure. I was told at a later time he was in Vegas.
Q. When were you told he was in Vegas?
A I don't recall. I just remember hearing that.
Q. Did you speak to Brett that day?
A I don't recall but possible.
Q. How did you communicate with him?
A If I talked to him it would have been by cell phone.
Q. Now, did you guys mostly, do you, at your business you usually use cell phones or did you use land lines?
A Both.

Page 107

Q. Do you recall faxing any materials to Brett that day?
A No.
Q. Do you know if somebody in your company did?
A I don't recall.
Q. Who would if they had?
A Could have been Jennifer or Sam or Brandt. The fax machine's on Jen's desk so if something was faxed it might have been faxed to her.
Q. Did you consider trying to sell to anybody else to try and raise some money?
A I, I don't recall. I'm not sure. Couldn't tell you anybody specific.
Q. How about Global Services, is there --
A I, I don't remember.
Q. Is Global Services one of your customers?
A I'm not sure Global Services is.
Q. What is Global Services?
A I don't know.
MR. MIXTER: If you don't know, just say you don't know.
A I don't know. It sounds familiar. I just, I don't know.

Page 108

Q. Now, is that the same day you separated from Translucent?
A Um, I don't remember.
Q. Okay. You were trying to raise money though, right?
A I was trying to raise money, yeah.
Q. All right.
A The handsets that Brett was purchasing were actually from a previous deal, when he had told us he had the handsets sold and we had bought them and they were sitting in our warehouse for months and the deal never came through. And my fault for buying them because he didn't have it a purchase order but we knew we had an asset in those handsets and we needed to unload them.
Q. So these were handsets that you had purchased in anticipation of a sale to Brett, is that right?
A Well, Brett had said he had them sold so we got a great deal on them. We purchased them and Brett's deal fell through, as they most very often did.
Q. Did you have any, do you have any correspondence or documents on that?
A I would have to check.

Page 109

Q. All right. If you got it, we'd like to see it.
A Majority of communications between me and Brett was verbal, you know, very, most of what we did was cell phone to cell phone. He wasn't at his commuter very often because he was running back and forth from the warehouse. And there was only a phone in the front so most, most of the time our correspondence was by e-mail.
Q. E-mail?
A Not e-mail. I mean --
Q. Voicemail?
A -- cell phone.
Q. Did you guys text?
A Little, not much. I don't know why. We probably should have more.
Q. Take a look again at Exhibit 10, which is the agreement. You'll see it's dated April 11. Do you have any reason to doubt this was not signed on April 11th, 2008?
A Any reason to doubt it?
Q. Yeah.
A Um, no, not necessarily.
Q. And if you look again at, again on the

Daniel about this. Just seems like I forwarded an e-mail. Why, I don't know.
Q. Well, it says here, please call, "call me when you get this," it says.
A I don't recall. I don't know if he even called me. He might have. I don't know.
Q. Did you call him?
A Um, I don't recall.
MR. MIXTER: If you know.
A I don't know, no.
MR. BROOKE: Take a, we'll take a look at a document which we'll label as Exhibit 16.
(Greene Deposition Exhibit Number 16 was marked for purposes of identification.)
MR. BROOKE: And it is Bates TLC 211. Take a look at these.
THE WITNESS: Okay.
BY MR. BROOKE:
Q. What is this?
A An e-mail from me to Brett.
Q. Sent when?
A April 11th at 5:28.
Q. And what do you say?
A "Brett, any losses occurred arising from

any loss of Translucent, Brett Schmulian will be covered by APC Wireless in reference to AmeriFactor invoices for factoring. I am putting up APC Wireless's collateral. The invoices you are assigning are the complete responsibility of APC, not Translucent. All payments occurring from AmeriFactors will be paid in full by APC Wireless."
MR. BROOKE: Do you need us -- you've got that?
COURT REPORTER: Yeah. I'll be getting the exhibits at the end.
MR. BROOKE: Right.
COURT REPORTER: Yeah.
MR. BROOKE: All right.
COURT REPORTER: Yeah, if you could read a little slower, though, when you do read.
THE WITNESS: Sorry.
COURT REPORTER: Appreciate it.
BY MR. BROOKE:
Q. Why did you send this e-mail?
MR. MIXTER: Objection. Go ahead.
A I don't remember.
Q. Do you know why you sent this e-mail?
A I don't remember.

Q. Do you recall discussions with Brett about this topic?
A Not at this point, but, you know, I don't, I don't really know what dates. You know, it was all kind of mumbled together but he, you know, I, I don't recall.
Q. Do you know why you said that you put up APC as collateral?
A Probably to calm him down.
Q. Why was he upset?
A He wasn't upset. He was just nervous.
Q. Why was he nervous?
A Don't know. He's a nerves person.
Q. Why did you think there would be losses?
MR. MIXTER: Objection.
A I didn't think there would be losses.
Q. All right. Why did you think you would need to give him these assurances?
MR. MIXTER: Same objection. Go ahead.
A Um, I don't recall.
Q. Do you recall why you said these invoices are the complete responsibility of APC, not Translucent?
MR. MIXTER: Objection.

