### UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **TRANSLUCENT COMMUNICATIONS, LLC** | : | |
| | : | |
| **Plaintiff** | : | |
| | : | |
| **v.** | : | **Civil Action No. WGC-08-3235** |
| | : | |
| **AMERICAS PREMIERE CORP.** *et al.* | : | |
| | : | |
| **Defendants** | : | |

### MEMORANDUM OPINION

Plaintiff Translucent Communications, LLC ("Translucent") brought this action against

the Defendants, Americas Premiere Corporation, d/b/a APC Wireless, National Angus

Corporation, d/b/a APC Wireless, and Paul Greene ("Greene"), President of both Americas

Premiere Corporation and National Angus Corporation. Americas Premiere Corporation and

National Angus Corporation (hereinafter "APC Wireless") are one and the same and conduct

business under the same trade name. The parties consented to proceed before a United States

Magistrate Judge for all further proceedings in the case and the entry of a final judgment. *See*

Document No. 21. Pending before the Court and ready for resolution is Plaintiff's Motion for

Summary Judgment (Document No. 53). The Defendants have filed no opposition. No hearing

is deemed necessary and the Court now rules pursuant to Local Rule 105.6 (D. Md. 2009).

### BACKGROUND

#### The False Factored Invoices

In December 2003 Brett Schmulian ("Schmulian") and Defendant Greene founded

Translucent as partners each owning 50% of the shares in Translucent. Subsequently, their

1

ownership shares were reduced to 40% each.  Though Greene had joined Schmulian in founding

Translucent, Greene continued to operate APC Wireless and serve as its Chief Executive Officer.

On or about April 11, 2008 Greene amicably separated from Translucent, and his 40% interest in

the shares of Translucent was purchased by Translucent for Two Hundred and Thirty Thousand

Dollars ($230,000).

During the time period when Greene was separated amicably from Translucent, the

Defendants commenced a multi-million dollar purchase of a company called Movida from a

Delaware Bankruptcy Court auction.  Defendants were looking to raise capital to fund the

purchase from several sources, including from the sale of Defendant Greene's shares in

Translucent and from factoring invoices.

On April 11, 2008, Greene as CEO of APC Wireless requested Schmulian as President of

Translucent to execute an assignment letter ("assignment letter") reflecting APC Wireless'

intention to assign certain invoices, dated April 8, 2008 and April 14, 2008 ("the invoices")

relating to wireless communications equipment, to AmeriFactors Financial Group, LLC

("AmeriFactors").  Schmulian refused to execute the assignment letter.  Greene also requested

Daniel Toledo ("Toledo"), Vice President of Translucent, to sign the assignment letter.  Toledo

refused to sign the assignment letter.  A subsequent conference call between Schmulian, Toledo

and Greene also resulted in the Translucent officials refusing to sign the assignment letter.

The invoices of April 8, 2008 and April 14, 2008 were false.  There was never an actual

sale of goods from APC Wireless to Translucent.  Translucent never ordered the goods listed on

the invoices.  The defendants never shipped any of the goods listed on the invoices, nor did

Translucent ever receive any of the goods listed on the invoices.  During discovery, the

Defendants failed to produce the Nextel Phone Invoices emails of April 8, 2008 and April 14, 2008 in original form and Translucent is entitled to a spoliation inference in its favor.  The Court concludes the invoices never existed in the first place and are a fabrication of the Defendants.  In deposition, the Defendants admitted complete responsibility for the debt owed to AmeriFactors.

At 7:21 p.m. on April 11, 2008 Samuel Bahreini ("Bahreini"), Vice President of APC Wireless, forwarded a purported record of an email with a subject line "Nextel Phones Invoices" to Dennis Bays ("Bays") at AmeriFactors.  This email purported to forward a four page fax from Translucent consisting of a Translucent fax cover sheet, a signed assignment letter purporting to contain the signature of Brett Schmulian, and the two invoices discussed above.  The fax cover sheet, assignment letter, and invoices were all fraudulent.  Schmulian never signed the assignment letter.  The effect of this transmission was to create in AmeriFactors' mind the belief that it had acquired all of APC Wireless' rights in the two invoices and that Translucent was indebted to AmeriFactors in the amount of $1,267,964.26.

On April 14, 2008 AmeriFactors advanced $600,000 to APC Wireless representing AmeriFactors' purchase of the invoices from APC Wireless.  On April 15, 2008 Translucent received a letter from AmeriFactors stating that it had purchased the invoices from APC Wireless and therefore acquired all of APC Wireless' rights in the invoices and demanding payment of the full amount listed on the invoices.  The following day, Schmulian notified Greene at APC Wireless of AmeriFactors' demand.  On five occasions between April 29, 2008 and May 23, 2008 Translucent by email asked Greene and APC Wireless when they would pay the AmeriFactors debt back.

On September 16, 2008 AmeriFactors sued Translucent for $1,267,964.26 plus

prejudgment interest and costs. *AmeriFactors Financial Group, Inc. v. Translucent Communications, LLC,* Case No. 08-54842 CA 03 (11th Circuit Court, Miami-Dade County, Florida). This case is pending in the Florida state court. No judgment has been entered.

In January 2009 the Defendant Americas Premier Corporation entered into a written settlement agreement with AmeriFactors to pay $665,254.16 to AmeriFactors in satisfaction for the assignment of the two false Translucent invoices, which are the subject of this case, and an invoice from Simplexity. This agreement was personally guaranteed by Paul V. Greene. There was a previous agreement entered into on July 15, 2008 among the parties to the January 2009 agreement which attempted to resolve the false invoice situation. Unfortunately, APC Wireless was unable to make all payments required by the July 15, 2008 Agreement thus giving rise to the January 2009 settlement agreement. Translucent is not a party to either of these two agreements.

<u>Improper Use of Domain Name and Translucent's Mark</u>

Translucent Communications is the trade name used by Plaintiff Translucent Communications, LLC to offer goods and services related to the cellular telephone industry. The Defendants have no right to Translucent's name and mark. Prior to October 6, 2008, Translucent Communications operated a website at the domain *translucentcommunications.com* on which it marketed its goods and services.

On or about October 6, 2008 the Defendants caused to be changed the registration of Translucent's domain name such that the website automatically redirected all internet traffic to Defendants' website, *apcwireless.com*. The Defendants also caused to be provided to the domain registrar false contact information listing Paul Greene as Registrant of the Translucent Communications website. As a result Translucent was unable to access its website and make any

changes to it.

Translucent was unable to return its domain to its control.  The domain

*translucentcommunications.com* continues to divert all internet traffic to *apcwireless.com*.

Translucent was required to create a new webpage at a new domain at Translucent's expense.

Translucent has lost business due to the redirection of all incoming internet traffic to the

*translucentcommunications.com* domain.

## STANDARD OF REVIEW

A motion for summary judgment will be granted only if there exists no genuine issue as

to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ.

P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *Celotex Corp. v. Catrett*,

477 U.S. 317, 322 (1986).  In other words, if there clearly exist factual issues "that properly can

be resolved only by a finder of fact because they may reasonably be resolved in favor of either

party," then summary judgment is inappropriate.  *Anderson*, 477 U.S. at 250; *see also Pulliam*

*Inv. Co. v. Cameo Properties*, 810 F.2d 1282, 1286 (4th Cir. 1987); *Morrison v. Nissan Motor*

*Co.*, 601 F.2d 139, 141 (4th Cir. 1979); *Stevens v. Howard D. Johnson Co.*, 181 F.2d 390, 394

(4th Cir. 1950).  The moving party bears the burden of showing that there is no genuine issue as

to any material fact.  Fed. R. Civ. P. 56(c); *Pulliam Inv. Co.*, 810 F.2d at 1286 (citing

*Charbonnages de France v. Smith*, 597 F.2d 406, 414 (4th Cir. 1979)).

When ruling on a motion for summary judgment, the court must construe the facts

alleged in the light most favorable to the party opposing the motion.  *United States v. Diebold,*

*Inc.*, 369 U.S. 654, 655 (1962); *Gill v. Rollins Protective Servs. Co.*, 773 F.2d 592, 595 (4th Cir.