A Don't recall.
Q. Do you recall why you said any payments will be paid in full by APC Wireless?
A I don't remember.
Q. This was a million dollar deal, wasn't it?
A Uh, kind of.
Q. Why kind of?
A We had, it was a million dollars on paper but they actually only funded us a portion of what they were supposed to fund us. They never funded us completely that I know.
Q. Who is "they"?
A AmeriFactors.
Q. How much were they supposed to fund you?
A You know, I don't remember but it was X amount of dollars and we ended up receiving just a portion of that.
Q. Why did you only receive a portion?
A They didn't have an answer.
Q. They being --
A The factor.
Q. AmeriFactors? How much did you expect to get?
A Um, I, I don't recall. A million dollars

and they gave us 600, something like that. 01:04PM
Q. If you take a look at these two invoices, on the back of exhibit -- well, let's back up. Take a look at the first one, Exhibit 14, and these are TLC 116 and 117. 01:04PM
MR. MIXTER: You're at 14, okay. 01:04PM
A Okay. 01:04PM
Q. One was for, the first one is invoice 3006092, is that correct? 01:04PM
A That's what it says. 01:04PM
Q. And it's for $1,039,373.26, is that right? 01:04PM
A Correct. 01:04PM
Q. And the second invoice is invoice 3006094, is that right? 01:04PM
A Correct. 01:04PM
Q. And that's for $228,591, is that right? 01:04PM
A That's what it says. 01:04PM
Q. So, you're telling me for a deal worth on paper 1.2 million-plus, you only got 600,000? 01:04PM
A I believe that those numbers, they're in the neighborhood of those numbers. We were supposed to get 80 percent and we got like, like 50 percent. 01:05PM
Q. And you don't know why you only got 50 percent? 01:05PM

A No. I don't, I don't believe the paperwork said 50 percent. For some reason they short-paid us. I don't know why. 01:05PM
Q. Are you still buying with AmeriFactors? 01:05PM
A Um, are we? 01:05PM
MR. MIXTER: I would have no idea to be completely frank with you. If you don't know, say you don't know. 01:05PM
MR. BROOKE: Okay. 01:05PM
MR. MIXTER: Oh. Well, I think he means -- 01:05PM
THE WITNESS: Are we still factoring invoices? Yes. 01:05PM
MR. MIXTER: Let me interject something here. He is trying to differentiate between paying them back -- 01:05PM
MR. BROOKE: Right.
MR. MIXTER: -- versus new deals. 01:05PM
MR. BROOKE: Right.
MR. MIXTER: Now, what, is your question -- 01:05PM
MR. BROOKE: That's my question. 01:05PM
BY MR. BROOKE:
Q. Have you done any new deals or subsequent deals? 01:05PM
A No. 01:05PM

Q. All right. This is the only deal you've ever done with AmeriFactors? 01:05PM
A Correct. 01:05PM
Q. All right. Did you ever intend to ship these goods? 01:06PM
A Uh-huh. 01:06PM
MR. BROOKE: Take a look at TLC 116 in front of you. This is part of Exhibit 14 and take a look at what we'll mark as Exhibit 17. 01:06PM
(Greene Deposition Exhibit Number 17 was marked for purposes of identification.)
THE WITNESS: Okay. 01:06PM
BY MR. BROOKE:
Q. Do you know what this is? 01:06PM
A No idea. 01:06PM
Q. Do you see at the top, it says Expeditors, is that right? 01:07PM
A It does. 01:07PM
Q. That's a contract of carriage, isn't it? 01:07PM
A I have no idea. I've never seen it before in my life. 01:07PM
Q. All right. Well, it says it's from APC Wireless, doesn't it? 01:07PM
A It does.

Q. And it says it's going to Cooper General Global Services, right? 01:07PM
A It does. 01:07PM
Q. Who is Cooper General Global Services? 01:07PM
A They're a cell phone company in Miami. 01:07PM
Q. And how was it that you were shipping goods from APC to Cooper General? 01:07PM
A I don't know. I didn't handle shipping. 01:07PM
Q. Did you know that you were sending equipment to Cooper General? 01:07PM
A No. 01:07PM
Q. Did you know you were doing business with Cooper General? 01:07PM
A I know we at that point been talking to them. I don't know if we were doing business with them or not. We were trying to. 01:07PM
Q. What kind of business were you trying do with them? 01:07PM
A We were trying to offset some of our refurbishing business. 01:07PM
Q. So what did Cooper General do? 01:07PM
A They were going to offset, do some of our refurbishing business. 01:07PM
Q. So they were going to refurbish for, on 01:07PM

MR. BROOKE: The food is here. Why don't we take a break, go off the record.
VIDEOGRAPHER: And we're off record at 1:38.
(There was a break in the proceedings.)
BY MR. BROOKE:
VIDEOGRAPHER: We're back on the record at 2:33.
BY MR. BROOKE:
Q. Thank you. Mr. Greene, you understand you're still under oath?
A Yes.
Q. All right. You at one point had mentioned that there's a deal that had fallen through involving Translucent and you had inventory because of that, is that right?
A Correct.
Q. Do you have any paperwork as a result of that?
A Yeah. I'm sure I do.
Q. All right. If we could have that.
A And which, are you talking about the excess inventory that I had.
Q. Yeah, yeah, yeah.

A I mean, I can check. There should be.
Q. Do you still have excess inventory?
A We still have that inventory.
Q. All right.
A A lot of it, not all of it.
Q. Does AmeriFactors have a lien against that?
A Um, I don't know. You're going to see the agreement in a minute.
Q. All right. This is a document we'll mark as Exhibit 24. It's TLC 204 through 208.
(Greene Deposition Exhibit Number 24 was marked for purposes of identification.)
BY MR. BROOKE:
Q. Take a look at this, tell me if you know what it is.
A Appears to be balance sheet from Translucent Communications.
Q. What is the cover sheet?
A Translucent's financials, conference dial-in for 11:30 Eastern Time.
Q. And it lists a number of people there. Who is Kevin Gowen?
A Kevin Gowen is the owner of AmeriFactors.
Q. And then there's Dennis Bays and he's also