1985).  The court may not weigh evidence or make credibility determinations.  *Reeves v.*

*Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).  A party who bears the burden of proof on a particular claim must factually support each element of his or her claim.  "[A] complete failure of proof concerning an essential element . . . necessarily renders all other facts immaterial."  *Celotex Corp.*, 477 U.S. at 323.  However, on those issues on which the nonmoving party will have the burden of proof, it is that party's responsibility to confront the motion for summary judgment with an affidavit or other similar evidence.  *Anderson*, 477 U.S. at 256.

"'A mere scintilla of evidence is not enough to create a fact issue.'"  *Barwick v. Celotex Corp.*, 736 F.2d 946, 958-59 (4th Cir. 1984) (quoting *Seago v. North Carolina Theaters, Inc.*, 42 F.R.D. 627, 632 (E.D.N.C. 1966), *aff'd*, 388 F.2d 987 (4th Cir. 1967), *cert. denied*, 390 U.S. 959 (1968)).  There must be "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.  If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."  *Anderson*, 477 U.S. at 249-50 (citations omitted).

A court does not automatically grant an unopposed motion for summary judgment.  Fed. R. Civ. P. 56(e).  Even if the adverse party does not respond, the court shall grant summary judgment in favor of the moving party only if appropriate.  *Id.; see Custer v. Pan American Life Ins. Co.*, 12 F.3d 410, 416 (4th Cir. 1993) ("[T]he court, in considering a motion for summary judgment, must review the motion, even if unopposed, and determine from what it has before it whether the moving party is entitled to summary judgment as a matter of law.").

## ANALYSIS

A.      Translucent is Entitled to Spoliation Inference

As noted *supra* the Court concluded the April 8, 2008 and April 14, 2008 invoices relating to wireless communication equipment to AmeriFactors are a fabrication of the

6

Defendants.  The Court thus found Translucent is entitled to a spoliation inference in its favor.

The Court reached its decision based on the following matters.

First, despite numerous requests by Translucent and an Order from this Court,

Defendants have **<u>never</u>** produced the original, un-forwarded "Nextel Phones Invoices" email

purportedly from Toledo of Translucent to Bahreini of APC Wireless.  Second, during discovery,

Defendants disclosed that their servers had been tampered with, all company files including

emails and financials were deleted.  Defendants were well aware, with the filing of this lawsuit,

of their obligation to preserve all electronically stored information.

> 'The failure to preserve electronic or other records, once the duty
> to do so has been triggered, raises the issue of spoliation of
> evidence and its consequences.'  Spoliation is 'the destruction or
> material alteration of evidence or the failure to preserve property
> for another's use as evidence in pending or reasonably foreseeable
> litigation.'

*Goodman v. Praxair Servs., Inc.*, 632 F. Supp. 2d 494, 505 (D. Md. 2009) (quoting *Thompson v.*

*U.S. Dep't Housing & Urban Dev.*, 219 F.R.D. 93, 100 (D. Md. 2003)).

B.    <u>Defendants Fraudulently Induced Inaction by Translucent</u>

To prove fraud or misrepresentation by clear and convincing evidence under Maryland

law, Translucent must demonstrate

> (1) the defendant made a false representation to the plaintiff, (2)
> the falsity of the representation was either known to the defendant
> or the representation was made with reckless indifference to its
> truth, (3) the misrepresentation was made for the purpose of
> defrauding the plaintiff, (4) the plaintiff relied on the
> misrepresentation and had the right to rely on it, and (5) the
> plaintiff suffered compensable injury as a result of the
> misrepresentation.

*Hoffman v. Stamper*, 358 Md. 1, 28, 867 A.2d 276, 292 (2005).

Translucent is able to prove by clear and convincing evidence the first element of fraud. Defendants Greene and APC Wireless asserted they were responsible for and would pay the amount owed under the assignment letter to AmeriFactors.  On April 11, 2008 at 5:28 p.m. Defendant Greene sent the following email to Schmulian.

> Any los[s]es incurred arising from any loss to Translucent/Brett Schmulian will be covered by APCWireless in reference to AmeriFactors invoices for factoring.  I am will [sic] put up APCWireless as collateral.
>
> The invoices you are signing are the complete responsib[ility] of APC not Translucent.
>
> All payments incurred from AmeriFactors will be paid in full by APCWireless.

Mem. Law Supp. Pl.'s Mot. Summ. J. ("Pl.'s Mem."), Ex. 5 (Email from Greene to Schmulian of 4/11/28 at 1).

Despite Defendants' claim of responsibility, Translucent received and continued to receive invoices and emails about the amount allegedly owed by Translucent to AmeriFactors. Schmulian notified Defendant Greene and Bahreini each time AmeriFactors contacted Translucent about the overdue bills.  With the bills still outstanding Schmulian sent an email to Defendant Greene on June 5, 2008 at 2:51 p.m., stating in the first three paragraphs

> I am forwarding this email from AmeriFactors which is self explanatory.  I think that you need to contact AmeriFactors and make satisfactory arrangements to have this debt discharged by APC Wireless on terms that are acceptable by APC Wireless and AmeriFactors.
>
> As you are aware this transaction with Translucent Communications have never taken place. We have never ordered the goods referred to in invoices 3006092 and 3006094 or taken delivery of such goods.  Furthermore I, or any other Translucent employee, did not sign the letter of assignment to AmeriFactors for

> invoice #3006092 for $1,039,373.26 and invoice 3006094 for $228,591 which has been represented as such.
>
> Failing this I have an obligation to protect Translucent Communications, myself and my partners by informing AmeriFactors of the fact that the documentation presented to them was not issued by Translucent Communications and likewise not signed by myself.  As you are aware I was not in Miami, but traveling in Las Vegas.

*Id.*, Ex. 14 (Email from Schmulian to Greene of 6/3/08 at 1).

Defendant Greene, when he sent the April 11, 2008 email to Schmulian, knowingly made false representations or, at the very least, was indifferent to the truth.  The invoices were never signed by Schmulian or any Translucent employee.  Nevertheless, despite claiming responsibility for these invoices, Defendants Greene and APC Wireless continued to allow AmeriFactors to believe Translucent was responsible for the debt owed as listed on the invoices.

Moreover, in response to request for admission 14, Defendants admitted they are currently making payments to AmeriFactors to settle the outstanding debt on the invoices under Translucent's name.  *See id.*, Ex. 8 at 3 (Request 14).  This settlement has not however released Translucent as a responsible party for the AmeriFactors debt.  *See id.*, Ex. 17.  The second element of fraud has been established.

The third element Translucent must prove is that Defendants' misrepresentation was made for the purpose of defrauding Translucent, by discouraging Translucent from notifying AmeriFactors that Defendants falsely assigned the AmeriFactors invoices.  Defendant Greene took specific steps to induce inaction by Translucent.  For instance, in response to Schmulian's email of June 3, 2008, Defendant Greene replied

> The only way for us to credit the account is for you to send back the goods.  We will issue a full refund and take full responsibility.

You are not liable if you send the goods back.  It then becomes our debt.  I told AmeriFactors that we extended you 120 days based on their paperwork.  [I]t is 100% our fault and we will take the full blame.  [T]his is an easy solution, I can have Dave Sellman send you the release prior to shipping.  Ship it immediately though……

Don't do anything that can not be undone.  [J]ust send the phones back!  We are finally seeing some relief on the Movida side.

*Id.*, Ex. 15 (Email from Greene to Schmulian of 6/3/08 at 1).

During his deposition Bahreini, APC Wireless' former Vice President, explained the purpose behind Defendant Greene's June 3, 2008 email.

Q:  Take a look at [Exhibit 30], and tell me if you know what it is.

A:  It's an e-mail.

Q:  All right.  Are you listed as a recipient or a sender?

A:  Yes, both.

Q:  All right.  Do you recall this?  They're all dated June 2nd, is that right, 2008?

A:  Yes.

Q:  Do you recall this?

A:  Yes.

Q:  And what do you recall about it?

A:  Paul [Greene] requested that I send this to Brett [Schmulian]. It's the first page of the - - the attachment is the first page of the factoring agreement which Paul [Greene] executed with AmeriFactors, and it showed a breakdown of the percentage fees that AmeriFactors would collect if invoices were certain days past due, and it ranged from 60 to 120.

Q:  So why did Paul [Greene] want to show this to Brett [Schmulian]?