at AmeriFactors, is that right?
A I don't even know that guy.
Q. You're listed here in the cc, right?
A Yes.
Q. You're participating in this conference call?
A I don't believe I ever participated in it.
Q. Who is an Angela Asencio?
A No idea.
Q. Do you have any idea why you or Sam or anybody else would be participating in a conference call looking over Translucent financials?
A No clue.
Q. Were you familiar with Translucent's financials?
A As far as I knew, we, they were never completed and I still haven't seen them for 2008.
Q. Do you know if this conference call took place?
A No idea.
Q. Do you know who would know?
A Probably "grc@vrb" and Sam and -- anybody else on it? Kevin Gowen and Dennis Bays.
Q. All right. Go back to Exhibit 14, which is

the one we've looked at more than once now, which is TLC 115 -- 115, 116 and 117. Do you have that in front of you?
A Yeah.
Q. And these were invoices, the first one is 3006092 and the second one is 3006094, is that correct?
A Where is that?
MR. BROOKE: Take a look at the invoice with Mr. --
MR. MIXTER: Second and third.
THE WITNESS: Okay. Yeah.
MR. BROOKE: All right. Let's take a look at what we'll mark as Exhibit 25.
(Greene Deposition Exhibit Number 25 was marked for purposes of identification.)
THE WITNESS: Okay.
BY MR. BROOKE:
Q. And can you tell me what this is?
A Appears to be an invoice.
Q. To whom?
A To Simplexity.
Q. From?
A APC Wireless.
Q. And are you familiar with this document?

little bit --
THE WITNESS: Okay.
COURT REPORTER: -- when you read?
A "April 15, 2008, Translucent Communications, attention Brett Schmulian, 8939 Northwest 23rd Street, Miami, Florida 33172, Re enclosed invoices 3006092 and 3006094. Dear sir or Madam, In reliance upon your verification that the referenced invoices from American (sic) Premiere Corp., d/b/a APC Wireless is due in full, AmeriFactors has purchased the invoices. American Premiere Corp., d/b/a APC Wireless has assigned all of its rights in the account to AmeriFactors and we hereby submit the enclosed original invoice for your records. Payment on the above referenced invoices and all invoices due to American Premiere Corp., d/b/a APC Wireless from this day forward should be made payable to AmeriFactors and mailed directly to AmeriFactors and mailed directly to AmeriFactors, PO Box -- "
MR. BROOKE: Well, That's enough. I mean --
THE WITNESS: Yeah.
BY MR. BROOKE:
Q. But, so, at what point did you realize that

this transaction had taken place?
A That the transaction had taken place?
Q. That there had been a sale to AmeriFactors.
A Um, I don't recall.
Q. Do you think you learned of it on that April 11th, that Friday afternoon?
MR. MIXTER: Objection. If you know.
A I don't recall.
Q. At what point do you know you became aware of it?
A I couldn't pinpoint that.
Q. Well, was it definitely within a few days of this original underlying transaction or months later or when do you think it happened?
A I don't recall.
Q. Do you remember discussing this with Daniel?
A Um --
MR. MIXTER: Toledo?
MR. BROOKE: Toledo, yeah.
A I don't know if I had any discussions with Daniel.
Q. Do you remember discussing this with Sam?
A Um, not really. He pretty much handled it

from start to finish.
Q. Well, once you learned of it what did you do?
A Um, told Brett that phones weren't shipped, that we would be responsible, we would pay for it.
Q. And what happened then?
A Brett said okay.
Q. Did you pay for it?
A Uh, paid a substantial amount of money down and paying every week since.
MR. BROOKE: Let's take a look at Exhibit 27, which is TLC 9 and 10.
(Greene Deposition Exhibit Number 27 was marked for purposes of identification.)
BY MR. BROOKE:
Q. Take a look at it and tell me if you know what it is.
A Looks like a custom transaction detail report from Sellman Hoff.
Q. From Sellman Hoff?
A That's what it says, Sellman Hoff, LLC on the top.
Q. Yeah. And what is Sellman Hoff?
A David Sellman's firm.

Q. All right. And appears that money came in, is that right?
A Yes.
Q. And it came into Cozak, is that right?
A Um, I don't know if it came into Cozak or went into his, his escrow account.
Q. Okay.
A It looks like it went into his escrow account.
Q. Then the money went -- that money went out, too, didn't it?
A It appears that it went to Young Conaway, Bank of America and Cole Schotz.
Q. Do you know what Young Conaway is?
A They are the attorneys for the Movida bankruptcy.
Q. And who is Cole Schotz?
A Our bankruptcy attorney.
Q. So this relates to the payment from Movida, right?
A Yes, I assume.
Q. And this took place, that took place, looks like the money went out to Young Conaway on the 16th of April, is that right?

Page 202

Q. All right. And then it's an inquiry about invoices, isn't it?
A Correct.
Q. Do you recall this?
A No.
Q. This is dated May 23, isn't it?
A May 23rd, correct.
Q. And at this point did you know that Brett was concerned about the situation?
A Brett was concerned but also, you know, at some point he was supposed to be selling the phones and that never happened either. I mean, there were a lot of different pieces to this puzzle.
Q. Why was he supposed to be selling the phones?
A Well, the whole time, you know, he said he was going to purchase them. He continued to try to sell them. He just could never make it happen. So there were a lot of different pieces to this puzzle.
Q. When did he say he was going to buy the phones?
A That's how this whole thing came about. He was going to buy the phones and resell them. He had, somebody was going to buy them, and that's how this