10

A:   To show he had 120 days to take care of this, not just 30.

Q:   Did Paul [Greene] expect Brett [Schmulian] to take care of it?

A:   No, Paul [Greene] expected Paul [Greene] to take care of it.

Q:   So why did he send this to Brett [Schmulian]?

A:   To calm Brett [Schmulian] down.

\*                                    \*                                    \*

Q:   Take a look at [Exhibit 31].  The e-mail is from Brett [Schmulian] back to you and to Paul [Greene]; is that right?

A:   It is right.

Q:   It says "yes, I have this, but according to the invoice it's only 30 days.  They seem to be sticking to it."

        Is that right?

A:   That's correct.

Q:   Is that what you were talking about, the actual real deadlines?

A:   I'm not talking about that; Brett [Schmulian] is.

Q:   But a few moments ago, you said that Paul [Greene] sent the e-mail to Brett [Schmulian] with the attachment to show it was really 120 days; is that right?

A:   Correct.

Q:   So in this case, what's happening here is Brett [Schmulian] - - what appears to be happening here?

A:   Basically, AmeriFactors was attempting to collect invoices within net 30 terms.  Paul [Greene] was trying to make Brett [Schmulian] think that he had up to 120 days in order to keep Brett [Schmulian] silent from raising any flags and give Paul [Greene] 120 days to figure out a way to pay off the debt with AmeriFactors, like he did with Simplexity.

Brett [Schmulian] writes back - - after I e-mailed him the attachment with the breakdown of days and percentages, writes back he has this, he's agreeing that he's seen it, but according to the invoice, it's only 30 days, so AmeriFactors seems to be sticking to the 30 days terms.

MR. BROOKE:   Let's take a look at Exhibit 32.

(Exhibit 32 identified.)

BY MR. BROOKE:
Q:   Again, two pages, and it's an e-mail from Paul [Greene] to Brett [Schmulian], forwarding an e-mail from you, is that right?

A:   Yes, it is; correct.

Q:   And this is the first page of that agreement we've been talking about?

A:   That is also correct.

Q:   Why is Paul [Greene] asking Brett [Schmulian] to give him a call?

A:   Once again, because Paul [Greene] at this point was trying to keep Brett [Schmulian] from doing anything that would bring harm to Paul [Greene].

Q:   Do you think he wanted to avoid making a physical record of this?

A:   I believe his intentions were that.

*Id.*, Ex. 1D (Bahreini Dep. 108:23 – 110:1, 9 – 112:9).

The fourth element Translucent must demonstrate is that it relied upon Defendants' misrepresentation and further that such reliance was reasonable.  Schmulian and Translucent never agreed to Defendant Greene's request that Translucent accept an assignment of the AmeriFactors invoices on behalf of Defendant APC Wireless.  When Defendant Greene could not persuade either Schmulian or Toledo to accept the factoring agreement, Defendants Greene

12

and APC Wireless created invoices that suggested a transaction between Translucent and AmeriFactors.  *See id.*, Ex. 1D (Bahreini Dep. 49:20 – 22).  Furthermore, Schmulian's signature was forged on an AmeriFactors contract whereby Schmulian, purportedly on behalf of Translucent, agreed to accept assignment of two invoices of APC Wireless.  The contract also bound Translucent to pay the amount listed on the two invoices.  *See id.*, Ex. 1C (Toledo Aff. ¶ 13), Ex. 1D (Bahreini Dep. 142:16 – 18).

When it became clear to Schmulian that AmeriFactors believed Translucent had accepted assignment of Defendant APC Wireless' two invoices with an expectation that Translucent would pay the amount owed on the invoices, Schmulian demanded an explanation from Defendant Greene.

> A:  I asked him what was this.  I told him I never agreed to do this. I, in fact, adamantly said I would not do this, nor would anyone in my company.  I told him to take care of it immediately.  He said not to worry, he will take care of this.  He needed a couple of days to pay whatever this was.  And that was the basis of our discussion.
>
> Q:  Did you ever discuss anything about what purports to be your signature on this document, that is, whether you signed it or somebody else signed it, and, if so, who it was?  Any discussion about that?
>
> A:  No.  I said to him this isn't - - we didn't do this.  We never signed the document.  We never received any goods.  We never agreed to this transaction.   We never agreed to do this.   I adamantly said not to do this.  So did Daniel Toledo.  So why was it done?
>
> *                          *                          *
>
> A:  I never agreed to any of this.
>
> Q:  I know.  But what did he say in response to your saying that during that phone call.

A:  He'll take care of it.

*Id.*, Ex. 1B (Schmulian Dep. 210:13 – 211:8, 18 – 21).

Defendant Greene is not a stranger to Schmulian.  Defendant Greene is a former partner of Translucent, owning 40% of the company.  *See id.*, Ex. 1A (Greene Dep. 95:22 – 23).  A level of trust existed between the two men.  Defendant Greene's withdrawal from Translucent was not due to any riff with Schmulian.  Defendant Greene terminated his interest in Translucent "so he could raise capital to purchase a company in bankruptcy proceedings called Movida.  Translucent agreed to purchase [Defendant] Greene's shares in Translucent."  *Id.*, Ex. 1C (Toledo Aff. ¶ 5).

Despite his former partner's initial assurance that he would take care of the AmeriFactors invoices, Schmulian received an April 15, 2008 letter from AmeriFactors.  Schmulian sought an answer from his former partner.

> A:   I believe I e-mailed [the April 15, 2008 letter from AmeriFactors] to both Paul [Greene] and Sam [Bahreini].  I do not remember what I wrote in the body of the e-mail.
>
> Q:  All right.
>
> A:   I also called Mr. Paul Greene to ask him what was this and what had happened, and etcetera, etcetera, again, claiming that I had not - -  not claiming, but, again, saying that I had not agreed to do this and wanted him to take care of it immediately.
>
> Q:  Well, what did he say?
>
> A:  He said he would take care of it.
>
> Q:  Anything else?
>
> A:  He said he needed a couple days.  Money was coming in.  He needed a couple days.  And he would take care of this. He also said to me that he had thirty days to pay this from - - thirty days - - I

> don't remember the exact amount.   But he - - he said he would
> absolutely take care of this.

*Id.*, Ex. 1B (Schmulian Dep. 282:13 – 283:9).

The Court finds Translucent relied on Defendants' misrepresentation, and considering the

prior relationship between Schmulian and Defendant Greene, Translucent's reliance on

Defendants' misrepresentation was reasonable.

The final element, Translucent suffered compensable injury as a result of the

misrepresentation, is clearly established in the record.   First, AmeriFactors filed suit in Florida

state court against Translucent for failing to pay the two invoices totaling $1,267,964.26.

Defendants misrepresented to AmeriFactors that Translucent agreed to accept assignment of the

two invoices.   Second, as a result of the AmeriFactors litigation, a prospective investor, Marc

Green, declined to purchase a thirty-eight percent (38%) interest in Translucent, valued at

$450,000.   *Id.*, Ex. 1E (Green Aff. ¶¶ 2-3, 6-9).   Third, Translucent has incurred significant legal

costs (a) in defending itself in the lawsuit brought by AmeriFactors and (b) in initiating the

lawsuit against Defendants Greene and APC Wireless.

> A:   I would also point out the fact of the amount of money that is
> being spent defending the lawsuits and filing the - - the lawsuit
> against APC Wireless and Paul Greene has cost me over six
> figures and is being paid, which has come out of profits.
>
> Q:   Do you know exactly or - - or approximately how much you
> have spent in legal fees to date?
>
> A:   I think the number is somewhere - - it's about a hundred - -
> between a hundred - - I would say 115 to $140,000.
>
> Q:  Okay. Now - -
>
> A:  Which is pure profit.

*Id.*, Ex. 1B (Schmulian Dep. 274:10 – 21).

To recover damages for fraud Translucent must prove it suffered compensable injury due to Defendants' misrepresentation.  "What must be proved by that standard is that *some* compensable injury arose from the deceit, because *a* compensable injury arising by reason of the fraud is an element of the tort.  We have never held, however, that the *measure* of the damages required to compensate for that injury must be proved by clear and convincing evidence."  *Hoffman*, 385 Md. at 41, 867 A.2d at 300.  The Court finds Translucent demonstrated a compensable injury, has proven its fraud allegation, and therefore is entitled to compensatory damages.