Page 203

whole thing started. Originally, you know, it started out that, you know, he had somebody to buy the phones. There were phones we had in our inventory.
Q. Okay. But I thought you said you knew nothing about this transaction.
A The details, no, but I know that Brett was trying to sell phones, phones we had in our warehouse. I know that he kept talking about it and talking about it. It never happened, that I do know, but the particulars, the signed papers and all that stuff, the e-mails back and forth between him and Sam, I, I don't know about.
Q. Do you have any -- you say you know this. Do you have any documents to back that up?
MR. MIXTER: Objection. That's a pretty broad question. There's documents here that back it up.
Q. How do you know that, that he was going to try to sell these phones?
A Everybody knew. You know, that's how this whole thing started. He was going to try to sell the phones. He was going down to South America. I think I brought this up earlier. He was trying to sell them in South America, through Brightstar, and, you know, he's,

Page 204

you know, he had some plan where he was going to sell them. He just, you know, as usual, phones never got sold.
Q. So how come you never shipped them?
A Because he never sold them.
Q. Did you act as a warehouse for Brett regularly?
A Yes, we did. These phones were part of a previous deal that Brett had sold X amount, maybe it's 10,000, 20,000; I don't remember the specifics. But it only ended up selling half so we were actually stuck with this inventory. It was actually cash that was sitting in our warehouse from a deal that got soiled from him. That's where the majority of this inventory came from.
Q. So is that why there were open invoices back on April 11?
A Possibly. I don't know. I think that, I think by April 11th everything was, I don't think there was outstanding -- I don't, I don't remember. Because I think that was just money that was owed. I don't think at that point it was for an invoice. I'm not sure.
Q. Well, why do you think you, that the

Page 205

invoices were created?
A Probably in anticipation of Brett taking the phones.
Q. Wasn't it just to get money out of AmeriFactors?
A No. A big part of it, he said he had the phones sold.
Q. Well, didn't you need money to finance the deal with Movida?
A Absolutely.
MR. BROOKE: Let's take a look at TLC 192. Take a look at this. We'll make this Exhibit 39.
(Greene Deposition Exhibit Number 39 was marked for purposes of identification.)
BY MR. BROOKE:
Q. What's this?
A An e-mail from Brett to me dated May 30th.
Q. And what's it about?
A It is an e-mail from Brett to me stating that "These guys are calling me nonstop, stating that the invoices are seriously past due. They claim you guys gave us 30 days and its closing in on 50. Please let me know when you are going to pay it off or how to handle it." They claim they are going to report this

to the agencies and take action. Please let me know what to do."

Q. Were you going to pay it off?

A We were either going to sell the phones or I was going to pay it off, correct. My intention was never to leave him holding the bag.

Q. If you flip back to, way back to Exhibit 16, which is TLC 11 -- 211. I can show it to you.

A That might be quicker.

MR. MIXTER: Here. Here. Hold on. I got it.

MR. BROOKE: Exhibit 16. Right before it. There we go.

MR. MIXTER: There you go.

THE WITNESS: Okay.

BY MR. BROOKE:

Q. That's consistent with what you told him on April 11th, isn't it?

A Yes.

MR. MIXTER: Just please note objection.

THE WITNESS: I'm sorry.

MR. MIXTER: Go ahead.

A Yes.

BY MR. BROOKE:

Q. Okay. So you were aware of this from April 11th forward, weren't you?

MR. MIXTER: Aware of what?

A In what context?

Q. That there was going to be, you were going to have to take care of this problem?

A No.

MR. MIXTER: Let me note an objection.

THE WITNESS: Okay.

MR. MIXTER: Go ahead. You can answer.

A Okay. Not necessarily but, you know, he was nervous so I was trying to appease him, letting him know that if anything did go bad that we would be responsible. And it did go bad and we have been responsible and we've been paying it ever since.

Q. So you let him know as early as April 11th that you would take care of this?

A I would let him know from day one that he would not be responsible for this.

(Greene Deposition Exhibit Number 40 was marked for purposes of identification.)

Q. All right. This is Exhibit 40. Take a look at this.

A Okay.

Q. What is this?

A This is a factoring agreement that they sent from me to Brett -- from Sam to me? From me, from Sam to me to Brett? I guess Sam forwarded it to me and then I sent it to Brett? Yes?

Q. I'm asking you.

A It looks like it is an e-mail sent from Sam to me that I then forwarded to Brett.

Q. And you said Paul to discuss, is that right?

A That's what it says.

Q. Do you remember telling Brett that you wanted to discuss this?

A No.

Q. Do you remember discussing it with Brett?

A Um, at this point we had had several conversations, yes.

Q. And, do you remember the substance of those conversations?

A No.

Q. Do you remember anything about those conversations at all?

A Um, you know, there were conversations having to do with AmeriFactors. There were

conversations having to do with he was trying to transship I-415s from Nextel and one of my techs was trying to unlock it for him.

Q. What is I-41 --

A I-415 is a Boost handset that he was transshipping to Avantel. And he couldn't break it. He couldn't figure out how to reprogram it because Boost had put in a lot of programming. And so he was trying to get one of my techs, Rami Mansour, who is gone now, he was trying to get him to actually do the unlocking and Rami wouldn't do it. And his business is kind of contingent on it so he was pushing real hard to have that done.

MR. BROOKE: Let's take a look at the next one we'll mark --

THE WITNESS: He did figure it out, though.

MR. BROOKE: Mark this as Exhibit 41.

(Greene Deposition Exhibit Number 41 was marked for purposes of identification.)

BY MR. BROOKE:

Q. Tell me what this is.

A This is an e-mail from Kevin to Brett and then from Brett to me.

Q. And Kevin is?

A Kevin Gowen is the President and CEO of AmeriFactors Financial Group, LLC.
Q. And what is Brett asking you to do?
A Advise him.
Q. And did you advise him?
A I don't recall.
MR. BROOKE: Okay. Let's take a look at what we'll mark as Exhibit 42.
(Greene Deposition Exhibit Number 42 was marked for purposes of identification.)
BY MR. BROOKE:
Q. Take a look at that. Tell me if you know what it is.
MR. MIXTER: Take your time and read it. Don't just jump in.
A Looks like bribery. Is that legal? Just checking. Okay.
Q. What is this?
A An e-mail, appears to be a blackmail e-mail from Brett Schmulian to me.
Q. Why do you call it a blackmail e-mail?
A Well, it says if you don't do this by this time, then I'm going to do this.
Q. Why is that blackmail?