C.      Translucent Reasonably Relied on Defendants' Promise to its Detriment

To prove a claim of promissory estoppel or detrimental reliance Translucent must satisfy a four-part test derived from the *Restatement (Second) of Contracts* § 90(1) (1979).  The components of the four-part test are

> 1.  a clear and definite promise;
>
> 2.   where the promisor has a reasonable expectation that the offer will induce action or forbearance on the part of the promisee;
>
> 3.   which does induce actual and reasonable action or forbearance by the promisee; and
>
> 4.      causes a detriment which can only be avoided by the enforcement of the promise.

*Pavel Enters., Inc. v. A.S. Johnson Co.*, 342 Md. 143, 166, 674 A.2d 521, 532 (1996).

Defendants Greene and APC Wireless made a clear and definite promise to Translucent.  In an April 11, 2008 email from Defendant Greene to Schmulian, Defendant Greene wrote

> Any los[s]es incurred arising from any loss to Translucent/Brett

16

Schmulian will be covered by APCWireless in reference to AmeriFactors invoices for factoring. I am will [sic] put up APCWireless as collateral.

The invoices you are signing are the complete responsib[ility] of APC not Translucent.

All payments incurred from AmeriFactors will be paid in full by APCWireless.

*Id.*, Ex. 5 (Email from Greene to Schmulian of 4/11/08).

Second, by making such a promise, Defendant Greene had a reasonable expectation that the promise would induce inaction by Translucent. Bahreini, the former Vice President of APC Wireless who worked closely with Defendant Greene, explained Defendant Greene's motivation for making the promise.

Q: Take a look at [Exhibit 31]. The e-mail is from Brett [Schmulian] back to you and to Paul [Greene]; is that right?

A: It is right.

Q: It says "yes, I have this, but according to the invoice it's only 30 days. They seem to be sticking to it."

Is that right?

A: That's correct.

*                              *                              *

Q: So in this case, what's happening here is Brett [Schmulian] - - what appears to be happening here?

A: Basically, AmeriFactors was attempting to collect invoices within net 30 terms. *Paul [Greene] was trying to make Brett [Schmulian] think that he had up to 120 days in order to keep Brett [Schmulian] silent from raising any flags and give Paul [Greene] 120 days to figure out a way to pay off the debt with AmeriFactors,* like he did with Simplexity.

17

*Id.*, Ex. 1D (Bahreini Dep. 110:9 - 16, 24 – 111:8) (emphasis added).

Third, in light of the trust that existed between Defendant Greene and Schmulian, since Defendant Greene had been a founding partner of Translucent with an initial 50% interest, Defendant Greene's promise induced silence on the part of Schmulian and Translucent. Defendant Greene assured Schmulian that Translucent would not be liable for AmeriFactors' invoices because Defendant APC Wireless would assume all responsibility.  Schmulian and Translucent thus never "sounded the alarm" to AmeriFactors.  Defendant Greene further assured Schmulian and Translucent that despite AmeriFactors' assertion, Defendants Greene and APC Wireless had 120 days, not 30 days, to pay AmeriFactors the amount owed as listed on the two invoices.  Schmulian and Translucent, in reasonable reliance of Defendants Greene and APC Wireless' promise and assurance, remained silent.  Thirty days elapsed without payment to AmeriFactors.

Fourth, the promise by Defendants Greene and APC Wireless caused a detriment to Translucent, namely, being sued by AmeriFactors to collect a debt of $1,267,964.26. Translucent has incurred substantial costs and legal fees to defend itself in the lawsuit brought by AmeriFactors.

The Court finds Translucent has clearly demonstrated a cause of detrimental reliance.  In the interests of justice, the Court shall enforce Defendants Greene and APC Wireless' promise to assume full responsibility for any losses incurred by Translucent as a direct result of Defendants' actions with regards to the AmeriFactors invoices.

D.      Request for Indemnification

Translucent cites as authority *Pyramid Condominium Association v. Morgan*, 606 F.

18

Supp. 592 (D. Md. 1985) and *Blockson v. United States*, 278 F. Supp. 576 (D. Md. 1968) for the proposition that Defendants Greene and APC Wireless must indemnify Translucent for all past and future losses directly related to Defendants' actions concerning the debt of $1,267,964.26 owed to AmeriFactors. "For the purposes of this Count only, the Court should assume that Translucent could be a 'negligent party' insofar as the allegations of liability for the AmeriFactors debt in the Florida lawsuit." Pl.'s Mem. at 25-26. The Court declines Translucent's invitation to make such an assumption.

The Court declines to grant Translucent relief on the basis of indemnification. The Court has already found that Translucent has proven its claim of fraud as well as its claim of promissory estoppel or detrimental reliance. The Court has concluded Defendants are liable for the losses associated with Defendants' deception concerning the AmeriFactors debt.

E.     Defendants Converted Translucent's Internet Domain

Under Maryland law conversion, an intentional tort, consists of two elements: (a) a physical act and (b) a certain state of mind. *Darcars Motors of Silver Spring, Inc. v. Borzym*, 379 Md. 249, 261, 841 A.2d 828, 835 (2004). A physical act is defined as "'any distinct act of ownership or dominion exerted by one person over the personal property of another in denial of his right or inconsistent with it.'" *Id.* (quoting *Allied Investment Corp. v. Jasen*, 354 Md. 547, 560, 731 A.2d 957, 963 (1999) (quoting *Interstate Ins. Co. v. Logan*, 205 Md. 583, 588-89, 109 A.2d 904, 907 (1954)). Regarding the second element, "[a]t a minimum, a defendant liable of conversion must have 'an intent to exercise a dominion or control over the goods which is in fact inconsistent with the plaintiff's rights.'" *Id.* at 262, 841 A.2d at 836 (quoting *Keys v. Chrysler Credit Corp.*, 303 Md. 397, 414, 494 A.2d 200, 208 (1985)).

Translucent's internet domain name, *translucentcommunications.com*, adopted most of

its content from Defendant APC Wireless' website.

> Q:    Did - - did the Website we have been talking about,
> translucentcommunications.com, adopt essentially all the contents
> of the APC Website?
>
> A:  At the time of when we started Translucent Communications?
>
> Q:  Yes.
>
> A:  No.
>
> Q:  At some point thereafter is that what happened?
>
> A:   We had - - I don't remember the dates, but several years later
> we agreed that we needed to overall - - overhaul the Website for
> Translucent Communications.  It was suggested that we utilize the
> - - the look and feel of APC's Website at the time under condition
> that we would pay the developers for the changes to do so.  And
> which we did.
>
> Q:  Who were the developers?
>
> A:  I stand to be corrected, but I think it's Ciplex or Cimplex.

Pl.'s Mem., Ex. 1B (Schmulian Dep. 234:2 – 20).

Defendant Greene confirmed Ciplex was the company that modified Translucent's

website to a format and style very similar to APC Wireless' website.

> Q:  [H]ave you heard of Ciplex in West Hollywood before?
>
> A:  That's the company that built the Web site.
>
> Q:  Which Web site?
>
> A:  APC Wireless.
>
> Q:  How about Translucent's Web sites?
>
> A:  I think they're the ones that changed the name.

Q:  Changed the name for what?

A:   Just changed the APC Wireless to Translucent and changed the directors.

*Id.*, Ex. 1A (Greene Dep. 237:10 – 20).

On December 14, 2007 Ciplex acknowledged receipt of 100% payment for web services on behalf of Translucent Communications.  *See id.*, Ex. 20 at 3.  Defendant Greene sold his 40% share of Translucent on April 11, 2008, which Translucent agreed to purchase.  *See id.*, Ex. 1C (Toledo Aff. ¶ 5).  On May 11, 2008 Ciplex issued an invoice to Translucent seeking payment of $125.  Ciplex had modified *translucentcommunications.com* by updating the list of company officers.  *See id.*, Ex. 20 at 2.  Over a month later on June 28, 2008 Ciplex issued another invoice to Translucent seeking payment of $125.  Ciplex had modified *translucentcommunications.com* by updating the team page.  *See id.*, Ex. 20 at 1.