A Isn't that the, what is the, what is the definition of blackmail? If I wrote this e-mail my attorney would have my neck. But it's all up for interpretation.
Q. Do you remember getting this?
A No.
Q. Do you read your e-mails?
A I do but I get four to 500 e-mails a day, and, to be honest with you, I lose a lot of them.
Q. So if you got, did you -- you knew at this point though that there was a problem with Brett, right?
A Correct. By June 3rd, yes, I assume I did.
Q. And you said earlier you knew by mid May?
A Yeah.
Q. And if it was a million dollar deal, why didn't you pay more attention to it?
MR. MIXTER: Objection.
A Believe it or not, this was the smallest of my headaches at this point. Not that it's not important but we had, at this point we had bitten off way more than we could chew and things were falling apart everywhere and working 18 hours a day and it just was one of 50 things, and it was just, you know, a

90-day period when, you know, just, everything was just crazy.
Q. When you say you had bitten off more than you could chew, what did you mean by that?
A Well, when we bought the company, you know, to quote the bankruptcy attorney, "You bought a dog with fleas. Deal with it." And we had no idea the software didn't work. Sprint didn't work. Nothing worked. There's a reason the company went into bankruptcy. A hundred thousand subscribers and they're still in bankruptcy.
Q. This is Movida?
A Movida, correct. So at this point, not to discount this problem because I'm not trying to do that but we had an insane amount of, I mean, it was just a 90-day period that I don't even remember -- my girls graduated from preschool. I don't remember even going, unfortunately.
Q. Now, why do you think this was a problem?
A Well, obviously Brett's upset. He hadn't sold the phones. I hadn't paid -- even though the invoices are not 1.2 million, I had not paid back AmeriFactors. We assumed from our receivables that we would be able to pay them back but we didn't know when

we purchased the companies that we wouldn't be able to collect any money for three weeks but still be responsible for all the billing, which is exactly what happened.
Q. Now, why do you say it wasn't 1.2 million?
A Because it was never 1.2. I think all they gave us on this was five or 600,000. They only gave us 50 percent. I guess this is posturing by a factoring company.
Q. Well, AmeriFactors was trying to collect 1.2 million, wasn't it?
A Yeah, they were trying. Well, I assume, yeah. I don't really know why.
Q. Well, that's --
A They never lent that.
Q. We can go back and look at the other documents but --
A I'm not, I'm not doubting what you're saying. I'm just doubting the validity of them trying to collect 1.2 million when they only lent six.
Q. They were trying to make a profit, weren't they?
A Goddamn them.
Q. They were attaching these two invoices

worth 1.2 million concerning their invoices, weren't they?

A Yes, they were.

MR. BROOKE: Let's take a quick break while he fixes the tape.

THE WITNESS: Okay.

MR. BROOKE: I'm not going to go anywhere but -- we're going to go off the record to fix the tape.

VIDEOGRAPHER: Off the record at 3:39.

(There was a break in the proceedings.)

VIDEOGRAPHER: We're back on the record at 3:41. This begins tape four.

(Greene Deposition Exhibit Number 43 was marked for purposes of identification.)

BY MR. BROOKE:

Q. All right. This is TLC 189 through TLC 191. It has been marked as Exhibit 43. Please take a look and tell me if you know what it is.

A Okay.

Q. What is it?

A It is an e-mail from Kevin Gowen to Brett, which is, I think --

Q. Well, isn't it what we just looked at --

A Yeah.

Q. -- only with an e-mail from you on top of it?

A Yes.

Q. All right. Tell me about, the only part that's new here then is an e-mail from you, is that right?

A Yes. This --

MR. MIXTER: That's all.

A Okay. Yes. Agreed.

Q. And what do you say?

A I say, "Brett, the only way for us to credit the account is for you to send back the goods. We will issue a new refund and take full responsibility. You are not liable if you send the goods back. It then becomes our debt. I told AmeriFactors that we extended you 120 days based on their paperwork. It is 100 percent our fault and we will take the full blame. This is an easy solution. I' can have David Sellman send you the release prior to shipping. Ship it immediately though. Don't do anything that cannot be undone. Just send the phones back. We are finally seeing some relief on the Movida side."

Q. Why did you tell him to send the phones back?

A This I believe is an e-mail that me and Brett orchestrated to try to get him to return the phones so that the debt would become ours and not his.

Q. Did he have the phones?

A He did not have the phones.

Q. Why did you say "it was a hundred percent our fault."?

A Because, as I said from the beginning, I don't believe this is his debt. This is my debt. And, just is what it is.

Q. And why did you say, "We will take full blame."?

A Because it's our debt.

Q. Why is APC getting, I mean -- excuse me. Why is Translucent getting sued in Florida, not you?

A Uh, maybe because I don't have an office in Florida. I don't know. Not me suing them.

(Greene Deposition Exhibit Number 44 was marked for purposes of identification.)

Q. Take a look at Exhibit 44 -- 44, and again, the only part new as far as I can tell is the very top.

A "From Paul to Brett. I won't be

available until -- "

MR. MIXTER: Hold on a second. There's no question.

Q. Take a look at it.

A Okay.

Q. See if you have anything, if there's any reason to doubt that the only difference between what we've just looked at is this e-mail from you.

A Yes, I believe that it's the same. A different response to the same e-mail?

Q. All right.

A Right?