In early October 2008 employees and/or officers of Translucent became aware that the website, *translucentcommunications.com*, had been taken over by someone outside of Translucent.  When users typed Translucent's internet domain name, users were redirected to APC Wireless' website.  Schmulian directed Toledo to investigate the matter.  On or about October 7, 2008, Toledo discovered Defendant Greene had taken control of Translucent's website.  *Id.*, Ex. 1C (Toledo Aff. ¶ 18), Ex. 18 at 1.

In response  to Toledo's discovery, Schmulian called *Register.com*, the registrar, requesting the immediate return of the domain name (*translucentcommunications.com*) to Translucent.  Schmulian followed up the telephone conversation with an email.

As discussed telephonically with you this morning, please find attached the notarized letter to immediately request that the domain name Translucentcommunications.com be returned to Translucent Communications LLC effectively along with all passwords and usernames.

Until this dispute has been resolved, I would request that the domain name be disabled as customers are being directed to a competitor['']s website and confidential email is being routed to Mr. Greene and APC Wireless – which is electronic mail fraud.

I have also attached the Purchase and Sale agreement which shows Mr. Greene is no longer an officer or employed by Translucent Communications thus has no right to the name or any intellectual property or assets, which the domain name is considered both. Another attachment shows the company registration with the officers of the company through the Florida Department of Company Registrations.

I appreciate your time and effort in resolving this matter with the utmost urgency.  Register.com has been informed and documents attached will prove the domain has been fraudulently taken.

Please do not hesitate to contact myself o[r] my attorney[]s for additional information.

*Id.*, Ex. 18 at 2 (Email from Schmulian to Bullitt of 10/8/08).

Monique Bullitt, Legal Assistant, Register.com Inc., responded to Schmulian.

I am writing in response to your recent emails, concerning the domain name <translucentcommunications.com>.

Although Register.com understands and appreciates the dispute you are having with Mr. Greene, Register.com is not in a position to make a legal determination, as to which party, possesses superior rights.  We hope that you can understand that we do not have the ability or authority to resolve your dispute with Mr. Greene.  The proper forum for resolving such issues is in the courts, and, where appropriate, pursuant to the Uniform Domain Name Dispute Resolution Policy ("UDRP").   Accordingly, Register.com will take no action unless presented with a decision or order from a court or tribunal or appropriate jurisdiction, regarding the disposition of the Domain Name.

> To allow you time to pursue such action, Register.com will hold the Domain Name on registrar lock for a period of fourteen (14) days.  If presented with credible documentary evidence (such as a file-stamped Complaint) that you have initiated such an action within 14 days, we will hold the Domain Name on registrar lock for the entirety of the proceedings.
>
> Should you wish to invoke UDRP against the registrant of the Domain Name, you are required to submit a complaint to one of the administrative-dispute-resolution service providers listed at <http://www.icann.org/udrp/approved-providers.htm>.  Once you have selected a dispute resolution provider, please consult the relevant website regarding the procedures for filing a UDRP complaint.  Please note that, as the registrar, Register.com would not be a participant in the proceedings.

*Id.*, Ex. 18 at 3 (Letter from Bullitt to Schmulian of 10/8/08 at 1).

Translucent filed its complaint against Defendants Greene and APC Wireless on December 2, 2008, more than 14 days after the October 8, 2008 letter from *Register.com*. Hence, the domain name, *translucentcommunications.com*, was not locked.  The Court has verified, by typing Translucent's domain name, via a web browser, that a user is redirected to APC Wireless' website.

Defendant Greene does not deny he acted against Translucent by taking over *translucentcommunications.com*.

> Q:     Let's start at the top.  It says, "WHOIS information for translucentcommunications.com, is that right?
>
> A:  Correct.
>
> Q:   And then it lists the registrant as Translucent Communications starting on the bottom of the page and it flips over to the next page, listing you and your address, is that right?
>
> A:   Correct.

Q:   Are you affiliated with Translucent Communications?

A:   Right now?

Q:   Yeah.

A:   No.

Q:   Why is it still in your name?

A:    Because all the accounts and everything was frozen.   They wouldn't allow us to make any changes because there's the lawsuit, an outstanding lawsuit.

*Id.*, Ex. 1A (Greene Dep. 234:16 – 235:9).  The first element of the tort of conversion is established.

Regarding the second element, a certain state of mind, Defendant Greene provided the following explanation for his conduct.

Q:   Why did you make a change [to Translucent's domain name] on October 7?

A:   Because Brett [Schmulian] had not paid his half of the Web site.  So, I pointed the Web site to my Web site hoping he would pay his half of the Web site, which he laughed at, never did.  He was using my material on his Web site.

\*                                     \*                                     \*

Q:   Did you tell Brett [Schmulian] you were doing this?

A:   No, I don't think so.

*Id.*, Ex. 1A (Greene Dep. 235:10 – 15, 236:2 – 3).

"The defendant may have the requisite intent even though he or she acted in good faith and lacked any consciousness of wrongdoing, as long as there was an intent to exert control over the property."  *Darcars Motors*, 379 Md. at 262, 841 A.2d at 836.  Translucent challenges

Defendant Greene's justification for seizing control of Translucent's domain name.  Translucent asserts it paid Ciplex for modifying Translucent's website.

> Q:   And who paid [Ciplex]?
>
> A:   Translucent Communications.  You have a copy of the check.

Pl.'s Mem., Ex. 1B (Schmulian Dep. 235:1 – 3).

The December 14, 2007 Ciplex invoice Translucent submitted in support of its motion for summary judgment does not identify the payor as Translucent although the invoice clearly states services were performed for Translucent Communications.  The Court notes the December 14, 2007 invoice is addressed to "APC Wireless[,] Sam Bahreini".  *Id.*, Ex. 20 at 3.  The Court is aware however that on December 14, 2007 Defendant Greene was a 40% partner of Translucent while still operating a separate entity, APC Wireless.

The testimony of Bahreini, former Vice President of APC Wireless, supports Schmulian's testimony that Translucent paid Ciplex for web development services.  Further, Bahreini's testimony exposes the true nature of Defendant Greene's seizure of Translucent's domain name.

> Q:    Do you recall a time when Mr. Greene took over the Translucent Web site?
>
> A:   Yes, I do.
>
> Q:   When was that?
>
> A:   Paul [Greene] had access to the domain account.  I think it was Bluehost or iPowerWeb.  And Paul [Greene] requested online to have a password sent to him.  So he then received the password that gave him access to Translucent's domain controls.
>
> Q:   Right.

25

A:   And Rami from there forwarded translucent.com [sic] to apcwireless.com entirely to just piss Brett [Schmulian] off.

Q:   Who actually did this?

A:   Rami Mansour actually did it.

Q:   Was there any question Translucent had not paid for content?

A:   Not at all.

Q:   Did Paul [Greene] give any justification for doing this?

A:   He wanted to get back at Brett [Schmulian].

Q:   For what?

A:   Opening his mouth regarding AmeriFactors.

Q:   Has APC or someone at APC or Mr. Greene have access to Translucent e-mails?

A:   Yes.

Q:   How did that happen?

A:   Paul [Greene] directed Rami to hack into - - I guess let me stop for a second.

Rami had access to Translucent's employees remotely because of assistance that he had given them on the IT side previously, programs weren't working or they needed to unlock phones.  So Rami had accessed Derrick's systems and created a forwarding e-mail.  So every e-mail that Daniel [Toledo] or Brett [Schmulian] would send or receive would be forwarded to hostmaster.ipowerweb@gmail.com, which Rami and Paul [Greene] had access to, and on a daily basis, Paul [Greene] would go in and read the e-mails.

Q:   How do you know this?

A:   I witnessed it.

*Id.*, Ex. 1D (Bahreini Dep. 123:9 – 125:1).

The second element of the tort of conversion is established.  Defendants Greene and APC

Wireless are liable to Translucent for the conversion of Translucent's domain name,

*translucentcommunications.com*.

Not surprisingly Translucent seeks damages.  Schmulian testified about the damages to

Translucent directly attributable to Defendants' misconduct.