Q. Well, I'm asking you. I'm asking you.

A That's what it appears to be, a different response to the same e-mail.

Q. All right. And what did you say? Slowly enough so the reporter can get it.

A "I won't be available until tomorrow night. Any way to hold off your issue until then? Don't let these guys scare you. If you return the goods and we accept them the liability is on us. And I will sign a document attesting to that."

Q. So, again, did he have the goods?

A No, he did not.

Page 218

Q. Why did you tell him to return them?
A Because that would put the liability on us because if he did not have the goods, then on paper it would put liability back on us.
Q. Did you ever tell AmeriFactors that you had the goods?
A I don't recall the conversation. I had very limited conversation with them. Sam handled them. I mean, I had very limited conversations with them. I don't recall any of them.
Q. Did you ever tell, did you ever instruct Sam to tell AmeriFactors that you had the goods?
A No, I did not. Not that --
Q. Do you --
A I'm sorry. I don't recall. I don't know.
Q. Do you ever recall telling Sam anything about how to get rid of this problem?
A Um, I don't recall. I mean, I'm sure we discussed it but I don't remember.
Q. So, were you basically letting Sam handle this or were you handling it at this point?
A Sam had handled it up until this point and then at this point things had started to calm down a little bit around June, July. And, obviously that's

Page 219

when I got involved, so, see the e-mails going back and forth.
Q. And this one we were just looking at is dated June --
A 4th.
Q. -- 4th and the one before is dated June 3rd, isn't it?
A Yes.
(Greene Deposition Exhibit Number 45 was marked for purposes of identification.)
Q. All right. Let's take a look at something, the next one, which is exhibit, which is TLC 185 and we've marked it as Exhibit 45. I don't need you to read this whole thing out loud but what is this?
A This is an e-mail that I sent to Brett, which is a response to one of his e-mails, that was headed, above board. I don't remember what that part of it is but I can get it. "Brett, I agree that we should not do anything -- "
MR. MIXTER: You don't have to read it.
MR. BROOKE: Yeah.
MR. MIXTER: You described it. It's an e-mail.
BY MR. BROOKE:

Page 220

Q. Right. Why do you think this is a response to Brett?
A Because Brett all of a sudden had started acting like he never, ever did anything wrong and he was this victim and this was just a reminder to him that he was very far from being a victim.
Q. It doesn't say on the subject "re above board," it just says "above board," is that right?
A Correct.
Q. So there's nothing here on this document that indicates it's a response?
A No. "paulvangreene@gmail. I don't know why it's --
MR. MIXTER: You answered the question.
THE WITNESS: Okay. Sorry. Go ahead.
BY MR. BROOKE:
Q. Let's look at the last paragraph.
A Yes.
Q. Would you just read that last paragraph slow enough so that the reporter can get it.
A "As I mentioned before, because I unintentionally misled you on the payment terms and due to the harassing nature of the phone calls you are receiving I will credit you the complete invoice as

Page 221

soon as the phones land in my warehouse."
Q. Okay. Why are you telling him that you'll credit when the phones land in your warehouse?
A Attempting to get the debt off of him and onto me.
Q. Even though the phones were in your warehouse already, right?
A Correct.
Q. So was this really above board?
A Was this above board?
MR. MIXTER: Objection go ahead.
A Um, no.
MR. BROOKE: Let's take a look at TLC 65 through 66 plus 106 and 107, if you can, and tell us if there's a problem with this but this will be Exhibit 46.
(Greene Deposition Exhibit Number 46 was marked for purposes of identification.)
BY MR. BROOKE:
Q. Take a look at these, tell me if you know what it is.
A It appears to be a negotiation --
MR. MIXTER: There's no question pending.
THE WITNESS: I'm sorry.

Q. Do you know anything about this?
A This particular letter?
Q. Yeah.
A No.
Q. Do you know anything about being, the idea of sending phones, where it came from?
A No. From the very beginning I tried to send them phones. That's how this whole thing got started. There were actually phones and there was actually a sale.
MR. MIXTER: There's no question.
Q. Why did Rami Mansour leave your company?
A He got an offer for $130,000 and we weren't in a financial position to pay him. He was making 70 with us, 68,000. Is there a different reason?
Q. Now, why are you paying AmeriFactors?
MR. MIXTER: Objection. Go, go ahead. You can answer.
Q. Yeah. Why are you paying AmeriFactors?
A Because I owe them money.
Q. Why do you owe them money?
A Because --
MR. MIXTER: Same objection.
Q. And you can continue to answer.

A Because we got the money and we owe them money.
Q. We have been discussing an agreement you have with them. Did you sign an agreement with AmeriFactors?
A Yes.
Q. All right. Do you know if a signed agreement exists someplace?
A It does.
Q. Do you have a copy of it someplace?
A I don't but David does. And, the reason he sent this is because he was in the middle of a conference call and this is the exact copy. He does have signed copies of it.
Q. We're all looking at a document that was sent to us at the top, says June 15, 2009, 2:22 p.m., right?
A Correct.
MR. BROOKE: And then in the right-hand side, it says No., 7197 P.1 and the last page says P.9, doesn't it, right? So we're all looking at the same thing?
MR. MIXTER: Yes.
MR. BROOKE: All right.