> Q:   What do you claim that Paul Greene, or one of his companies,
> or all of his companies, did with respect to the Website that's
> illegal, or has caused you damage, or Translucent damage.
>
> *                          *                          *
>
> A:   From my opinion, over a period of a couple of days we started
> not receiving any e-mails.  We were able to send out e-mails and
> then that stopped.   Customers were calling to complain the
> Website which was www.translucentcommunications.com was
> going to another company called APC Wireless.   And what was
> going on.  Was everything okay.  A lot of different complaints that
> came in.  To what extent had this taken place in terms of e-mails
> not being delivered or - - or not correctly being delivered, or not
> being sent, I don't know.  I know it happened over a period of a
> couple of days.
>
>         In a business that we have, which relies very heavily on e-
> mails, specifically for stock offers, selling of inventory, of course
> specifically because we sell heavily to Latin America and e-mail is
> usually a very efficient way to do business, it - - it - - it interrupted
> our business tremendously.  And that's from what we've found out
> from the clients.   Damage control took place a few days later.
> When people were going to translucentcommunications.com they
> were being directed to APC Wireless.
>
>         So if I was a potential client going to Translucent
> Communications and went to APC Wireless, look up the number
> there and call APC Wireless and not Translucent.  So Translucent
> Communications was a Website that belonged to Translucent
> Communications for the purpose of doing business as Translucent
> Communications.  All the e-mails that were being sent back and
> forth were intended for either the partners or employees of
> Translucent Communications, and we weren't receiving those e-

> mails because Paul Greene, or someone at his office had taken the registration of Translucent Communications over and pointed that towards APC Wireless.com, along with all of our e-mails and domain and URL.
>
> So from that standpoint it interrupted our business flow for - - you know, immediately for a couple of days, if not a week.  And moving forward, customers that we hadn't spoken or hadn't, you know, dealt with in awhile may have fallen off the face of the earth because they couldn't reach us in terms of an e-mail or to go to our Website.

*Id.*, Ex. 1B (Schmulian Dep. 236:10 - 14, 17 – 238:17).

Translucent asks the Court to order Defendants to pay Translucent $50,000 as compensatory damages and to order Defendants to transfer the domain name, *translucentcommunications.com*, to Translucent.  Pl.'s Mem. at 31.

The Court finds that Translucent has superior rights to the domain name, *translucentcommunications.com*.  Instead of ordering Defendants to transfer the domain name of Translucent, the Court directs Translucent to present *Register.com* with a copy of this memorandum opinion and accompanying order.  Based on Monique Bullitt's letter of October 8, 2008, *Register.com* will return control of the domain name to Translucent when "presented with a decision or order from a court . . . regarding the disposition of the Domain Name."  *Id.*, Ex. 18 at 3 (Letter from Bullitt to Schmulian of 10/8/08 at 1).

With regard to the request for monetary damages, Translucent fails to demonstrate, in any way, how it calculated $50,000 as damages resulting from Defendants' conversion.  Translucent has presented evidence concerning the consequences of Defendants' seizure of Translucent's domain name.  Defendants are liable and Translucent is entitled to monetary damages.  Based on the record presently before the Court, damages in the amount of $50,000 will not be awarded.

Liability has been established.  Translucent will need to present evidence to a trier of fact regarding the amount of damages it seeks.

**F.**     Defendants Improperly Used Translucent's Mark Violating 15 U.S.C. § 1125

    **1.**     Trademark Infringement

As outlined in detail *supra* Defendants not only took control of Translucent's domain name, Defendants also caused the domain name to point to Defendants' website, *apcwireless.com*.  As Schmulian testified and Bahreini corroborated, internet users seeking *translucentcommunications.com* were redirected to *apcwireless.com*.  Emails directed to officers and employees of Translucent were redirected to Defendant Greene who read the emails on a daily basis.  Defendants' actions constitute Trademark infringement, 15 U.S.C. § 1125(a), and a violation of the Anticybersquatting Consumer Protection Act, 15 U.S.C. § 1125(d) as explained *infra*.

> A plaintiff alleging causes of action for trademark infringement and unfair competition must prove (1) that it possesses a mark; (2) that the defendant used the mark; (3) that the defendant's use of the mark occurred "in commerce"; (4) that the defendant used the mark "in connection with the sale, offering for sale, distribution, or advertising of goods or services; and (5) that the defendant used the mark in a manner likely to confuse consumers.

*People for the Ethical Treatment of Animals v. Doughney*, 263 F.3d 359, 364 (4th Cir. 2001) (citing 15 U.S.C. §§ 1114, 1125(a); *Lone Star Steakhouse & Saloon v. Alpha of Virginia*, 43 F.3d 922, 930 (4th Cir. 1995)) [hereinafter "*PETA*"].

It is undisputed that Translucent owns the mark "Translucent Communications." Defendants have acknowledged Translucent's ownership.

    15.     REQUEST: Admit that Plaintiff is the owners of the names
    and     marks     **TRANSLUCENT**     and     **TRANSLUCENT**

**COMMUNICATIONS** for use in the sale of telephones, mobile devices and related equipment.

RESPONSE: Admitted.

16.    REQUEST: Admit that Defendants have no rights to use the names and marks **TRANSLUCENT** and **TRANSLUCENT COMMUNICATIONS** for use in the sale of telephones, mobile devices and related equipment.

RESPONSE: Admitted.

Pl.'s Mem., Ex. 8 at 3.

The domain name, *translucentcommunications.com*, was created on or about January 10,

2005.  *See id.*, Ex. 18 at 1, 7.  The mark, Translucent Communications, has been continually used

and promoted by Translucent.   Schmulian testified about the importance of the mark,

Translucent Communications.

The trade - - the name Translucent Communications is a well known name in the - - in the industry for the company.  People recognize us by our name.  And our reputation and our business is - - is, you know, identified by our name, Translucent.  So it's part and parcel of doing business.  You know, customers and vendors recognize us by our name.  And to - - to me that's what the name represents, an image.  A - - you know, kind of an identification of who we are and what we do.

*Id.*, Ex. 1B (Schmulian Dep. 191:19 – 192:7).  Translucent's mark is entitled to protection.  The

first element of trademark infringement is established.

Regarding the second, third and fourth elements ⸻ defendant used the mark;

defendant's use of the mark occurred in commerce; defendant used the mark in connection with

the sale, offering for sale, distribution or advertising of goods and services ⸻ it is undisputed

that Defendants Greene and APC Wireless took control of Translucent's domain name and

pointed Translucent's domain name to Defendant APC Wireless' website, *apcwireless.com*.  As

of the date of this memorandum opinion Defendants exercise control over Translucent's domain name.  As of the date of this memorandum opinion, when an internet user types Translucent's domain name, *translucentcommunications.com*, via a web browser, the user is redirected to *apcwireless.com*.  Although the web browser displays *translucentcommuications.com*, regardless of what page or link a user selects, the only information presented to the user is *apcwireless.com*.

Defendants Greene and APC Wireless need not have sold or advertised goods or services on Translucent's website.  Defendants Greene and APC Wireless "need only have prevented users from obtaining or using [Translucent's] goods or services, or need only have connected the website to other's goods or services." *PETA*, 263 F.3d at 365.  Defendants' hijacking of Translucent's website is in connection with goods and services because Defendants' website likely hindered prospective Translucent internet customers or repeat Translucent internet customers from accessing Translucent's services on Translucent's own website. *Id.*  Elements two, three and four are established.

The final element to prove a trademark infringement claim is that the use of the mark by defendant likely confused customers.  "To determine whether a likelihood of confusion exists, a court should not consider 'how closely a fragment of a given use duplicates the trademark,' but must instead consider 'whether the use in its entirety creates a likelihood of confusion.'" *Id.* at 366 (quotation omitted).  In this case Defendants' hijacking of Translucent's website, without a doubt, creates a likelihood of confusion.  When a user types *translucentcommunications.com* via a web browser, the user is taken to *apcwireless.com*.  This is not the website the user was seeking.  If the user looks at the browser, the user notes *translucentcommuications.com* appears.  If the user then selects various links on the website, the user is redirected to other pages of

31

*apcwireless.com*; however, the browser continues to display *translucentcommunications.com*.
The user may deduce that *apcwireless.com* and *translucentcommunications.com* have merged.
Users who accessed Translucent's website before Defendants' conversion may notice the same
products and services are available via *apcwireless.com*.