THE WITNESS: Correct.
MR. BROOKE: So let's make it Exhibit 49. You each have a copy, right?
THE WITNESS: Uh-huh.
MR. BROOKE: All right. So this is Exhibit 49.
(Greene Deposition Exhibit Number 49 was marked for purposes of identification.)
BY MR. BROOKE:
Q. Flip to the third page, paragraph two, right?
A Yes.
Q. It says that upon full payment of all sums required by this agreement AF and the APC parties shall mutually, fully, and then it goes on for several lines here, et cetera, et cetera.
A Correct.
Q. But it goes, "shall mutually and fully, irrevocably and unconditionally release and forever discharge." Do you see that?
A Yes.
Q. So this means that there's no release until the full payment is made, is that correct?
MR. MIXTER: Objection. The document

speaks for itself. You can answer if you know.
A I don't know.
Q. Is that your understanding of the situation?
A Um, long time since I signed this but yeah.
Q. When did you sign this?
A Um, I think December. Assume -- maybe January.
Q. Well, do you know or --
A I'm guessing because the last page says witness our hand and seals this blank day of January.
Q. And did Translucent sell products under, through its Web site?
A Not that I'm aware of.
Q. Do you know where the name Translucent came from?
A No.
Q. Was that a name that was in operation before you got into business with --
A No.
Q. -- Brett?
A No.
Q. So, did he tell you he wanted to name the company Translucent?

A I mean, I don't remember whose idea it was. 04:04PM
Q. Could it have been your idea? 04:04PM
A Could have been my idea. Could have been his idea. And originally there was another partner, Brian -- Brian something that Brett lent money to and the guy didn't pay him back and Brett threw him out. Might have been his idea. I don't know. 04:04PM
MR. BROOKE: Oh, here we go. Okay. Just have some paper-clip issues here. This is TLC 50 -- I mean, excuse me, this is Exhibit 50, which is TLC 1, 2 and 3. There's one set, two sets, Exhibit 50. 04:05PM
(Greene Deposition Exhibit Number 50 was marked for purposes of identification.)
BY MR. BROOKE:
Q. If you flip through -- well, at the very bottom of the page it says that -- I'm sorry. Let's start at the top. It says, "WHOIS information for translucentcommunications.com, is that right? 04:05PM
A Correct. 04:05PM
Q. And then it lists the registrant as Translucent Communications starting on the bottom of the page and it flips over to the next page, listing you and your address, is that right? 04:05PM
A Correct. 04:05PM

Q. Are you affiliated with Translucent Communications? 04:06PM
A Right now? 04:06PM
Q. Yeah. 04:06PM
A No. 04:06PM
Q. Why is it still in your name? 04:06PM
A Because all the accounts and everything was frozen. They wouldn't allow us to make any changes because there's the lawsuit, an outstanding lawsuit. 04:06PM
Q. Why did you make a change on October 7? 04:06PM
A Because Brett had not paid his half of the Web site. So, I pointed the Web site to my Web site hoping he would pay his half of the Web site, which he laughed at, never did. He was using my material on his Web site. 04:06PM
Q. How is it your material, the content? 04:06PM
A The content, we paid for it, we built it. It was our exact Web site. All he did was change the contacts and the name on the Web site. It was an exact copy of our Web site. 04:06PM
Q. Why didn't you just close down the Translucent Communications Web site? 04:06PM
A At the time I don't remember. I think Rami Mansour did it. He had it pointed somewhere. I don't know. It wasn't -- I don't remember. 04:07PM

Q. Did you tell Brett you were doing this? 04:07PM
A No, I don't think so. 04:07PM
Q. Now, did you have access to Translucent's e-mails at that time? 04:07PM
A No. 04:07PM
Q. When did you have access to Translucent's e-mails? 04:07PM
A Never. 04:07PM
Q. So no one was ever, you never had Translucent's e-mails forwarded to you? 04:07PM
A Did I? No. 04:07PM
Q. Did your company? 04:07PM
A Not that I know of but, you know, can't say for sure. I never gave anybody the directive to point them anywhere. 04:07PM
Q. Did somebody else do that? 04:07PM
A Not that I know of. 04:07PM
Q. Is there somebody who had access to the host master e-mail for -- 04:07PM
A The only person who had access was Rami Mansour. I didn't even have access. I don't know what the password log-in is. 04:08PM
(Greene Deposition Exhibit Number 51 was marked for purposes of identification.)

MR. BROOKE: Now, you say the content -- take a look at Exhibit 51. Yeah, these are brand new documents. We just got these today. You haven't seen these before. 04:08PM
MR. MIXTER: All right. 04:08PM
BY MR. BROOKE: 04:08PM
Q. Do you know what these are? 04:08PM
A Nope. 04:08PM
Q. Do you see the address; have you heard of Ciplex in West Hollywood before? 04:08PM
A That's the company that built the Web site. 04:08PM
Q. Which Web site? 04:08PM
A APC Wireless. 04:08PM
Q. How about Translucent's Web sites? 04:08PM
A I think they're the ones that changed the name. 04:08PM
Q. Changed the name for what? 04:08PM
A Just changed the APC Wireless to Translucent and changed the directors. 04:08PM
Q. Now, you'll see on the left below, Simplex's address. It says "Translucent Communications, Paul, Paul," right? 04:08PM
A Yes. 04:08PM

Q. Is that you?
A Uh, I don't know. "Paul Paul?." I have a last name.
Q. I'm asking you.
A Your guess is as good as mine.
Q. Now, you see that this, the third page is addressed to APC Wireless, Sam Bahreini, right?
A Yes.
Q. And again this one says a hundred percent payment, right?
A Yes.
Q. So, apparently according to this the Web site was paid for, right?
A Just the changes.
Q. Well --
A Not the Web site.
Q. -- this is December 14, 2007, right?
A Then that is the date but then the first one is June 26, 2008, which, why would they bill me if I had nothing do with the company then? They're billing, on the 27th they're billing Sam Bahreini, on the 28th, they're billing me, and on the 13th they're still billing me. So why are they billing me?
Q. Well, the 13th is May and --