In *Lamparello v. Falwell*, 420 F.3d 309 (4th Cir. 2005), the Fourth Circuit listed seven
factors helpful in determining whether a party used a mark in a manner likely to confuse
consumers.  All seven factors are not relevant in every dispute.  Additionally, each factor is not
necessarily weighed equally in every case.  *Id.* at 314.  Those seven factors are

> (a) the strength or distinctiveness of the mark; (b) the similarity of
> the two marks; (c) the similarity of the goods/services the marks
> identify; (d) the similarity of the facilities the two parties use in
> their businesses; (e) the similarity of the advertising used by the
> two parties; (f) the defendant's intent; (g) actual confusion.

*Id.* at 315 (quoting *Pizzeria Uno Corp. v. Temple*, 747 F.2d 1522, 1527 (4th Cir. 1984)).

Translucent's mark is distinctive which Defendants acknowledged in response to a
request for admission.  Defendants have seized Translucent's domain name by redirecting all
users to *apcwireless.com*.  Defendants' hostile act has made the two marks not only similar but
indistinguishable.  Defendant APC Wireless and Translucent are competitors in the cellular
telephone industry.  Because all users seeking Translucent's domain name are redirected to
*apcwireless.com*, users may logically conclude the two companies are now one with APC
Wireless retaining its name and Translucent Communications' name being phased out.  It is clear
from Bahreini's testimony that Defendant Greene's intent in seizing Translucent's domain name
and thus Translucent's distinctive mark was "to get back" at Schmulian for "[o]pening his mouth
regarding AmeriFactors."  Pl.'s Mem., Ex. 1D (Bahreini Dep. 124:7).  Finally, since users

seeking *translucentcommunications.com* are redirected to *apcwireless.com*, there is actual

confusion.  For the above reasons, the Court finds Defendants have infringed Translucent's

trademark.

2.      Cybersquatting Violation

"Cybersquatting" is equivalent to a land grab but is accomplished via the Internet.

*Virtual Works, Inc. v. Volkswagen of America, Inc.*, 238 F.3d 264, 267 (4th Cir. 2001).  A more

formal definition is "the practice of registering 'well-known brand names as Internet domain

names' in order to force the rightful owners of the marks 'to pay for the right to engage in

electronic commerce under their own brand name.'"  *Id.* (quoting S. Rep. No. 106-140, at 5

(1999)).  The Anticybersquatting Consumer Protection Act ("ACPA"), 15 U.S.C. §

1125(d)(1)(A), imposes civil liability for cybersquatting.

To establish an ACPA violation Translucent must demonstrate (1) Defendants Greene

and APC Wireless had a bad faith intent to profit from Translucent's mark, and (2) that the

*apcwireless.com* domain name "is identical or confusingly similar to, or dilutive of, the

distinctive" mark of Translucent.  *PETA*, 263 F.3d at 367 (citing 15 U.S.C. § 1125(d)(1)(A)).  In

determining whether a person acted with a bad faith intent, 15 U.S.C. § 1125(d)(1)(B)(i) states a

court may consider a non-exhaustive list of factors

>        (I) the trademark or other intellectual property rights of the person,
> if any, in the domain name;
>
>        (II) the extent to which the domain name consists of the legal name
> of the person or a name that is otherwise commonly used to
> identify that person;
>
>        (III) the person's prior use, if any, of the domain name in
> connection with the bona fide offering of any goods or services;

(IV) the person's bona fide noncommercial or fair use of the mark in a site accessible under the domain name;

(V) the person's intent to divert consumers from the mark owner's online location to a site accessible under the domain name that could harm the goodwill represented by the mark either for commercial gain or with intent to tarnish or disparage the mark, by creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the site;

(VI) the person's offer to transfer, sell, or otherwise assign the domain name to the mark owner or any third party for financial gain without having used, or having an intent to use, the domain name in the bona fide offering of any goods or services, or the person's prior conduct indicating a pattern of such conduct;

(VII) the person's provision of material and misleading false contact information when applying for the registration of the domain name, the person's intentional failure to maintain accurate contact information, or the person's prior conduct indicating a pattern of such conduct;

(VIII) the person's registration or acquisition of multiple domain names which the person knows are identical or confusingly similar to marks of others that are distinctive at the time of registration of such domain names, or dilutive of famous marks of others that are famous at the time of registration of such domain names, without regard to the goods or services of the parties; and

(IX) the extent to which the mark incorporated in the person's domain name registration is or is not distinctive [inherently or through acquired distinctiveness] and famous. . . .

The ACPA includes a safe harbor provision. "Bad faith intent . . . shall not be found in any case in which the court determines that the person believed and had reasonable grounds to believe that the use of the domain name was a fair use or otherwise lawful." *Id.* § 1125(d)(1)(B)(ii).

Applying the factors of § 1125(d)(1)(B)(i), the Court finds (I) Defendants Greene and APC Wireless had no intellectual property rights in *translucentcommunications.com*; (II)

*translucentcommunications.com* is neither Defendants' name nor a name otherwise used to

identify APC Wireless; (III) Defendants Greene and APC Wireless had no prior use of

*translucentcommunications.com* in connection with the bona fide offering of any goods or

services under the APC Wireless name; even during the time Defendant Greene was a 40% to

50% owner of Translucent Communications, Translucent and APC Wireless were separate and

distinct business entities; (IV) Defendants used the Translucent mark in a commercial manner;

(V) Defendants intended to confuse, mislead and divert internet users into accessing APC

Wireless' website, a direct competitor of Translucent in the cellular telephone industry and

therefore harmful to the goodwill represented by Translucent's mark; and (IX) the domain name,

*translucentcommunications.com*, consists exclusively of Translucent's mark.

Regarding Factor VII, according to an April 16, 2009 printout from *Whois.Net*,

Translucent's domain name was created on or about January 10, 2005.  *See* Pl.'s Mem., Ex. 18 at

7.  It is the Court's understanding, at the time of registration, Defendant Paul Greene was either a

40% or 50% partner of Translucent.  *See* Am. Compl. ¶ 15.  The record also reveals that

Defendants Paul Greene and APC Wireless provided a lot of assistance to Translucent such as

technical support and the design and content for Translucent's website.  According to

Translucent's Amended Complaint

> While working for Translucent, Defendant Greene was tasked
> with, among other things, acquiring Plaintiff's domain name,
> setting up and maintaining Plaintiff's website, and e-mail systems.
>
> To facilitate that process, Defendant Greene served as the liaison
> between Plaintiff and Register.com, the entity retained by
> Translucent to create its web-site and internal e-mail system.  In
> working with Register.com, Defendant Greene had access to all
> passwords and codes for Plaintiff's electronic system.

35

*Id.* ¶¶ 18-19.  In their Answer to the Amended Complaint Defendants admitted Defendant

Greene "was responsible for procuring the domain name

'www.translucentcommunications.com', setting up the initial website and email systems while

working for Translucent, however, Defendant Greene denies the remaining allegations set forth

in Paragraph 18 of Plaintiff's Amended Complaint."  Document No. 17 ¶ 18.  Defendants

admitted the allegations set forth in Paragraph 19.  *Id.* ¶ 19.

Based on the Amended Complaint and Answer, the Court cannot conclude that, at the

time when applying for the registration of Translucent's domain name, Defendant Paul Greene

provided misleading false contact information.  On or about April 11, 2008 when Defendant

Greene sold his 40% share of Translucent to Translucent, Defendant Greene should have notified

*Register.com* that he was no longer an officer of Translucent and that someone else from

Translucent would henceforth be the registrant.  Whether Defendant Greene mistakenly failed to

maintain accurate contact information or intentionally failed to maintain accurate contact

information on or shortly after April 11, 2008 cannot be gleaned from the record.  However, on

or about October 7, 2008, well after Defendant Greene sold his 40% share of Translucent,

Defendant Greene intentionally provided *Register.com* false information in updating the contact

information for *translucentcommunications.com*.  This action by Defendant Greene is indicative

of bad faith.

Factor VIII is not relevant because the facts of this case do not involve the registration or

acquisition of multiple domain names.  Regarding Factor VI, Defendants did not intend to

improperly leverage a higher price from Translucent when it hijacked Translucent's domain

name.  Rather, Defendant Greene was angry at Schmulian for "opening his mouth" about

AmeriFactors and making things difficult for Defendants Greene and APC Wireless.  Although

Defendant Greene testified that he exerted control over Translucent's domain name because

Translucent failed to pay its share of the web development service, both Schmulian and Bahreini,

APC Wireless' former Vice President, testified Translucent paid for the web development

service.