A May 13th, 2008.
Q. Right. And the next one is June 26th, so you're out of the company then so why do you, why do you care if they're not getting -- if this bill is paid or not paid, why do you care?
A Um, I don't -- I didn't say I did, did I?
Q. Well, you were saying they hadn't paid for it but --
A Well, I don't know if they paid for it or not.
Q. Well, look at the --
A I can see right here they were billed but I don't know if they paid for their changes or not. I know they didn't pay us because it costs us $10,000 to build the site. I know they didn't pay us. Whether they paid Ciplex or not, I don't know.
Q. Did you invoice them $10,000?
A No. We invoiced them for half.
Q. All right. Do we -- can you get us a copy of that invoice?
A I can attempt to.
Q. All right. Why wouldn't you be able to?
A Because Sam Bahreini wiped out his hard-drive and he's the one who billed them. We're

having a hard time getting all of our end-of-year records right now. We are in an attempt, we paid a good sum of money to this guy Blazer who is trying to build our hard-drives back.
Q. Does Americas Premiere Corp have any assets?
A No.
Q. Who owns the phones in the warehouse?
A Um, probably Movida. There's a lot of money owed from Movida to APC.
Q. All right. Does -- oh, Movida has assets?
A What do you mean by assets?
Q. Well, I mean --
A It has subscribers. It's got a debt of about a million and a half dollars.
Q. How about the inventory in the warehouse?
A I mean, yeah, it's an asset.
Q. Any other inventory besides those phones?
A (Shaking head from side-to-side.)
Q. That's the only inventory you have?
A Correct.
Q. Are you out of the phone business now?
A The handset business?
Q. Yeah. Yeah.

A (Shaking head up and down.)
Q. So other than the ones that are, you have been talking about all afternoon, that's it?
A Correct.
Q. How about Cozak, what's, Cozak LLC, what kind of assets does it have?
MR. MIXTER: I'm going to object to -- you really aren't entitled to ask asset questions until you get a judgment. Now, if you're asking what the nature of their business is because of the allegations about the diversion of business, that's --
MR. BROOKE: Well, I'm also trying to save time and if you want to wait till after --
MR. MIXTER: Yeah.
MR. BROOKE: Yeah.
MR. MIXTER: That's why I hesitated before I responded. All right. Go ahead. I'll let it go on for a limited period of time.
MR. BROOKE: I mean, you can object. I understand. You can keep it out if you want to.
MR. MIXTER: And based on our conversation off the record before, I will let you go down that path for a while anyway.
MR. BROOKE: My goal is to save time and

A Yes.
Q. Do you now recall any of these phone calls that took place on April 11th?
A No.
MR. MIXTER: I'm going to object because I think it's multiple questions but go ahead.
Q. All right. Do you recall phone calls, taking part in telephone calls on April 11?
A No.
MR. MIXTER: With Mr. Schmulian?
Q. With Mr. Schmulian.
A No.
Q. All right. Do you recall having any telephone conversations on or around April 11, 2008 with Mr. Schmulian?
A Do I recall? No.
Q. Did you fax any documents yourself to Mr. Schmulian?
A No, I did not.
MR. BROOKE: Other than the fact that we, you know, we have some questions about some of your documents we get after you guys figure out the computers --
MR. MIXTER: If we -- sorry --

MR. BROOKE: -- I want you to understand, so I want to keep the deposition open for that purpose to go over any other documents we might get.
MR. MIXTER: Yeah, and as I said, depending upon what --
MR. BROOKE: Right.
MR. MIXTER: -- the full panorama of circumstances are, I may or may not object to resuming it, assuming there's additional documents to be retrieved and I don't know that at this point.
MR. BROOKE: All right. We haven't done seven hours so I'm done for now. If you've got some cross, I may have redirect. You have some cross?
MR. MIXTER: Yeah, I have a couple questions. What time is it?
MR. BROOKE: That's not a good question for cross but it's five before five.
MR. MIXTER: And we started what time? I just want to make sure we note it on the transcript for the court reporter's purposes.
COURT REPORTER: Want me to look?
MR. MIXTER: As long as you have it in, you don't have to look.
MR. BROOKE: We started at 10:38 a.m., I

remember is when we started --
MR. MIXTER: Okay. That's fine because I've had experiences where court reporters don't note it on the transcript. I'm just making sure it's there.
EXAMINATION BY MR. MIXTER:
Q. You were asked a few questions, Mr. Greene, about dates on invoices. Would you have any reason to know why, for example, an invoice -- and I'm just going to use a hypothetical example -- number three might be dated earlier than an invoice numbered two or could that happen just in the normal course of events?
A It could happen in the normal course of events but I would have no recollection of it.
Q. Okay. And how would it happen in the normal courts of events; what might happen to lead to that kind of situation?
A It's Quick Books, um, problem with Quick Books is that you can go back and the reason people don't like Quick Books is you can go back and change anything, there's all sorts of mistakes and the dating's not -- accountants have a term for it but the accounting is not, is not, uh --
Q. Chronological?
A -- chronological but when you use a

different accounting package it's a little more secure. It's just, you can go back and change anything you want to anything you want from anything you want.
Q. Okay.
A It's just not, you know.
Q. Okay. You were very clear that as between APC and AmeriFactors it's your belief that the debt that -- I'm going to call it a debt -- that we have been discussing here today is owed AmeriFactors by APC, correct?
A Correct.
Q. Is, are you equally clear that the phones which are the subject of the two invoices that are attached to numerous exhibits, the pricing for which was I'm going to say roughly $1,250,000 were agreed to, to be purchased by Mr. Schmulian from you?
A Yes.
Q. And, were those also the same phones that were the subject of a previous deal wherein Mr. Schmulian agreed to buy those phones but was unable to find an ultimate purchaser for the phones?
A Yes.
Q. And those same phones or at least the lion's share of them that we have been talking about,