Although the Court has determined that one factor is not indicative of a bad faith intent

and a second factor is irrelevant, the other seven factors weigh in favor of Translucent and

clearly demonstrate a bad faith intent by Defendants.  Moreover, diverting internet users from

*translucentcommunications.com* to *apcwireless.com* is strong evidence of Defendants' bad faith

intent and this factor alone, Factor V, sufficiently establishes Defendants' bad faith intent.  *See*

*Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 237 (4th Cir. 2002).  The first

element of an ACPA violation is established.

Regarding the second element of an ACPA violation — the *apcwireless.com* domain

name is identical to, confusingly similar to or dilutive of Translucent's distinctive mark —

Defendants have confused internet users or at least given them the impression that Translucent

and APC Wireless have merged because internet users seeking *translucentcommunications.com*

are diverted, as intended by Defendants, to *apcwireless.com*.  The second element is established.

"A person shall be liable for using a domain name . . . only if that person is the domain

name registrant or that registrant's authorized licensee."  15 U.S.C. § 1125(d)(1)(D).  A search

using *Whois.Net* on April 16, 2009 identified the registrant of *translucentcommunications.com* as

follows

Translucent Communications
Paul Greene

5268-R Nicholson Lane
Kensington, MD 20895
US
Email:  Paul@APCWireless.com

Pl.'s Mem., Ex. 18 at 6-7.  The record for this domain name was last updated on October 7,

2008.  Defendant Greene is also listed as the "administrative contact" for Translucent's domain

name.  *Id.*  The Court finds Defendants violated the ACPA and are liable to Translucent.

"In any civil action involving the registration, trafficking, or use of a domain name . . . , a

court may order the forfeiture or cancellation of the domain name or the transfer of the domain

name to the owner of the mark."  15 U.S.C. § 1125(d)(1)(C).  In the accompanying Order,

Defendants will be ordered to (a) immediately remove the APC Wireless website from the

Translucent website, (b) relinquish the registration of the domain name,

*translucentcommunications.com*, and (c) transfer their (Defendants') registration of such domain

name to Translucent.

3.    Damages for Cybersquatting Violation

"In a case involving a violation of section 1125(d)(1) . . . , the plaintiff may elect . . . to

recover, *instead of actual damages and profits*, an award of statutory damages in the amount of

not less than $1,000 and not more than $100,000 per domain name, as the court considers just."

15 U.S.C. § 1117(d) (emphasis added).  Translucent seeks the maximum statutory damages.

"[I]t shall be a rebuttable presumption that the violation is willful for purposes of

determining relief if the violator, or a person acting in concert with the violator, knowingly

provided or knowingly caused to be provided materially false contact information to a domain

name registrar, domain name registry, or other domain name registration authority in registering,

maintaining, or renewing a domain name used in connection with the violation." *Id.* § 1117(e). The record is clear that on or about October 7, 2008, when Defendant Greene contacted *Register.com* and provided updated contact information for maintaining Translucent's domain name, Defendant Greene knew the information he provided, namely himself as the registrant for Translucent's domain name, was false. Defendant Greene intentionally and willfully provided false information to *Register.com*. Further Defendant Greene had Translucent's domain name diverted to Defendant APC Wireless' domain name to exact punishment or harm to Translucent because, from Defendant Greene's perspective, Schmulian was causing trouble regarding the AmeriFactors invoices. Defendants' action was egregious and Translucent is entitled to the maximum statutory damages of $100,000.

Translucent also seeks damages pursuant to 15 U.S.C. § 1117(a) which permits plaintiff to recover "(1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action." Because Defendants diverted Translucent's domain name to Defendant APC Wireless' domain name, Translucent lacks information about profits generated due to Defendants' illegal action. The Court will thus order Defendants to submit an accounting of all profits derived from *translucentcommunications.com* and all websites linked thereto from October 7, 2008 to the present. This information is necessary regarding other counts. Since Translucent requested the maximum statutory damages pursuant to § 1117(d), which the Court has granted, Translucent is not also entitled to profits and damages pursuant to § 1117(a).

 4. Attorney's Fees and Costs due to Cybersquatting Violation

Translucent seeks to recover "the costs of the action" as well as attorney's fees. An award of attorney's fees is not automatic under the ACPA. "The court in exceptional cases may

award reasonable attorney fees to the prevailing party."  15 U.S.C. § 1117(a).

What are "exceptional cases?"  According to the Fourth Circuit a case is exceptional "if the defendant's conduct was 'malicious, fraudulent, willful or deliberate in nature.'  In other words, a prevailing plaintiff must 'show that the defendant acted in bad faith.'"  *PETA*, 263 F.3d at 370 (citations omitted).  The record clearly establishes Defendants' conduct, in seizing Translucent's domain name and redirecting internet users to Defendant APC Wireless' domain name, was malicious, fraudulent, willful, deliberate.  The Court has outlined in great detail how Defendants acted in bad faith.  *See supra.*  The Court finds this is an exceptional case and that Translucent is entitled to reasonable attorney's fees.

G.      Violation of Maryland's Unfair Competition Law

Under Maryland law a party commits the tort of unfair competition when the party damages or jeopardizes "another's business by fraud, deceit, trickery or unfair methods of any sort."  *Baltimore Bedding Corp. v. Moses*, 182 Md. 229, 237, 34 A.2d 338, 342 (1943).  Although the doctrine of unfair competition was originally applicable only to trade mark cases, the doctrine is no longer limited to a particular kind of business activity.

> What constitutes unfair competition in a given case is governed by its own particular facts and circumstances.  Each case is a law unto itself, subject, only, to the general principle that all dealings must be done on the basis of common honesty and fairness, without taint of fraud or deception.

*Id.*  This doctrine remains a viable cause of action under Maryland law.  *See Baron Fin. Corp. v. Natanzon*, 471 F. Supp. 2d 535, 546-48 (D. Md. 2006); *Southern Volkswagen, Inc. v. Centrix Fin., LLC*, 357 F. Supp. 2d 837, 852-53 (D. Md. 2005).

Defendants seizing control of Translucent's domain name by claiming to be the registrant

and then redirecting all internet traffic for Translucent's domain name to Defendant APC

Wireless' domain name are hallmarks of fraud, deceit, trickery.  The principle underlying the

common law tort of unfair competition is old-fashioned honesty.  "'One man may not reap where

another has sown, nor gather where another has strewn.'"  *Electronics Store, Inc. v. Cellco*

*P'ship*, 127 Md. App. 385, 407, 732 A.2d 980, 991-92 (1999) (citation omitted)).  Defendant

APC Wireless is a competitor of Translucent in the cellular telephone industry.  Translucent has

been damaged by Defendants' fraud, deceit, trickery.  The total amount of losses directly

attributable to Defendants' fraud, deceit, trickery is presently unknowable.

> Q:    Are you able to quantify in dollars the damages that you
> believe are attributable to the actions undertaken by Paul Greene
> with respect to the Website?
>
> A:    I believe it would be very difficult to quantify the exact
> amount, as I'm sure even to this day we are potentially losing
> business because it's still pointing to APC Wireless.  For me to
> quantify how much, there is no way of telling.
>
> Q:  Okay.
>
> A:   I haven't done business with a client in months.  And they e-
> mailing me and going to my Website to call me.  They are calling
> APC Wireless.  Perhaps that's a question that could be directed to
> APC.  How many calls they are receiving on Translucent.

Pl.'s Mem., Ex. 1B (Schmulian Dep. 242:5 – 19).

Defendants must provide an accounting to Translucent of the profits derived from

Defendants' use of Translucent's domain name from October 7, 2008 to the present.

Translucent seeks an award of punitive damages.  Translucent will have an opportunity to

present evidence to trier of fact on this matter.

## **CONCLUSION**

For the foregoing reasons the Court finds there are no genuine issues as to any material fact and thus Translucent is entitled to judgment *as to liability only* as a matter of law.  Fed. R. Civ. P. 56(c).  An Order will be entered separately.


  February 24, 2010                                          /s/
          Date                             WILLIAM CONNELLY
                                   UNITED STATES MAGISTRATE JUDGE